UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| J.A.J., a minor, through his mother and guardian ad litem CRYSTAL BOTELLO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> EFRAIN JIMENEZ, et al., <br><br> Defendants. | No.  1:18-cv-01138-KES-SKO <br><br><br> ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT EFRAIN JIMENEZ'S MOTION FOR SUMMARY JUDGMENT <br><br> (Doc. 62) |

This case arises from the August 20, 2017, fatal officer-involved shooting of Santana Juarez Gonzalez ("Juarez").  Juarez's son, J.A.J., and mother, Teresa Gonzalez-Velazquez, allege that in shooting Juarez, who was unarmed, twice in the back, defendant Efrain Jimenez used excessive force in violation of the First, Fourth and Fourteenth Amendments as well as state law. Defendant Jimenez moves for summary judgment.  Doc. 62.  For the reasons set forth below, the motion for summary judgment is granted in part and denied in part.

1

I.   **BACKGROUND**

A.   **Factual Background**

The record, viewed in the light most favorable to plaintiffs, shows the following.[1]  In August 2017, defendant Jimenez was an officer with the California Highway Patrol ("CHP") and was assigned to patrol the southeast portion of Madera County.  DSUF No. 2.  On August 20, 2017, at about 2:00 p.m., defendant Jimenez received a radio transmission from the CHP dispatcher regarding an armed carjacking at a gas station.  DSUF No. 3; Doc. 78-2 at 118.  The CHP dispatcher stated that three Hispanic males were involved in the carjacking and that a silver-colored handgun was pointed at a woman and her child.  DSUF Nos. 3–4; Doc. 78-2 at 118.

As Jimenez responded to the gas station, the CHP dispatcher provided updates about the incident.  DSUF No. 6.  One of the suspects was described as having short black spikey hair and wearing a black shirt.[2]  DSUF No. 3.  CHP Officers Jobinger, Martinez, and Kelsey also heard the radio transmission of the carjacking and responded to the incident.  DSUF Nos. 8–9.  Deputies from the Madera County Sheriff's Office ("MCSO") responded to the incident as well.  DSUF No. 10.

Jimenez learned from the dispatcher that witnesses had detained two of the suspects involved in the carjacking and were holding them about a half mile south of the gas station at Avenue 14½ and Skyview ("Skyview location").  DSUF No. 6.  Jimenez responded to the location of the two suspects.  DSUF No. 6.  Jimenez also learned from the dispatcher that the third suspect, who had taken the vehicle, had crashed the vehicle at State Route 41 and Avenue 12.  DSUF No. 7.

---

[1] The facts that follow are undisputed unless otherwise noted and are derived from the undisputed facts submitted by defendant Jimenez and responded to by plaintiffs (Doc. 78) ("DSUF")); the additional undisputed facts submitted by plaintiffs and responded to by defendant Jimenez (Doc. 82-1 ("PSUF")); as well as declarations and exhibits attached to the motion and opposition, including video footage.  Where the parties dispute a fact, the record is viewed in the light most favorable to plaintiffs.

[2] Plaintiffs clarify that the clothing and hair description was not part of the initial dispatch transmission but was later provided to the officers, including Jimenez, while Jimenez was enroute to the gas station.  DSUF No. 3a.

2

When Jimenez arrived at the Skyview location, he patted down the two suspects, secured them in separate patrol vehicles, and questioned them about the gun used in the carjacking. DSUF No. 11.  Neither suspect had a gun, and neither suspect responded to Jimenez's questions regarding whether the third suspect who stole the vehicle had the gun.  *Id.*  Jimenez then headed towards the location where the stolen vehicle had crashed and assisted MCSO deputies and Officers Jobinger and Martinez with the perimeter, which officers had set up because the suspect had fled on foot after the crash.  DSUF No. 12.

MCSO Sergeant Kerber requested two K-9 units to report to the location of the crash to assist with the perimeter search.  DSUF No. 13.  An MSCO Deputy Reserve spotted Juarez and alerted other law enforcement of Juarez's location.  DSUF No. 14.  Officer Kensey encountered Juarez walking on the shoulder of Avenue 12, exited his vehicle, and ordered Juarez to get down on the ground.  DSUF Nos. 15–16.  Juarez ran towards Kensey and then made a left turn into an orchard.  DSUF No. 16.  As Juarez was running towards Kensey, Kensey observed and reported seeing a bulge in Juarez's pocket.  Officer Jobinger repeated Kensey's transmission that he had seen the bulge and that Juarez was possibly still armed.  DSUF No. 22; Doc. 78-2 at 5.

The parties dispute whether Kensey observed what appeared to be the outline of a revolver in Juarez's left front pocket or whether Kensey simply observed a bulge in Juarez's pocket.  *See* DSUF Nos. 17, 17a.  The extent to which other officers, including Jimenez, directly heard Kensey's report of what he saw is also disputed.  *See* DSUF Nos. 17a, 20, 20a.  But it is undisputed that Jobinger transmitted that Kensey had advised that the suspect had a bulge in his pocket and was possibly still armed, and that Jimenez heard Jobinger's transmission.  DSUF No. 22.  Viewing the record in the light most favorable to plaintiffs, a reasonable jury could find that the information relayed to Jimenez was that Juarez had a bulge in his pocket and was possibly armed.  *See* Jimenez Dep. 137:7–21 ("And then there was another message that Officer [Jobinger] had put out stating what Officer Kensey had seen . . . . [i]t was similar to what Officer Kensey had put out because he was just relating what Officer Kensey had related to him."); Doc. 78-2 at 5.

Officer Kensey ran to the passenger side of his patrol car, retrieved his canine, pointed out

Juarez to the canine, gave the command to apprehend, and released the canine into the orchard. DSUF No. 18.  Kensey followed the canine into the orchard, but after the canine lost sight of Juarez, Kensey called the canine back to him.  DSUF No. 19.  Jobinger arrived near Kensey's location, and Kensey and his canine got into Jobinger's patrol vehicle.  DSUF No. 23.

Jimenez responded to Kensey's location, which was over five miles from Jimenez's earlier location at the car crash perimeter.  DSUF Nos. 12, 21.  After Juarez exited the orchard, CHP AirOps started providing the CHP officers with updates of Juarez's location.  DSUF No. 24. The officers traveled on a dirt road for about half a mile before spotting Juarez running through an open field with rolling hills.  DSUF No. 25.

