NATIONAL JUSTICE CONSULTANTS, INC.
1507 7th Street, Suite 350, Santa Monica, CA 90401 ○ 310.429.2940 ○ crchapman@earthlink.net

Ms. Diana Esquivel, Esq.
Deputy Attorney General
Offices of the California Attorney General
1300 I Street, Suite 125
Sacramento, California 94244-2550

**Federal Rule of Civil Procedure 26 (a)(2)(B)**
**REPORT OF DEFENDANT'S POLICE PRACTICES EXPERT**

Re: *J.A.J, et al., vs. California Highway Patrol Officer Efrain Jimenez, et al.*
United States District Court, Eastern District of California
Case No.: 1:18-cv-01138-DAD-SKO

Dear Ms. Esquivel,

As per my retention agreement in this case, the following is a preliminary FRCP Rule 26(a) Report based on my review of the below-listed case materials. Upon receipt of additional information and/or materials on which to opine, I reserve the right to modify my evaluation and findings accordingly.

As an expert in law enforcement policies, procedures, and training in the area of the use of deadly force, the focus of my report will be to formulate opinions regarding the appropriateness of the actions of California Highway Patrol (*hereinafter CHP*) Officer Efrain Jimenez (*hereinafter Officer Jimenez*) with regard to the shooting of Santana Juarez Gonzalez (*hereinafter Juarez*).

In reaching my conclusions herein, I did not assign credibility to any testimony or statements of Defendant, or witnesses. I assumed all facts in this case to be true solely for the purpose of analysis and then analyzed those facts against the backdrop of contemporary professional standards for police use of deadly force, the legal standards that those professional standards are based upon, and the practice, principles, and protocols recognized, relied upon, and employed in the law enforcement profession on the date of this incident. Additionally, all the opinions reached herein are derived from the foundation of my training, education, and 50 years of experience in the field of law enforcement policy, procedures, training, and supervision.

I anticipate supplementing this report if additional discovery is conducted and made available to me for review.

I. Overview of Incident:

On August 20, 2017 at approximately 2:19 p.m., suspect Juarez committed an armed carjacking robbery at the Chevron gas station located at Avenue 15 and Highway 41 in the city of Madera, California. Later investigation revealed that Juarez, accompanied by two other subjects, had previously been driving a stolen vehicle which broke down a short distance away. Juarez walked to the gas station and briefly sat on an outside table with the two other subjects. A short while later, Juarez suddenly stood up from the table, produced a handgun, and entered a vehicle parked nearby at the curb. The occupants of the vehicle, later identified as Sara Grendahl and her 12-year-old son Carson Allen, ran from the vehicle in fear for their lives. A surveillance video obtained from the Chevron gas station clearly shows Juarez with a gun in his right hand as he approaches the driver's side of Grendahl's vehicle.[1] Juarez then drove from the gas station at a high rate of speed as the other two subjects left from the gas station on foot into the surrounding neighborhood.[2]

A short time later, a citizen reported to police that the stolen vehicle had apparently crashed and was stopped positioned sideways in the middle of the road in the area of Avenue 12 and Highway 41. A witness reported that she observed a male, later identified as Juarez, run from the disabled vehicle and flee into an adjacent orchard.

Officer Jimenez responded to the location and after an extensive search assisted by other CHP officers, a CHP aircraft, and Madera County Sheriff's Office (*hereinafter MSO*) deputies they located Juarez running through the orchards a few miles from the crash site. Officer Jimenez went into foot pursuit of Juarez in an attempt to arrest him for armed carjacking robbery. As Officer Jimenez closed the distance on Juarez, he issued numerous

[1] Chevron Station Video AG004344 @ 13:44:27
[2] Chevron Station Video AG004341 @ 13:44:45

and repeated orders for Juarez to stop and show his hands. During this time, Officer Jimenez received information via his radio dispatch that Juarez was seen with what appeared to be a gun in his front pants pocket. Also, as Officer Jimenez ran behind Juarez, he observed Juarez appear to be struggling to remove an object from his right front pants pocket that could have been a gun. Additionally, as the foot pursuit proceeded, Officer Jimenez could see a large crowd of people including children present on the grounds outside of a large red barn participating in a large party gathering clearly visible in an area elevated above the orchard fields. At that point, Officer Jimenez became fearful that if Juarez reached the crowd, he could jeopardize their safety by possibly taking hostages or committing additional armed assaults with his gun. As Juarez advanced to a short distance from the crowd, Officer Jimenez observed him remove his hand from his pocket and began to turn to his right to look back in the officer's direction. At that point Officer Jimenez believed that the safety of the people at the red barn were in danger. In response, when Officer Jimenez was approximately 25 feet behind Juarez, he fired two rounds from his tactical patrol rifle striking Juarez in the back causing him to fall to the ground. After several minutes of attempts to revive Juarez, he died at the scene.