Officers Kensey and Martinez, the canine, and two MCSO deputies pursued Juarez on foot and gave him multiple orders to stop, but Juarez ignored their commands.  DSUF No. 25. Kensey did not deploy the canine while pursuing Juarez in the open field because Juarez was about 200 yards away from the officers.  DSUF No. 26.  As Martinez and Kensey returned to the patrol vehicle, Jimenez and Jobinger drove through a dirt road to try to get ahead of Juarez. DSUF No. 27.

CHP AirOps transmitted that Juarez was running towards the Branch & Vine Event Center, also known as the "Red Barn," and Martinez transmitted that someone needed to get to the Red Barn. [3]  DSUF No. 29.  Jimenez heard both transmissions.  *Id.*  At the time of the incident, the Red Barn was hosting a function where children were present.  DSUF No. 1.  The AirOps video shows that there was an inflatable bounce house near the Red Barn.  *See* Doc. 78, Ex. 8 at 10:14.  MCSO Sergeant Kerber directed the MCSO's K-9 units to go to the Red Barn because he was concerned that Juarez would reach the partygoers at the Red Barn, and he did not want the pursuit to reach a populated area or for the incident to become an active shooter or hostage situation.  DSUF No. 31.  Jimenez and Jobinger, in separate patrol vehicles, drove through the field in pursuit of Juarez.  DSUF No. 33.

Jobinger stopped his vehicle when he was in an open orchard and gave a short foot pursuit

---

[3] The Red Barn center is in Madera, California.  DSUF No. 1.

4

while yelling at Juarez to stop. DSUF No. 34. Jimenez saw Jobinger exit his patrol vehicle when Jobinger was south of Juarez. DSUF No. 35. After Jobinger realized that he was not going to catch Juarez on foot, Jobinger returned to his vehicle. DSUF No. 34. Jimenez exited his vehicle, and he heard the CHP dispatcher announce, "shots fired."[4] DSUF No. 35. Jimenez had his rifle when he exited his vehicle and pursued Juarez on foot. DSUF No. 38. Jimenez lost radio contact as he pursued Juarez on foot.[5] DSUF No. 35. Jimenez proceeded towards Juarez on foot, and yelled various commands, including for Juarez to stop. *Id*.

MSCO Sergeant Kerber, who was also on foot in the open orchard area, was about 100 to 150 yards from Jimenez when Jimenez exited his vehicle and began to pursue Juarez on foot. DSUF No. 36. Around this time, Jobinger also left his patrol vehicle and began pursuing Juarez again on foot. DSUF No. 37. Jobinger was traveling along an elevated road and saw Jimenez pursuing Juarez. *Id*.

Due to the uneven terrain, Jimenez lost sight of Juarez several times for a few seconds at a time. DSUF No. 39. Jimenez pursued Juarez on foot for about three-quarters of a mile before he fired the first round. DSUF No. 41. As Jimenez pursued Juarez, he ordered Juarez to stop, get to the ground, and show his hands. DSUF No. 42a. Several patrons at the Red Barn were able to see Juarez and Jimenez, including one witness who recorded part of the pursuit. From the time the patrons of the Red Barn first became aware of Juarez to the time Jimenez fired his first shot, several Red Barn patrons heard Jimenez yelling at Juarez to stop and get on the ground. DSUF No. 43. At least two patrons heard Jimenez yell for the patrons to get inside. DSUF No. 44.

---

[4] The parties dispute whether Jimenez exited his vehicle before or after the dispatcher announced that shots had been fired. DSUF No. 35, 35a. A reasonable jury could find that the MVARS video suggests that Jimenez exited his vehicle before the CHP dispatcher transmitted that shots were fired because sounds of what appears to be a car unlocking and a closing door can be heard shortly before the "shots fired" transmission is made. *See* DSUF No. 35a.

[5] Plaintiffs argue that Jimenez did not lose all radio contact when he pursued Juarez on foot because Jimenez continued to make reports while he was pursuing Juarez. DSUF Nos. 35, 61a. But plaintiffs provide no evidence to contradict Jimenez's evidence that he lost some or all incoming radio contact while on the foot pursuit (nor do plaintiffs specify which transmissions Jimenez allegedly did receive).

5

While Jimenez testified that during the pursuit he told Juarez that he would be shot if he did not stop, the Red Barn patrons did not hear Jimenez warn Juarez that he would be shot.[6]  *See* DSUF No. 42, 42a.

When Jimenez fired the first shot, Juarez was walking, while staggering, towards a dirt road that led to the Red Barn.[7]  Doc. 78, Ex. 18.  Juarez, who had removed his shirt during the pursuit, was holding his shirt in his left hand.  *Id*.  Juarez's right hand was near his waistband or right front pocket and was not visible to Jimenez.[8]  DSUF Nos. 45a; 48.  Jimenez repeatedly ordered Juarez to get his hands out of his pocket.  DSUF No. 47.  Juarez continued to approach the dirt road leading to the Red Barn and staggered to the left and then to the right. [9]  DSUF

[6] The parties dispute what orders Jimenez gave to Juarez.  *See* DSUF No. 42, 42a.  Jimenez contends that he ordered Juarez to stop or he would be shot.  DSUF No. 42.  Plaintiffs dispute that Jimenez warned Juarez that deadly force would be used, and instead argue that Jimenez ordered Juarez to stop, show his hands, and to get on the ground.  DSUF No. 42a.  Witnesses Huaracha, Gonzales, and Galindo, who were attending the event at the Red Barn and observed the final moments before Jimenez shot Juarez, did not hear Jimenez tell Juarez he would be shot.  *Id*.  Viewing the record in the light most favorable to plaintiffs, a reasonable jury could find that before he fired the first shot, Jimenez ordered Juarez to stop, show his hands, and get on the ground, but did not tell Juarez he would be shot unless he stopped.

[7] The parties dispute whether Juarez was running or walking or staggering to the Red Barn immediately before Jimenez fired the first shot.  DSUF No. 45, 45a, 53, 53a.  A video recorded by Gonzales, a patron at the Red Barn, shows Juarez walking in the moments before the first shot.  Based on the video, a reasonable jury could find that Juarez was staggering towards the dirt road that led to the Red Barn moments before Jimenez shot him.  *See* Doc. 78, Ex. 18.

[8] The parties dispute whether Juarez was reaching for something in his waistband or pocket immediately before he was shot.  DSUF No. 45, 45a.  The video recorded by a patron at the Red Barn shows Juarez's left hand near his waistband or pocket.  *See* Doc. 78, Ex. 18.  A witness testified that Juarez appeared to be holding up his pants.  DSUF No. 45a; Huaracha Dep. at 58:19–59:19.  A reasonable jury could find that Juarez was not reaching for something in his pocket, but that Juarez's left hand was near his pocket or waistband.