Subsequently, a handgun matching the description of the carjacking robbery weapon and the identification card of Juarez, along with numerous bullets were found along the course of the foot pursuit.

II. <u>Data or Other Information Considered in Forming Opinion:</u>

1. Plaintiffs' First Amended Complaint For Damages and Demand for Jury Trial
2. Madera County Sheriff's Office Incident Report No.: 17003657
3. Air Ops Video
4. Chevron Phone Calls 08202017
5. 911 Dispatch Calls
6. Interview of CHP Officer Efrain Jimenez, Incident Report No.: 17003657, p. 48 of 50.
7. Interview of CHP Officer Efrain Jimenez, Vol. I: 08/25/17 & Vol. II: 08/25/17
8. Interview of CHP Officer Scott Jobinger
9. Interview of CHP Officer Shandara Kensey, Volumes I & II
10. Interview of Julian Gonzalez
11. Interview of Rene Galindo
12. Interview of Fernando Ramirez
13. Interview of Isaac Martinez, Volumes I & II
14. Deposition of Rene Galindo, dated February 4, 2021
15. Deposition of Julian Gonzalez, dated February 4, 2021
16. Deposition of Efrain Jimenez, dated January 22, 2021
17. Deposition of Officer Shandara Kensey, dated February 25, 2021
18. Deposition of Officer Isaac Martinez, dated February 26, 2021

<u>Compact Discs Containing:</u>

1) Defendants' and CHP's Production of Documents in Response to RPD1 and Subpoenas (1 – 8)
    a. CHP Video and Photographic Evidence
    b. CHP Crime Scene Evidence Report
    c. Autopsy Report
    d. CHP Administrative Report of Findings
    e. Julian Gonzalez Video
    f. Fernando Ramirez Video
2) Defendants' and CHP's Production of Documents in Response to RPD1 and Subpoenas (Supplement)
3) Second Production (1-4)
    a. Chevron Gas Station Videos (15 Camera Segments)

III. <u>Exhibits to be Used in Support of Opinions:</u>

1. Peace Officer Standards and Training (POST) Learning Domain #12: Illegal Substances
2. Peace Officer Standards and Training (POST) Learning Domain #20: <u>Use of Force</u>
3. Peace Officer Standards and Training (POST) Learning Domain #23: <u>Crimes in Progress</u>
4. CHP HPM 70.6 Use of Force Policy

IV. <u>Statement of Opinions</u>:

Opinion #1: It is my opinion, based on a review of all the materials provided that Defendant CHP Officer Jimenez acted objectively reasonable and consistent with CHP policies, POST training guidelines and national standards of care in his use of deadly force in the immediate defense of life in the face of an imminent deadly threat created by Juarez.

Opinion #2: At the time of the shooting, Defendant Officer Jimenez had no other reasonable options or alternatives than the use of deadly force to stop the life-threatening actions of Juarez based on the totality of the circumstances.

Opinion #3: The actions and behavior of Juarez constituted the elements of an "*active shooter*" scenario that justifiably created a mind set in Officer Jimenez that he was being confronted with an armed suspect who threatened the lives of a large group of potential innocent victims.

Opinion #4: The defensive use of deadly force by Officer Jimenez in confronting and neutralizing a suspect who was posing an imminent deadly threat was consistent with that of any other reasonably trained peace officer faced with a similar set of circumstances.

Opinion #5: The actions of Defendant Officer Jimenez were consistent with national standards of care, CHP policies and training, federal case law,[3] and California POST training in regard to police use of deadly force in the immediate defense of life.

Opinion #6: The actions of Juarez as interpreted by Officer Jimenez were consistent with a suspect who was armed with a handgun. Therefore, the presence of a gun in the possession of a felony suspect raised the potential for the loss of innocent lives that produced a situation that any reasonable officer would justifiably interpret as a deadly threat.

[3] Graham v. Conner

V. <u>Reasons and Basis for Opinions</u>:

My opinions are based on the summary of facts as recited above, the listed materials reviewed, my law enforcement training and experience, and the following factors:

1. I found that Defendant Officer Jimenez had reasonable cause to arrest Juarez for felony armed robbery based on his commission of a carjacking robbery that threatened the lives of innocent victims.