[9] The parties dispute whether Juarez started to turn towards his right immediately before Jimenez fired the first shot.  DSUF No. 48 and 48A.  Jimenez testified that Juarez started to turn towards his right immediately before Jimenez fired that first shot.  DSUF No. 48.  Gonzales, a patron of the Red Barn, stated that Juarez was shot as he was walking away from Jimenez and facing away from Jimenez.  DSUF No. 48a. The AirOps video does not clearly show whether Juarez was starting to turn to the right before Jimenez shot him.  Whether Juarez started to turn immediately before Jimenez shot him is a question of fact for the jury.  Viewing the record in the light most favorable to the plaintiffs, Juarez was walking away from Jimenez, staggering to his left and then to his right, with his back to Jimenez immediately before he was shot.

6

No. 48a.  Juarez was about 50 to 75 yards from the event at the Red Barn when Jimenez fired the first shot and struck Juarez in the back.[10]  Officers had not yet arrived at the Red Barn at the time Jimenez fired the first shot, DSUF No. 51, but the video shows a patrol vehicle had arrived on an elevated road close to Jimenez and Juarez, apparently to cut off Juarez.  Officers Martinez and Kensey had arrived in a patrol vehicle on the elevated dirt road and were parking when they heard the shot.  DSUF Nos. 56, 56a; Martinez Dep. 25:11–14.

After Jimenez fired the first round, Juarez continued moving and Jimenez continued to shout for Juarez to stop.[11]  DSUF No. 52, 53.  Within seconds of firing the first shot, Jimenez fired a second shot to Juarez's back.[12]  DSUF No. 54.  After Jimenez fired the second shot, Juarez fell to the ground.  DSUF No. 57.  When Jimenez fired the second shot, no law enforcement officers had arrived yet at the Red Barn, DSUF No. 55, but the video shows other officers had arrived at the field and one officer reached Juarez within seconds after he fell to the ground, and before Jimenez reached Juarez.

CHP officers immediately started life saving measures on Juarez, but Juarez was pronounced dead at the scene.  DSUF Nos. 58, 59.  Within a minute of the first shot, multiple patrol vehicles arrived at the Red Barn.  Doc. 78, Ex. 8 at 8:48–9:48.  Juarez was unarmed when

---

[10] The parties dispute how far away Juarez was from the Red Barn when Jimenez fired the first shot.  *See* DSUF No. 49 and 49a.  Jimenez testified that Juarez was about 15 to 25 yards away from the Red Barn when he fired the first shot.  DSUF No. 49.  Ramirez and Gonzales, patrons of the Red Barn, estimate that Juarez was at least 50 yards away from the Red Barn.  DSUF No. 49a.  Huaracha, a patron of the Red Barn, estimates that Juarez was about 70 yards away.  *Id.*  MCSO Sergeant Kerber estimates that Juarez was found about 75 yards from the Red Barn party area.  *Id.*  A reasonable jury could find that Juarez was about 50 to 75 yards away from the Red Barn when Jimenez fired the first shot.

[11] The parties dispute whether Jimenez ordered Juarez to stop after he fired the first shot.  DSUF No. 53, 53a.  Jimenez could not recall whether he gave any additional commands to Juarez before he fired the second shot.  DSUF No. 53a.  Gonzales, a patron at the Red Barn, testified that Jimenez continued to shout for Juarez to stop after he fired the first shot.  DSUF No. 53.

[12] The parties dispute whether the second shot was fired a few or several seconds after the first shot.  DSUF No. 54, 54a.  Nonetheless, it is undisputed that Jimenez fired the second shot within seconds of firing the first shot.  When Jimenez fired the shots, there was a dirt berm in Jimenez's field of fire and Jimenez aimed for Juarez's torso.  DSUF No. 60.

7

he was shot.  PSUF No. 78.  Jimenez does not claim that he saw a gun in Juarez's hands at any point.

### B.    Procedural Background

Plaintiffs assert constitutional claims under 42 U.S.C. § 1983 and state law claims against defendant Jimenez.[13]  First Amended Complaint ("FAC"), Doc. 9.  In their first amended complaint, plaintiffs allege federal law claims for violations of Juarez's Fourth Amendment right to be free from excessive force, and J.A.J. and Gonzalez-Velazquez's Fourteenth Amendment right to familial association.[14]  Plaintiff J.A.J. also asserts state law claims for negligence, assault and battery, and violation of California Civil Code § 52.1 ("Bane Act").

Defendant Jimenez moves for summary judgment on plaintiffs' federal and state law claims on the basis that Jimenez used reasonable force and is entitled to qualified immunity.  Doc. 62.  Plaintiffs filed an opposition and a separate statement of disputed issues of material facts.[15]  Docs. 78, 79.  Jimenez filed a reply.

## II.    LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome

---

[13] Plaintiffs also named A.J., a minor, as a defendant in this action, individually and as a successor in interest for Juarez.  FAC.  A.J. has not filed an answer or appeared in this action.  Plaintiffs' motion for default against A.J. was denied without prejudice.  Doc. 39.  For purposes of the present motion, this Order refers to plaintiffs and defendant Jimenez as "the parties."

[14] The plaintiffs and defendant Jimenez previously stipulated to the dismissal of the claims brought by Juarez's father Santana Juarez Jimenez.  Doc. 43.

[15] In a declaration in support of their opposition, plaintiffs indicated that there was a discovery issue related to the CHP AirOps video.  Doc. 78-1.  The magistrate judge subsequently ordered that Jimenez amend his discovery responses to certify, under penalty of perjury, that: (1) there was no "raw" footage of the CHP AirOps Video, and (2) the footage produced to plaintiffs constituted a "complete and true copy of the original footage" of the CHP AirOps Video and contained everything that was recorded of the incident on that date.  Doc. 92.  The parties have not identified any further discovery issue regarding the CHP AirOps video.

of the suit under the governing law." *Id.*  The parties must cite "particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1).  The court then views the record in the light most favorable to the nonmoving party and draws reasonable inferences in that party's favor.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).  The nonmoving party's version of the facts need not be credited if it is blatantly contradicted by video evidence.  *Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018).  The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  *Matsushita*, 475 U.S. at 587 (citations omitted).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  If "the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party."  *Soremekun*, 509 F.3d at 984; *Moreno v. Baca*, 431 F.3d 633, 638 (9th Cir. 2005) ("[T]he moving defendant bears the burden of proof on the issue of qualified immunity.").