2. Defendant Officer Jimenez stated in his post-incident interview and in his deposition testimony that he believed Juarez posed a deadly threat not only to himself and other law enforcement personnel in the area, but also to innocent citizens attending a large open air gathering attended by young children.

3. According to his testimony, Officer Jimenez based his pre-shooting decision on his collective knowledge that Juarez had just committed a violent felony with a firearm that threatened the lives of innocent victims, that Juarez was vigorously evading arrest, and that Juarez was running directly to a location where other potential victims were visibly present, exposed and vulnerable. This information constituted the foundation of facts known at the time that reasonably established the mind set of Officer Jimenez that if he did not deploy deadly force before Juarez reached the party location, that there was a high probability that he could attempt to evade capture by taking hostages and/or harm citizens which would have presented a grave and imminent threat to community safety. Juarez was shot just a short distance from the party location.[4]

4. POST Learning Domain #23: Chapter 4 – Rapid Deployment to Deadly Encounter "Active Shooter," page 4-14 states that responses to active shooter scenarios should be the swift and rapid deployment of law enforcement resources to "on going, life threatening situations" where delayed action could otherwise result in multiple

[4] Refer to crime scene photo AG004173 contained in disc 4 of 8.

deaths or serious bodily injuries to innocent persons. The facts in this case clearly represent an imminent threat that jeopardized the safety of the general public.

5. POST Learning Domain #20: Chapter 4 – Use of Deadly Force, page 3 - 6 states "**imminent danger** means a significant threat that a peace officer could reasonably believe will result in death or serious bodily injury to themselves or others. Imminent danger is not limited to "immediate" or "instantaneous." A person may pose an imminent danger even if they are not at the very moment pointing a weapon at another person.

6. POST training guidelines teach that any use of force should have at its basis an appreciation for the sanctity of life. POST LD #20, Chapter 4, p. 3-3 instructs that in consideration of the use of deadly force, an officer's decision should be guided by a foundation of the reverence for all human life, including not only the officer's life, but all others that may be in imminent danger.

7. In this regard, CHP policy and national standards of care instructs officers to issue warnings, when feasible, before using deadly force. Specifically, during the foot pursuit, Officer Jimenez properly, and in accordance with CHP policy and training, repeatedly issued commands and warnings to Juarez to stop and show his hands or that he would be shot.[5] However, Juarez ignored these lawful orders and warnings and continued to run in the direction of citizens who Officer Jimenez believed could be placed in significant threat of death or serious physical injury if he were allowed to reach their location.

8. As Juarez was fleeing from Officer Jimenez, witnesses Fernando Ramirez and Julian Gonzalez both stated that they observed Juarez place his hand in his pocket and/or around the front waistline area of his pants. This behavior was interpreted by Officer Jimenez as indicative of Juarez reaching to retrieve his gun. Additionally, Officer

[5] Officer Jimenez's deposition testimony, page 93, Q.: "Prior to your first shot did you give a verbal deadly force warning?" A.: "I did multiple times. Q.: "Did you? Your testimony is that you did, right?" A.: "Multiple times. Yes, multiple times." Q.: "All right. How did you phrase it?" A.: "I believe I told him to stop as he was running towards the barn or he would be shot."

Jimenez was aware that CHP Officer Kensey reported that he observed a bulge that could have been a handgun in Juarez's left front pocket when he encountered Juarez running on Avenue 12.[6] However, Officer Jimenez gave a statement that he observed a bulge and that he believed Juarez was struggling to pull a gun out.[7] According to the statements and testimony of these officers, it is reasonable to believe that Juarez was removing and reinserting the gun in either of his pants pockets. It is a fact in this case that a revolver fitting the description of the weapon used in the carjacking robbery along with Juarez's identification, and over two dozen bullets were found a short distance away from Juarez after the shooting incident.[8]

9. CHP Policy 70.6, Chapter 1, Use of Force, defines deadly force when an officer utilizes a firearm or another potentially deadly weapon for self-defense, the defense of others, or to apprehend or prevent the escape of a subject who the officer reasonably believes has committed an armed violent felony and is a threat to public safety. Specifically, the CHP use of force policy states that officers are permitted to use deadly force which is "objectively reasonable" to:

    (1) Defend themselves or others from what is reasonably believed to be an imminent threat of death or serious bodily injury.

    (2) When necessary to apprehend a person who the officer reasonably believes has committed a felony involving the use or threatening use of deadly force, except for an assault with a deadly weapon (ADW) by a vehicle.