If the moving party meets its initial burden, the burden shifts to the nonmoving party to produce evidence supporting its claims or defenses and "establish that there is a genuine issue of material fact."  *Matsushita*, 475 U.S. at 585.  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Id.* at 586 (citation omitted).  "The mere existence of a scintilla of evidence in support of the [nonmovant's] position" is insufficient to survive summary judgment.  *Anderson*, 477 U.S. at 252.

To establish the existence of a factual dispute, the nonmoving party need not establish a material issue of fact conclusively in its favor.  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *Anderson*, 477 U.S. at 252 (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).  In addition, "[t]he mere existence of video footage of the incident does not foreclose a

9

genuine factual dispute as to the reasonable inferences that can be drawn from that footage." *Vos*, 892 F.3d at 1028 (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

"If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment. But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000) (citing *Celotex*, 477 U.S. at 322).

## III.    DISCUSSION

### A.    Section 1983 Claims

Under 42 U.S.C. § 1983, a private right of action exists against anyone who, "under color of" state law, causes a person to be subjected "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. The parties do not dispute that Jimenez's actions were under color of state law. However, the parties dispute whether Jimenez's use of force deprived Juarez and plaintiffs of their constitutional rights under the First, Fourth, and Fourteenth Amendments, and whether Jimenez is entitled to qualified immunity. Doc. 62.

Qualified immunity shields government officials from liability unless "(1) the [evidence], taken in the light most favorable to the party asserting injury, show[s] that the officer's conduct violated a constitutional right, and (2) the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood her conduct to be unlawful in that situation." *Calonge v. City of San Jose*, 104 F.4th 39, 44 (9th Cir. 2024) (quoting *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "While there does not have to be a case directly on point, existing precedent must place the lawfulness of the [conduct] beyond debate." *Villanueva v. California*, 986 F.3d 1158, 1165 (9th Cir. 2021) (internal quotation marks and citations omitted). Because whether Jimenez's conduct violated a

10

constitutional right is a component of the qualified immunity analysis, the Court proceeds directly to consideration of qualified immunity.

### 1. Fourth Amendment Excessive Force Claim

#### a. Constitutional Violation

Claims of excessive force during an arrest are examined under the Fourth Amendment's prohibition against unreasonable seizures. *Id.* at 1169. The inquiry is whether an officer's actions were reasonable under the totality of the circumstances. *Id.* The Court should carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing government interests at stake." *Hart v. City of Redwood City*, 99 F.4th 543, 549 (9th Cir. 2024) (internal quotation marks and citation omitted).

"The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). In this context, reasonableness is to be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)). Because this is an objective inquiry, an officer's intentions – good or ill – do not bear on whether he employed excessive force. *Id.* at 397. In addition, "[o]nly information known to the officer at the time the conduct occurred is relevant." *S.R. Nehad v. Browder*, 929 F.3d 1125, 1132 (9th Cir. 2019). "The reasonableness standard nearly always requires a jury to sift through disputed factual contentions, so summary judgment in an excessive-force case should be granted sparingly.'" *Est. of Aguirre v. Cnty. of Riverside*, 29 F.4th 624, 628 (9th Cir. 2022) (internal quotation marks and citation omitted); *see also Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014) ("summary judgment should be granted sparingly in excessive force cases.").

##### i. Juarez's Fourth Amendment Interests

"Deadly force is the most severe intrusion on Fourth Amendment interests because an individual has a 'fundamental interest in his own life' and because, once deceased, an individual can no longer stand trial to have his 'guilt and punishment' determined." *Est. of Aguirre*, 29 F.4th

11

at 628 (internal citation omitted).; *A. K. H. ex rel Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016) ("The use of deadly force implicates the highest level of Fourth Amendment interests both because the suspect has a 'fundamental interest in his own life' and because such force 'frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment.'").  Because Jimenez used deadly force against Juarez, the Court examines whether the governmental interests at stake justified the use of deadly force.  *Vos*, 892 F.3d at 1031.

ii.      *The Government's Interests*

The government's interests include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396.  "The immediacy of the threat posed by the suspect is the most important factor."  *Gonzalez*, 747 F.3d at 793 (citing *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc).  "These factors are not exclusive, and we consider the totality of the circumstances."  *Id.* at 793–94 (citing *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)).

The "severity of the crime" factor weighs in favor of Jimenez.  Juarez was a suspect in an armed carjacking, which is a felony.[16]  Jimenez and the other officers were informed that an armed carjacking had taken place, and the officers had taken two of the suspects into custody but had not located the gun.  It was reasonable for the officers, including Jimenez, to proceed in their pursuit of Juarez on the belief that he was possibly armed.  But, as addressed below, Juarez did not brandish a weapon, and no officer saw Juarez holding a weapon at any point during the several mile long foot chase.  Juarez was found to be unarmed at the time he was shot.

The *Graham* factor concerning whether the suspect was resisting arrest or attempting to evade arrest by flight also weighs in favor of Jimenez.  The parties do not dispute that Juarez was fleeing from arrest when Jimenez shot him, and that Juarez failed to comply with Jimenez's

---

[16] In California, "'[c]arjacking' is the felonious taking of a motor vehicle in the possession of another, from his or her person or immediate presence, or from the person or immediate presence of a passenger of the motor vehicle, against his or her will and with the intent to either permanently or temporarily deprive the person in possession of the motor vehicle of his or her possession, accomplished by means of force or fear."  Cal. Penal Code § 215(a).

orders to stop and to show his hands. *See* Doc. 79 at 27; Jimenez Dep. 91:16–92:5. Plaintiffs submit that Juarez was "actively resisting" arrest. PSUF No. 74.

The most important *Graham* factor is the immediacy of the threat posed to the safety of the officer or others. *Nehad*, 929 F.3d at 1132. Deadly force is reasonable only if a suspect "poses a significant threat of death or serious physical injury to the officer or others." *Gonzalez*, 747 F.3d at 793 (internal quotation marks and citation omitted). "[T]he mere fact alone "that the suspect was armed with a deadly weapon does not render the officers' response per se reasonable under the Fourth Amendment." *Napouk v. Las Vegas Metro. Police Dep't*, 123 F.4th 906, 917 (9th Cir. 2024) (emphasis omitted); *Nehad*, 929 F.3d at 1134 ("That a person is armed does not end the reasonableness inquiry."). Rather, courts "look at the totality of the circumstances to determine whether each individual who was holding a weapon was reasonably perceived as posing a threat at the moment the officer acted." *Napouk*, 123 F.4th at 918.