    Defendant Officer Jimenez complied fully with this policy in his determination that Juarez was armed and was running in the direction of an area heavily populated with innocent citizens who would be subject to serious harm or be taken as hostages.

[6] Kensey's interview statement, "*I broadcast that over the radio that I saw him and it looked like he still had the gun in his pocket.*" Volume 1 of 2, page 9, lines 22-24.
[7] Refer to page 27 of Officer Jimenez's Volume II, 08/25/2017 recorded interview statement.
[8] Refer to MSO Incident Report, page 67 of 82.

10. In consideration of the national standards directing officers in the use of force, officers must be judged by the standard of "reasonableness." When determining whether to use force and evaluating whether an officer has used reasonable force, a number of factors should be taken into consideration. The key elements among those factors include:

(1) Officers are to be aware of the conduct of the individual being confronted;
(2) the proximity of weapons of any kind;
(3) whether the suspect poses an immediate threat to the safety of officers or others;
(4) the seriousness of the threat;
(5) and finally, the potential for injury to citizens, officers, and suspects.

I found that Defendant Officer Jimenez strictly considered all of the delineated areas in making his decision to use of deadly force.

11. Based on national standards of care and best practices in police use of deadly force, there should always be an examination of alternative defensive methods and/or options that law enforcement could have considered short of lethal force. However, based on the facts of this case, I found that other than the failed attempt of the police K-9 to locate Juarez, there were no viable tactical or plausible alternative less-lethal force options that could have been deployed or effective to stop the rapid advance of Juarez toward the crowd of citizens in place of the use of deadly force. It was obvious in viewing the video evidence provided by CHP Air 43 that the CHP officers had no opportunity to acquire any alternative less-lethal device or resource in time to stop the advance of Juarez on the crowd of citizens. Specifically, neither Officer Jimenez, nor any other officer on-scene, was within sufficient range to use a Taser, coupled with the fact that electronic control devices are not practical in confrontations with armed suspects. In the same sense, chemical agents are not recommended or effective when deployed in large open-air environments due to unpredictable wind disbursement and the risk of cross contamination and unintended exposure. Additionally, kinetic energy munitions

such as bean bag projectiles are not designed to be trajectorially accurate or reliable against fleeing suspects where varying distances and uneven topography cannot be accurately calculated prior to deployment.

12. The MSO investigative report indicates that Juarez sustained two gunshot wounds, both of which entered the back of his torso. The descriptions of these wound trajectories are consistent with the statements of Officer Jimenez that Juarez was running toward the crowd of citizens at the time the shots were fired.

13. There were several civilian witnesses in addition to police broadcast information relevant to the events leading up to and including the shooting incident that are consistent with the testimony of Officer Jimenez:

    (1) Witness **Fernando Ramirez** stated in his post-incident interview that he observed Juarez reaching for something or had something in his hand. Additionally, witness Ramirez stated that he could hear Officer Jimenez giving commands to Juarez to, "stop, stop, stop" before the two shots.[9]

    (2) Witness **Julian Gonzalez** testified in his deposition that he could hear Officer Jimenez yelling, "stop" before the first gunshot. Witness Gonzalez also testified that he saw Juarez with his left hand in his pocket or maybe in his waistband.[10]

    (3) Witness **Rene Galindo** testified in his deposition that he observed Juarez running toward the group at the red barn location and could hear Officer Jimenez yelling.

14. A Harrington and Richardson .32 caliber 2½" barrel chrome revolver with black duct tape wrapped around the grip was subsequently found in a nearby orchard along the path of the foot pursuit. It is my experience that suspects wrap the grip of firearms with duct tape and is a common practice among career criminals to

[9] Ramirez's interview statement, pages 6 and 7.
[10] J. Gonzalez's deposition, p. 27:23-24.

avoid leaving fingerprints which could lead to their identification. This gun fit the description of the weapon used by Juarez to carjack victim Grendahl and threaten her life and the life of her 12-year-old son and steal her vehicle. It is noteworthy that investigators found that all of the bullets in the gun had multiple firing pin strikes on each bullet as evidenced by indentations on the primers indicating that someone had pulled the trigger of the weapon numerus times, however, the ammunition failed to fire. It is most important to note that it is unknown when and where Juarez pulled the trigger of his weapon that produced the hammer strikes that caused the misfires, either before or during the foot pursuit as he was running from Officer Jimenez or other officers.