Juarez was not armed when he was shot. "Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of an immediate threat, and in those situations courts will not hold that they have violated the Constitution." *Est. of Strickland v. Nevada County*, 69 F.4th 614, 621 (9th Cir. 2023) (quotation marks and citations omitted) (holding that officers' perception that a plastic, airsoft replica gun was a real firearm was not unreasonable). "When an officer's use of force is based on a mistake of fact, we ask whether a reasonable officer would have or *should* have accurately perceived that fact." *Id.* (quotation marks omitted) (citing *Torres*, 648 F.3d at 1124). "Whether the mistake was an *honest* one is not the concern, only whether it was a *reasonable* one." *Nehad*, 929 F.3d at 1133 (quotation marks omitted). It was not unreasonable for Jimenez to believe that Juarez was armed because Juarez was one of three suspects involved in an armed carjacking, the other two suspects had been apprehended without a gun, and another officer had reported seeing a bulge in Juarez's pocket.

But even if Jimenez reasonably believed that Juarez was armed, there is a genuine dispute as to whether Juarez posed an immediate threat to the safety of Jimenez, or to the patrons of the Red Barn, when Jimenez shot him. As there are two crucial factual disputes regarding the immediacy of the threat, summary judgment is inappropriate.

13

The first significant dispute is whether Juarez was close enough to the Red Barn such that Jimenez reasonably believed that, if he did not shoot Juarez at that moment, Juarez would pose a threat to the patrons at the Red Barn, 50 to 75 yards away. A reasonable jury could credit plaintiffs' version of events and find that a reasonable officer would not have considered Juarez to pose an imminent threat to the patrons of the Red Barn, because Juarez was walking relatively slowly and was staggering away from Jimenez, Juarez was 50 to 75 yards from the Red Barn, other officers were arriving on the scene, and, although Juarez's hands were not visible to Jimenez at that moment, Jimenez never saw Juarez with a weapon at any point. *Glenn v. Washington Cnty.*, 673 F.3d 864, 879 (9th Cir. 2011) ("In deadly force cases, where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."); *Est. of Lopez by & through Lopez v. Gelhaus*, 871 F.3d 998, 1010–11 (9th Cir. 2017) (when viewing the facts in the light most favorable to plaintiffs, officer violated decedent's Fourth Amendment right to be free from excessive force by shooting teenager holding a toy gun, pointed down, while standing in an open field).

Given that Juarez had just walked or run multiple miles through orchards and was staggering as he walked away from Jimenez, a reasonable jury could find that it was not reasonable for Jimenez to believe that Juarez would be able to quickly reach the patrons of the Red Barn. Juarez had traveled several miles on foot through orchards while being pursued by various officers. Jimenez testified that, when Juarez got tired from running, Juarez would begin to walk. Jimenez Dep. 188:2–9. The video footage captured by Gonzales, a patron of the Red Barn, shows Juarez walking and staggering towards the dirt road that led to the Red Barn. Both Jimenez and Jobinger testified that they were also exhausted from pursuing Juarez. Jobinger Dep. 47:2–11; Jimenez Dep. 46:16–18. A reasonable jury could find that Jimenez knew other officers were arriving to assist in apprehending Juarez, who was staggering and was 50 to 75 yards away from the Red Barn.

Jimenez knew that both CHP and MCSO officers were assisting in the pursuit of Juarez, that a CHP AirOps plane was tracking and reporting Juarez's movements, and that Martinez and

14

the CHP AirOps had directed officers to go to the Red Barn. Although it would be reasonable for Jimenez to be concerned for the safety of the patrons of the Red Barn, a reasonable jury could find that it was not reasonable for Jimenez to believe that the threat was so immediate that he needed to shoot a staggering Juarez in the back at that moment, particularly as other officers were arriving on scene, to protect the patrons of the Red Barn from an immediate threat. Indeed, another officer reached Juarez within a few seconds of Juarez being shot and falling to the ground, and multiple patrol vehicles reached the Red Barn less than a minute after the first shot.

The second significant dispute is whether Juarez made a rapid movement immediately before he was shot, such that Jimenez reasonably believed that he was in danger of being shot. Jimenez testified that he was concerned that Juarez had a gun and that he was going to turn around and shoot him. DSUF No. 46. But several patrons at the Red Barn witnessed the shooting and provide a conflicting account. Gonzales, a patron of the Red Barn, stated that Juarez was shot as he was walking away from, and facing away from, Jimenez. DSUF No. 48a. A reasonable jury could credit Gonzales's testimony, and discredit Jimenez's testimony, and find that Juarez was facing away from Jimenez when he was shot and that he did not turn to the right immediately before Jimenez shot him.

Although the video footage captured by Gonzales does not show the moment that Juarez was shot, the video depicts the moments right before Juarez was shot. A jury could reasonably interpret the video to depict that Juarez was stumbling or staggering as he walked to the dirt road and was not making furtive movements. The CHP AirOps video provides a view of the moment that Juarez was shot but does not conclusively show that Juarez was rapidly turning right as Jimenez asserts. A reasonable jury, viewing the video evidence along with the witness testimony, could credit plaintiffs' version of events and find that Juarez did not make a furtive movement, but, rather, was staggering as he walked away from Jimenez.

Summary judgment is inappropriate because there is a genuine dispute of fact as to whether Jimenez reasonably perceived that Juarez made a furtive movement and as to whether Juarez posed an imminent threat such that deadly force was warranted. *See Longoria v. Pinal County*, 873 F.3d 699, 706–07 (9th Cir. 2017) (reversing summary judgment for officers because

15

there was a genuine dispute of material fact as to whether the decedent assumed a threatening stance at the time the officer shot him).  A reasonable jury could potentially credit Jimenez's version of events and find that he reasonably believed that Juarez was armed and that Juarez made a furtive movement by turning right, and that a reasonable officer in that situation would find that to present an immediate threat warranting the use of deadly force.  *See Est. of Strickland*, 69 F.4th at 620 (internal quotation marks and citation omitted) (Where "the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat.").  But a reasonable jury could also find that Juarez did not make a furtive movement, and that a reasonable officer would have concluded that Juarez was simply staggering with fatigue while walking away from Jimenez, when Jimenez shot him twice in the back.  *See Foster v. City of Indio*, 908 F.3d 1204, 1211 (9th Cir. 2018) ("It is clearly established law that shooting a fleeing suspect in the back violates the suspect's Fourth Amendment rights."); *Peck v. Montoya*, 51 F.4th 877, 888 (9th Cir. 2022) ("where, as here, a jury could find that no such [furtive] movement occurred, our cases clearly establish that the use of deadly force would be impermissible.").