15. POST Learning Domain #23 instructs that officer safety is always paramount, however, there are times and circumstances when officers must consider placing their safety in jeopardy to protect the innocent. The community has a right to expect that peace officers will "step into harm's way" on behalf of those endangered by violent crime. In this regard, the large civilian presence in the immediate area, directly in the path of Juarez's advance constituted a direct threat that required Officer Jimenez to proceed without the benefit of cover or concealment. In this case, the duty to protect public safety outweighed the officer's concern for his own personal safety.

16. The mere presence of danger is not sufficient in and of itself to justify the use of deadly force. According to California POST guidelines, there must be a *sufficiency of fear* in order to justify and support the use of deadly force.[11] In this case, it was the actions of Juarez in advancing on innocent civilians while reasonably believed to be armed with a gun and evading police capture that sufficiently excited fear and concern in Officer Jimenez for the lives and safety of others. This circumstance sufficiently justified Officer Jimenez's objectively reasonable decision to deploy deadly force when he believed that Juarez was in a position, and had the present ability, to access and harm potential victims.

[11] POST LD #20: Chapter 4 - Use of Deadly Force, page 3-18.

17. In his testimony, Officer Jimenez explained his decision to fire a second round at Juarez was based on his belief that he either missed hitting Juarez or that Juarez was still advancing toward the crowd of citizens and was thus still a threat to the lives and safety of citizens and himself alike. Officers are permitted under contemporary training and policy to continue to use force until the threat and/or resistance has been either stopped or neutralized.

18. Significant levels of alcohol and methamphetamine were found in Juarez's blood sample from the autopsy examination. These substances could have accounted for the violent and resistive nature of Juarez's actions prior to the shooting.

VI. <u>Qualifications:</u>

Please see attached curriculum vitae.

VII. <u>Compensation:</u>

Please see attached fee schedule.

VIII. <u>Experience:</u>

A supplemental attachment is included listing prior trial and deposition testimony.

Executed this 6th day of April 2021, in Los Angeles County, California.

[signature]

Clarence Robert Chapman

# C U R R I C U L U M V I T A E

**Clarence Robert Chapman**

Police Practices Expert & Law Enforcement Consultant
1507 Seventh Street, Suite 350
Santa Monica, CA 90401
310.429.2940
crchapman@earthlink.net

## EMPLOYMENT HISTORY

| | |
|---|---|
| **Chief of Police (Retired)** | **University of California Los Angeles Police Department** |
| *Department size:* | 245 Sworn and Civilian Personnel |
| *Date of appointment:* | June 1994 |
| *Date of Retirement:* | December 2004 |
| **Captain (Retired)** | **Los Angeles County Sheriff's Department** |
| *Department size:* | 12,000 Sworn and Civilian Personnel |
| *Date of appointment:* | May 1966 |
| *Date of Retirement:* | June 1994 |

## SUMMARY OF EXPERIENCE

To date, retired Chief Chapman has consulted on over 1000 cases involving law enforcement related civil litigation, criminal prosecution and employment practices and has given court and deposition testimony in over 300 cases. Chief Chapman has served over 150 clients from municipal, county, State and federal agencies and private enterprises throughout the country and has been certified as an expert witness and testified in State and federal court in the areas of:

*-Police Policy, Procedures and Practices*
*-POST Training*
*-Officer Involved Shootings – Deadly Force*
*-Use of Force*
*-Pursuit/Emergency Driving*
*-In-Custody / Restraint Deaths*
*-Active Shooter Policies and Procedures*
*-Search Warrants*
*-Private Sector Security and Loss Prevention*
*-Racial Discrimination*
*-Police Employment Practices*
*-Jail & Custody Practices*
*-Criminal Interview & Interrogation Practices*

During over 40 years in law enforcement, Chief Chapman supervised, managed and commanded a vast number of police personnel and units covering a wide range of assignments. As a Captain/Station Commander with the Los Angeles County Sheriff's Department, and a California State Chief of Police, Chapman has served as a supervisor, manager and executive level administrator in the areas of field patrol, criminal investigations, officer involved shooting investigations and policies, procedures and training in the area of use of force.

Chief Chapman has served as an expert witness in the following States: Alaska, Alabama, Colorado, Illinois, Nevada, New Mexico, New York, Ohio, Oregon, Texas, Arizona, Florida and Washington State.