Although Juarez was a suspect in an armed carjacking, Juarez did not make any verbal threats or brandish any weapon at Jimenez or any other officer.  Juarez did not have a weapon at the time he was shot, and Jimenez does not claim that he ever saw a weapon on Juarez.  Jimenez asserts that it looked to him as if Juarez was struggling to pull something out of his pocket. DSUF No. 45.  In contrast, the witnesses at the Red Barn, who had a view of Juarez's front, did not see Juarez attempting to pull anything out of his pocket and did not see Juarez with a weapon. It is for the jury to resolve such factual discrepancies.

Other relevant factors in the balancing include "the availability of less intrusive force" and "whether proper warnings were given." *Hughes v. Kisela*, 862 F.3d 775, 780 (9th Cir. 2016), *cert. granted, rev'd on other grounds*, 584 U.S. 100 (2018).  Regarding the availability of less intrusive force, Jimenez knew that other CHP officers and MCSO officers had been directed to the Red Barn and were arriving, and that canine units were assisting with the arrest.  At least four other officers reached the location of the shooting in the field within a minute of the first shot.

16

When an officer knows additional officers are en route to the scene, "[h]e was, or should have been, aware that the arrival of those [additional] officers would change the tactical calculus confronting him, likely opening up additional ways to resolve the situation[.]" *Bryan*, 630 F.3d at 831.

Before the use of deadly force, an officer must, "where feasible," issue a warning. *Est. of Aguirre*, 29 F.4th at 628 (internal quotation marks and citation omitted). The parties dispute whether Jimenez warned Juarez, before firing, that he would shoot him if he did not stop. Viewing the record in the light most favorable to the plaintiffs, a reasonable jury could find that Jimenez gave Juarez several commands throughout the foot pursuit, including ordering Juarez to stop, to show his hands, and to get on the ground, but did not warn Juarez that he would shoot him if he did not stop and/or show his hands. Although the situation was rapidly evolving due to Juarez's flight, viewing the record in the light most favorable to plaintiffs, when Jimenez fired the shots, Juarez was staggering towards the dirt road that led to the Red Barn but was still 50 to 75 yards away from the Red Barn.

A reasonable jury could find that it would have been feasible for Jimenez to issue a warning that lethal force would be used if Juarez did not stop or show his hands. There is therefore a material dispute of fact as to whether Jimenez had time to give a command that lethal force would be used, which could have lessened the need for the use of force had Juarez stopped or showed his hands. This failure to warn of the use of deadly force weighs in favor of plaintiffs. *Bryan*, 630 F.3d at 831 ("[P]olice officers normally provide [] warnings where feasible, even when the force is less than deadly, and that the failure to give such a warning is a factor to consider."). While such a warning to Juarez "may or may not have caused him to comply," a reasonable jury could find that "there was ample time to give that order or warning and no reason whatsoever not to do so." *Id.* (citing *Deorle v. Rutherford*, 272 F.3d 1272, 1284 (9th Cir. 2001).

Another relevant factor considers whether the officer was or should have been aware that the suspect was emotionally disturbed. *Glenn*, 673 F.3d at 875. Patrons at the Red Barn, who had a view of Juarez's face, observed that Juarez was staggering, walking awkwardly, and may not have been "in his mind." DSUF No. 61A. Jimenez argues that he was not in a position to

assess or ascertain whether Juarez was emotionally disturbed.  Doc. 62 at 20.  Plaintiffs have not produced evidence as to whether Juarez was in fact emotionally disturbed, and there is no evidence that Jimenez was aware of any such issue.  This factor does not weigh in favor of either party.

Considering the totality of the *Graham* factors, it is for a jury to determine whether Jimenez's use of force was reasonable when he shot Juarez twice in the back.  Construing the facts in the light most favorable to the plaintiffs, a reasonable jury could find that the use of force was unreasonable and excessive.  Under plaintiffs' version of events, which a reasonable jury could credit based on the video footage and the testimony from the patrons of the Red Barn, Juarez was walking or staggering towards a dirt road, was 50 to 75 yards away from the Red Barn, and was facing away from Jimenez, when Jimenez shot him twice in the back.  "It is clearly established law that shooting a fleeing suspect in the back violates the suspect's Fourth Amendment rights."  *Foster*, 908 F.3d at 1211.  "'Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. ... A police officer may not seize an unarmed, nondangerous suspect by shooting him dead."  *Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).

Similarly, in *Estate of Aguirre*, a police officer responded to a radio report in April 2016 that someone was destroying property with a bat-like object and had threatened a woman with a baby.  *Est. of Aguirre*, 29 F.4th at 626–628.  The man refused to comply with the officer's orders, and the officer shot him six times.  *Id.*  There were disputed facts as to whether the man was positioned to "attack" the officer or whether he was turned away, and disputed facts as to whether the man was holding the bat in a threatening way.  *Id.*  A coroner's report indicated that the man had died from gunshots to the back, which strongly suggested that the man had turned away from the officer.  *Id.*  The Ninth Circuit held that shooting a man who did not present a threat to the officer or anyone else at that moment was excessive force and violated the Fourth Amendment.  *Id.*

The Court cannot find as a matter of law that Jimenez used reasonable force under the

circumstances.  There are triable issues of material fact that will require the jury, in evaluating the evidence, to determine whether Jimenez acted reasonably under the circumstances and whether Jimenez used excessive force in violation of the Fourth Amendment.

### b.  Clearly Established Law

The Court must next decide if it was "clearly established at the time of the violation" that the use of deadly force in such circumstances was a constitutional violation.  *Espinosa v. City & County of San Francisco*, 598 F.3d 528, 532 (9th Cir. 2010) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  To determine whether a defendant violated clearly established law, courts must look to "cases relevant to the situation [the officer] confronted."  *Brosseau v. Haugen*, 543 U.S. 194, 200 (2004).  "The law is clearly established when precedent is 'clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.'"  *Calonge*, 104 F.4th at 47 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)).  "Although '[the Supreme] Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.'"  *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *White v. Pauly*, 580 U.S. 73, 78–79 (2017)).  The "general rules" from *Garner* and *Graham* "do not by themselves create clearly established law outside an 'obvious case.'"  *Id.* at 105.  At the summary judgment stage, the disputed facts are viewed in the light most favorable to plaintiffs.  *Longoria*, 873 F.3d at 709.