## *CAREER HIGHLIGHTS:*

Between 1980 and 1982, Chief Chapman was appointed to the **California State Governor's Office** as **Project Manager** for a new and progressive criminal tracking project, known as the **California Career Criminal Apprehension Program.**

Between 1987 and 1990, while assigned to the Sheriff's Department Detective Division, Narcotic Bureau, Chief Chapman was awarded a $3 million federal drug enforcement grant to target Los Angeles area street gangs involved in mid-level cocaine enterprises. Under Chief Chapman's command this highly successful and widely publicized law enforcement anti-drug effort, known as the **STAR Grant**, (Sheriff's Task force Against Rock), incorporated a multi-agency concept joining agents and investigators from the Federal Bureau of Investigation, State Bureau of Narcotics Enforcement and the Los Angeles County District Attorney's Office. During this project, Chief Chapman was sworn as a **Deputy United States Federal Marshall.**

In January of 1998, Chief Chapman was selected to participate on a task force with the **UCLA Anderson School of Management** to formulate an executive management curriculum for the Los Angeles Police Department's senior command staff. That effort culminated in the creation of an accredited police management course for all LAPD senior level police administrators.

In June of 1998, Chief Chapman was selected by the Federal Bureau of Investigation to attend the prestigious **National Law Enforcement Executive Academy** in Quantico, VA.

Chief Chapman is a nationally recognized police practices management consultant and instructor. In 1999, Chief Chapman was selected by the State of California Department of Justice, Commission on Peace Officers Standards and Training (POST) to serve as a staff instructor for the Center of Leadership Development. In this capacity, Chief Chapman instructs the California State **Executive Development Management Course.**

In January 2000, Chief Chapman was contracted by the City of Los Angeles to assist the mayor's office in developing a systematic approach to facilitate compliance with a federal court consent decree involving LAPD training and citywide employment practices.

In June of 2001, Chief Chapman was appointed as an **independent federal monitor** by the Federal Court in the district of New Mexico to oversee a class action suit involving civil rights violations by local law enforcement. The areas that Chief Chapman is commissioned to monitor include specified police policies, procedures and practices in the areas of racial profiling, search and seizure and use of force. ***[Refer: Johnson, et al. vs. City of Hobbs, et al., CIV 99-00348 MV/JHG-ACE]***

## *PUBLICATIONS:*

Los Angeles Times Editorial: **"Silence Code Doesn't Exist"** - December 1992

## *NATIONAL TELEVISION APPEARANCES:*

McNeil / Lehrer News hour: **"Street Gangs & the Drug Trade"** – April 1988

## ***LECTURES & SPEAKING APPEARANCES:***

- Westwood Village Rotary Club: **"Police Operations - Democratic National Convention"** – June 2000
- UCLA Law School: **"Community Crime and Drugs"** - October 2000
- *New Mexico Law Enforcement Training Conference,* "Policing 2000: Entering the New Millennium"*: Guest Lecturer on:* ***Police Use of Force & Racial Profiling*** *– December 2000*
- Los Angeles County Professional Peace Officers Association: Guest Speaker: **"The Media and Law Enforcement"** – March 2001
- Los Angeles Women's Resource Center, Lecturer: **Hate Crimes & Rape Prevention** – April 2001
- Seminar panelist with Professor James Q. Wilson: **The LAPD and the Community** - UCLA Bradley Center – July 2001
- POST sponsored training seminar, guest lecturer to the San Bernardino Sheriff's and Chief's Association on the topic of **Racial Profiling** – January 2002
- Seminar panelist on subject of in-custody death related to Excited Delirium syndrome – October 2009

## ***EDUCATION:***

- Master of Business Administration: UCLA Executive Program, Los Angeles, CA, 1997
- Postgraduate Certificate: (Criminal Justice Ed.), University of Virginia, Quantico, VA. 1992
- Bachelor of Science: (Public Affairs), Pepperdine University, Malibu, CA, 1980
- Postgraduate Studies: (Public Administration), University of Southern California

## ***RECOGNITION:***

- **Career Achievement Award** recipient from the National Organization of Black Law Enforcement Executives, 2002
- **Law Enforcement Achiever Tribute Award** from California Governor Gray Davis, 2002

## ***CALIFORNIA POST CERTIFICATES HELD:***

*-Basic Certificate*
*-Intermediate Certificate*
*-Advanced Certificate*
*-Supervisory Certificate*
*-Management Certificate*
*-Executive Certificate*