Viewing the record in the light most favorable to plaintiffs and construing all reasonable inferences in their favor, Jimenez shot Juarez twice in the back as Juarez, who was unarmed, walked away from him, staggering, towards a dirt road that led to the Red Barn, which was 50 to 75 yards away, while other officers were arriving at the scene to assist.  In August 2017, it was clearly established that the use of force in such circumstances was excessive.  As the Ninth Circuit has affirmed, "*Hayes v. County of San Diego* [736 F.3d 1223 (9th Cir. 2013)] and *George v. Morris* [736 F.3d 829 (9th Cir. 2013)]*,* made 'clear to a reasonable officer' that a police officer may not use deadly force against a non-threatening individual, even if the individual is armed, and even if the situation is volatile."  *Est. of Aguirre,* 29 F.4th at 629.

In *George v. Morris*, the Ninth Circuit held that it was a violation of the Fourth

19

Amendment for officers to shoot a man armed with a gun that was pointed down. *George*, 736 F.3d 829. There, officers responded to a call about a domestic disturbance involving a firearm and encountered George on his patio with a gun. *Id.* at 832. There was a material dispute of fact as to whether George manipulated the gun or pointed it directly at the officers. Although the court recognized that domestic disputes were particularly dangerous because more officers are killed or injured on domestic violence calls than on any other type of call, the concern over the officers' safety was less salient when the domestic dispute was seemingly over by the time the officers began their investigation. *Id.* at 839. The court held that if the officers shot George without an objective provocation while he used his walker and with his gun trained on the ground, a reasonable jury could find that the officers violated the Fourth Amendment. *Id.*

In *Curnow*, the Ninth Circuit affirmed the denial of summary judgment for officers because there was a genuine dispute of material fact as to whether Curnow had raised and pointed his weapon at an officer. *Curnow By & Through Curnow v. Ridgecrest Police*, 952 F.2d 21 (9th Cir. 1991). There, an officer heard yelling and, when he looked into a window, allegedly saw Curnow slapping and shaking another individual and pleading with her to wake up. *Id.* at 323. There was a gun next to Curnow. *Id.* Under the plaintiff's version of events, Curnow did not reach for his gun before the police shot him, and the first shot was to Curnow's back. *Id.* The court held that under the plaintiff's version of events, the officers were not entitled to qualified immunity because they "could not reasonably have believed the use of deadly force was lawful because Curnow did not point the gun at the officers and apparently was not facing them when they shot him the first time." *Id.* at 325.

In *Cruz v. City of Anaheim*, the Ninth Circuit reversed summary judgment for officers involved in a fatal shooting because there was a material dispute of fact as to whether Cruz posed an immediate threat to police or the public at the time he was shot. 765 F.3d 1076 (9th Cir. 2014). In *Cruz*, a confidential informant told officers that Cruz was a gang member who sold drugs and was armed with a gun. *Id.* at 1077–78. Police executed a traffic stop, but after Cruz pulled into a parking lot, Cruz attempted to escape and backed his vehicle into one of the marked patrol cars. *Id.* at 1078. When Cruz stopped, the officers got out of their vehicle with weapons

20

drawn. *Id.* The Court held that it would have been reasonable for police to shoot in those circumstances if Cruz had reached for a gun in his waistband, but that it would be clearly unreasonable if Cruz did not reach for his waistband or make a similar threatening gesture, because Cruz no longer posed a danger. *Id.* at 1078–79. "*Cruz* establishe[d] that officers may not fire at a suspect—even an armed suspect—absent some reason to believe that the suspect will soon access or use the weapon." *Peck*, 51 F.4th at 888.

At the time of the shooting, a police officer would have had fair notice that shooting a fleeing suspect in the back, without giving a warning that lethal force would be used, when the suspect was turned away from the officer and had not drawn any weapon and did not make a furtive movement, would violate the Fourth Amendment. Accordingly, Jimenez is not entitled to qualified immunity based on the present record and his motion for summary judgment as to plaintiffs' Fourth Amendment claim is denied.

### 2. Fourteenth Amendment

Defendant Jimenez also moves for summary judgment on plaintiffs' Fourteenth Amendment claim. Jimenez argues that the Fourteenth Amendment claim fails because he did not act with the intent to harm Juarez, but rather, he intended to stop Juarez from reaching the patrons at the Red Barn. Doc. 62 at 18 & n.1.

Under the Fourteenth Amendment, an officer's "conduct that 'shocks the conscience' in depriving [family members] of [a liberty interest in the companionship and society of a family member] is cognizable as a violation of due process." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). An officer's conduct shocks the conscience if (1) the officer acted with a purpose to harm for reasons unrelated to legitimate law enforcement objectives; or (2) the officer acted with deliberate indifference. *Id.* The parties agree that the purpose to harm standard applies here.[17]

"The purpose to harm standard is a subjective standard of culpability." *A.D. v. California*

---

[17] Plaintiffs do not dispute that the purpose to harm standard applies to the incident. *See* Doc. 79 at 32–33. The purpose to harm standard applies when officers made a snap judgment based on an escalating situation. *See Peck*, 51 F.4th at 893–94 (9th Cir. 2022).

*Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013).  "[I]t is the intent to inflict force beyond that which is required by a legitimate law enforcement objective that 'shocks the conscience' and gives rise to liability under § 1983[.]"  *Porter v. Osborn*, 546 F.3d 1131, 1140 (9th Cir. 2008) (internal quotation marks and citation omitted).  Although evidence of ulterior motive or bad intent is not required to satisfy the purpose to harm standard, "most meritorious purpose to harm claims will involve evidence of ulterior motive or bad intent separate and apart from evidence of an unreasonable use of force."  *Nehad*, 929 F.3d at 1139–40.

Plaintiffs argue that their Fourteenth Amendment claim survives for the same reason that their Fourth Amendment and Bane Act claims survive, arguing that Jimenez's shooting of Juarez in the back, when Juarez did not pose an immediate threat to Jimenez or others, shocks the conscious.  But, "it may be possible for an officer's conduct to be objectively unreasonable [under the Fourth Amendment] yet still not infringe the more demanding standard that governs substantive due process claims [under the Fourteenth Amendment]."  *Ochoa v. City of Mesa*, 26 F.4th 1050, 1057 (9th Cir. 2022) (internal quotation marks and citation omitted omitted).  Even if Jimenez's use of deadly force was unreasonable under the Fourth Amendment, plaintiffs have not presented evidence that the use of force was unconnected to a legitimate law enforcement objective.  *See Peck*, 51 F.4th at 890 (granting summary judgment as to Fourteenth Amendment claim because there was no evidence to suggest that deputies shot decedent "for any other purpose than their (possibly mistaken) perception of the need for self-defense.")  Jimenez testified that he believed Juarez was involved in an armed carjacking and was armed, and that he wanted to stop Juarez from reaching the patrons at the Red Barn.  Jimenez Dep. 57:9–13, 208:19–24.  MSCO Sergeant Kerber expressed concern that Juarez would reach the partygoers at the Red Barn.  DSUF No. 31.  Martinez and the CHP AirOps officer also directed officers to go to the Red Barn based on this concern.  Jimenez Dep. 57:2–8.  As such, there was a legitimate law enforcement objective in preventing Juarez from reaching the patrons at the Red Barn.  Plaintiffs do not argue that there is evidence that Jimenez's use of force lacked a legitimate law enforcement objective.