## ***OTHER CERTIFICATIONS ATTAINED:***

- *Teaching Credential*, State of California Vocational: Police Science, 1982
- *Police Personnel Management* (POST Certified), 1990
- *Hostage Negotiations*, Rio Hondo Community College, 1990
- *Certificate of Achievement*, Criminal Justice Education, (University of Virginia), 1992
- *Executive Development Program* (POST Certified), 1995
- *Law Enforcement Southwest Command College;* Federal Bureau of Investigation, 1996
- *Law Enforcement Executive Development Program;* Federal Bureau of Investigation, 1998
- *Force Science Institute Training Certificate, 2016*
- *Force Science Instructors Course, Containment and De-Escalation, 2019*

## ***AFFILIATIONS:***

*Graduate*, FBI National Academy, United States Department of Justice
*Staff Instructor*, Peace Officer Standards and Training – Executive Development Program
*Member*, California Peace Officers Association
*Member*, Los Angeles County Black Peace Officers Association
*Member*, FBI Law Enforcement Executive Development Association
*Member*, FBI National Academy Graduates
*Member*, International Association of Chiefs of Police
*Member*, National Organization of Black Law Enforcement Executives
*Ex-Board Member*, Santa Monica Community College District Citizen's Bond Oversight Commission
*Associate Member*, California State Sheriff's Association
*Ex-Commissioner*, City of Malibu Public Safety Group
*Associate Member*, Force Science Research Institute
*Subscriber*, American for Effective Law Enforcement
*Past Member*, International Union of Police Associations
*Past Member*; Los Angeles County Management Council
*Past Member*, National Sheriff's Association
*Past Member*, Los Angeles County Chiefs of Police Association
*Past Member*, University of California Association of Black Administrators
*Past Member*, International Association of College Law Enforcement Administrators
*Past Member*, Los Angeles County Sheriff's Executive & Command Staff Support & Advisory Group
*Past Member*, Board of Directors – Peace Officer Association of Los Angeles County

# *F E E S C H E D U L E*

[Federal Tax ID# 95-4413728]

***CASE RETAINER*** ***$7,500.00***

A retainer fee is due prior to the start of work and will be billed against the first 12.5 hours of work. Upon depletion of retainer, appropriate billing will commence at the indicated hourly rate.

***CASE WORK / HOURLY RATE*** ***$400.00 per hour***

This hourly fee applies to all directed activities associated with ongoing and continued case review, analysis, research and preparation. Included in this category are administrative and operating expenses, organizational audits, production of reports, witness interviews, site surveys, client meetings, production of exhibits / visual aids, and teleconferencing expenses and reports. Payment is due upon receipt of invoice and payable within 30 days. *I reserve the right to suspend all work and refuse delivery of services until outstanding balances over 60 days past due are paid in full.*

***COURT APPEARANCES*** ***$2,000.00 (half day) & $4,000.00 (full day)***

This fee applies to all court appearances and court related hearings regardless of whether testimony is given. Appearances lasting less than four hours will be billed at the ½ day rate. Any required appearance time beyond the morning Court or Hearing sessions will be billed at the full day rate.

***DEPOSITION APPEARANCES*** ***$400.00 per hour***

All depositions lasting less than ½ day in duration are subject to a four-hour minimum.

***REQUIRED TRAVEL*** ***[AT COST]***

Travel related expenses including hotel accommodations, airline tickets, taxi/limousine services and parking fees will be billed at cost. Business Class air travel is expected for flights more than 2 hours in duration. Travel by car will be bill at a rate of $0.65 per mile. Travel time to and from scheduled meetings and appearances is billed at my hourly rate.

***OTHER EXPENSES***

There will be a fee for in-house Printing and Duplication for all case documents sent via electronic media at the rate of $0.10 per page (black & white) and $0.75 per page (color).

***REQUEST FOR EXPEDITED REPORTS*** ***$1,200.00 per hour***

There will be a surcharge of three times the hourly rate for expedited F.R.C.P. Rule 26(a) expert reports required to be produced and submitted in less than 30 court days.

[Revised 01/2021]