Accordingly, defendant Jimenez's motion for summary judgment as to the Fourteenth

Amendment claim is granted.

### B. State Law Claims

Defendant Jimenez also moves for summary judgment on plaintiffs' state law claims for assault and battery, negligence, and violation of the Bane Act.

#### 1. California Code Section 820.2

Defendant Jimenez argues that he is entitled to immunity from liability for the state law claims under California Government Code section 820.2. Section 820.2 provides that "a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." Cal. Gov't Code § 820.2. Section 820.2 does not confer immunity when an officer uses "unreasonable force when making an arrest or overcoming resistance to it." *Conway v. Cnty. of Tuolumne*, 231 Cal. App. 4th 1005, 1015 (2014); *Blankenhorn v. City of Orange*, 485 F.3d 463, 487 (9th Cir. 2007) (Section 820.2 does not apply to officers who use unreasonable force in making an arrest). Because the state law claims arise out of Jimenez's use of force during the attempt to arrest Juarez, and Jimenez is not entitled to summary judgment on the excessive for claim under the Fourth Amendment, Jimenez is not entitled to summary judgment on the state law claims based on Section 820.2 immunity.

#### 2. Negligence

To sustain a claim for negligence under California law, "a plaintiff must show that [the] defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." *Hayes v. Cty. of San Diego*, 57 Cal. 4th 622, 629 (2013) (internal quotation marks omitted) (alterations in original) (quoting *Nally v. Grace Comm'y Church*, 47 Cal. 3d 278, 292 (1988)). Under California law, police officers have a duty to act reasonably when using deadly force. *Id.* at 62.

Under California law, a claim for negligent use of deadly force is broader than an excessive force claim under the Fourth Amendment. *Murillo v. City of Los Angeles*, 707 F. Supp. 3d 947, 966 (C.D. Cal. 2023). Negligence is broader in that "[l]aw enforcement personnel's tactical conduct and decisions preceding the use of deadly force are relevant considerations under

23

California law in determining whether the use of deadly force gives rise to negligence liability." *Garlick v. Cty. of Kern*, 167 F. Supp. 3d 1117, 1178 (E.D. Cal. 2016) (internal quotation marks and citations omitted). Because there is a triable issue as to whether Jimenez's decision to use deadly force was reasonable under the totality of the circumstances, the motion for summary judgment is denied as to plaintiffs' negligence claim.

### 3.   Assault and Battery

Jimenez moves for summary judgment on plaintiffs' state law assault and battery claim on the basis that Jimenez's use of force was reasonable and not excessive. Doc. 62 at 21–22. Plaintiffs' cause of action for assault and battery is based on the same facts as their Fourth Amendment excessive force claim and is "measured by the same reasonableness standard of the Fourth Amendment." *Evans v. City of San Diego*, 913 F. Supp. 2d 986, 999 (S.D. Cal. 2012). "In an assault and battery action against a police officer arising from an arrest, a plaintiff must demonstrate that the officer's use of force was unreasonable." *Id.* (citing *Edson v. City of Anaheim,* 63 Cal.App.4th 1269, 1272 (1998)); *Nelson v. City of Davis*, 709 F. Supp. 2d 978, 992 (E.D. Cal. 2010) ("it is clear that an assault and battery claim against a police officer requires that unreasonable force be established."). As there are disputed issues of material fact that preclude finding that the force Jimenez used was reasonable as a matter of law, summary judgment is not warranted as to the assault and battery claim.

### 4.   Bane Act Claim

Defendant Jimenez also moves for summary judgment on plaintiffs' Bane Act claim. The Bane Act provides a cause of action for an intentional violation of a person's state or federal constitutional or legal rights by "threats, intimidation or coercion." Cal. Civ. Code § 52.1(b); *see Allen v. City of Sacramento*, 234 Cal. App. 4th 41, 67 (2015). "[T]he Bane Act does not require the 'threat, intimidation or coercion' element of the claim to be transactionally independent from the constitutional violation alleged." *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018) (internal quotation marks and citation omitted). But the Bane Act requires that the defendant have a specific intent to violate a person's rights such as the right to be free from unreasonable seizure. *Id.* "[R]eckless disregard for a person's constitutional rights is evidence of

24

a specific intent to deprive that person of those rights." *Id.* at 1045 (internal quotation marks and citation omitted).  In many cases "the existence of specific intent for a Bane Act claim is a question that is 'properly reserved for the trier of fact.'" *Chinaryan v. City of Los Angeles*, 113 F.4th 888, 907 (9th Cir. 2024) (quoting a *Hughes v. Rodriguez*, 31 F.4th 1211, 1224 (9th Cir. 2022)).

The Bane Act claim is based on the same facts as the claim for excessive force under the Fourth Amendment.  The same material factual disputes that preclude summary judgment on the Fourth Amendment claim also preclude summary judgment on the Bane Act claim.  There is a triable issue of fact as to whether Jimenez acted with reckless disregard when he shot Juarez.  If a reasonable jury concludes that Jimenez did not reasonably believe that Juarez posed an immediate threat to Jimenez or the patrons of the Red Barn, the jury could infer that Jimenez acted with reckless disregard when he shot Juarez twice in the back.  Accordingly, Jimenez's motion for summary judgment as to the Bane Act claim is denied.

## IV.   CONCLUSION

For the reasons explained above, defendant Jimenez's motion for summary judgment, Doc. 62, is granted in part and denied in part, as follows:

      a.   Denied as to the Fourth Amendment claim for excessive force;

      b.   Granted as to the First and Fourteenth Amendment claim for loss of familial relationship;

      c.   Denied as to the state law claims of negligence, battery and assault, and violation of the Bane Act.

The Clerk of the Court is directed to terminate plaintiff Teresa Gonzalez-Velazquez as a plaintiff in this action.

IT IS SO ORDERED.

Dated:   May 15, 2026

_____
UNITED STATES DISTRICT JUDGE

25