## RECORD OF COURT & DEPOSITION TESTIMONY APPEARANCES

## COURT APPEARANCES

| | | | | |
|---|---|---|---|---|
| **2017** | | | | |
| Valentin | v. | CHP | (F) | CV 15-09011 BRO |
| Ewart | v. | County of Los Angeles | (S) | BC 522 492 |
| Green | V. | City of South Pasadena | (S) | BC 572 438 |
| Shaw | v. | County of Los Angeles | (F) | 2:13-cv-08873-JG |
| Robertson | v. | County of Los Angeles | (F) | 16-cv-02761 BRO |
| **2018** | | | | |
| Armstrong | v. | County of Los Angeles | (S) | BC 528 453 |
| Archibald | v. | County of San Bernardino | (F) | 5:16-cv-01128 AB |
| Zuniga | v. | CHP | (S) | 37-2016-00034292-CU |
| Shaw | v. | County of Los Angeles | (F) | 2:13-cv-08873-JG |
| Palmer | v. | CHP | (F) | 1:17-cv-01290-LJO-JLT |
| Fausto | v. | CHP | (S) | RG16809897 |
| McFadden | v. | County of Los Angeles | (S) | MC 026632 |
| Carcamo | v. | County of Los Angeles | (S) | TC 028 076 |
| Bennett | v. | County of Los Angeles | (S) | BC 670 310 |
| **2019** | | | | |
| Hargrove | v. | City of Bakersfield | (F) | 1:17-cv-01743-JLT |
| Sidrow | v. | County of Los Angeles | (S) | BC 647 075 |
| Holmes | v. | County of Los Angeles | (S) | 2:18-03739-PGG-E |
| **2020** | | | | |
| Penaloza | v. | City of Rialto | (F) | 5:19-cv-01642-SVW |

**(F) Indicates Federal Court Appearances**
**(S) Indicates State Court Appearances**
**(P) Indicates Plaintiffs Case**
**(H) Indicates Arbitration / Personnel Hearing**

# DEPOSITION APPEARANCES

| | | | | |
|---|---|---|---|---|
| **2017** | | | | |
| Fusiler | v. | County of San Bernardino | (F) | CIVDSS 1313206 |
| Alma M. | v. | County of Kern | (F) | 1:15-cv-01378 EFC |
| Frausto | v. | State of California | (F) | 3:16-cv-00311 RS |
| Ewart | v. | County of Los Angeles | (S) | BC 522 492 |
| Green | v. | City of South Pasadena | (S) | BC 572 438 |
| McDaniel | v. | County of Kern | (F) | 1:15-cv-1320 JAM JLT |
| Honan | v. | State of California | (F) | CV 2:13-cv-02380 GEB |
| Levingston | v. | County of Kern | (F) | 1:16-cv-00188 DAD |
| Robertson | v. | County of Los Angeles | (F) | 16-cv-02761 BRO |
| **2018** | | | | |
| Armstrong | v. | County of Los Angeles | | BC 528 453 |
| Archibald | v. | County of San Bernardino | (F) | 5:16-cv-01128 AB |
| Zuniga | v. | CHP | (S) | 37-2016-00034292-CU |
| Corbin | v. | County of Los Angeles | (S) | BC 512 036 |
| Palmer | v. | CHP | (F) | 1:15-cv-00787 SLO |
| Soares | v. | County of Los Angeles | (F) | 2:17-cv-00924 RGK |
| Villanueva | v. | CHP | (F) | 8:17-cv-01302 JLS |
| Carcamo | v. | County of Los Angeles | (S) | TC 028 076 |
| Grismore | v. | City of Bakersfield | (F) | 1:17-cv-00413 AWI |
| Macedo | v. | City of Santa Ana | (F) | SACV 17-00897 CJC (JDEx) |
| **2019** | | | | |
| Serna | v. | City of Bakersfield | (F) | 1:17-cv-01290-LJO-JLT |
| Friday | v. | City of Stockton | (F) | 2:17-cv-01648-KJM-DB |
| Hargrove | v. | City of Bakersfield | (F) | 1:17-cv-01743-AWI-JLT |
| Sidrow | v. | County of Los Angeles | (S) | BC 647 075 |
| Holmes | v. | Harris | (F) | 2 :18-cv-03739-PSG-E |
| Alcox | v. | Lompoc | (F) | 5 :17-cv-00507-JVS-JEMx |
| Herd | v. | CHP | (F) | 5 :17-cv-02545-AB-SP |
| Gonzalez | v. | Fresno County | (F) | 1:18-cv-01558-DAD-BAM |
| **2020** | | | | |
| French | v. | County of Santa Barbara | (F) | 2:19-cv-04734-JFW-JC |
| Penaloza | v. | City of Rialto | (F) | 5:19-cv-01642-SVW-SP |
| Pickett | v. | County of Los Angeles | (F) | 2:17-cv-00074-JAK-ASx |
| Gonzalez | v. | CHP | (F) | RIC 1804244 |
| Hagood | v. | Kern County | (F) | 1:18-cv-01092-JLT |
| **2021** | | | | |
| Ochoa | v. | Kern County | (F) | 1:18-cv-01599-LJO-JLT |