ROB BONTA, State Bar No. 202668
Attorney General of California
NORMAN D. MORRISON, State Bar No. 212090
Supervising Deputy Attorney General
DIANA ESQUIVEL, State Bar No. 202954
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA 95814
Tel:: (916) 210-7320 | Fax: (916) 322-8288
E-mail: Diana.Esquivel@doj.ca.gov
*Attorneys for Defendant Efrain Jimenez*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| **JOSHUA A. JUAREZ, individually and as successor in interest to SANTANA JUAREZ GONZALEZ, Deceased,**<br><br>Plaintiff,<br><br>**v.**<br><br>**EFRAIN JIMENEZ,**<br><br>Defendant. | No. 1:18-cv-01138-KES-EGC<br><br>**INDEX OF EXHIBITS IN SUPORT OF DEFENDANT'S MOTIONS IN LIMINE NOS. 1-6**<br><br>Judge: Honorable Kirk E. Sherriff<br>Trial Date: November 10, 2026<br>Action Filed: August 22, 2018 |

TO THE COURT, PLAINTIFF, AND HIS ATTORNEYS OF RECORD:

The exhibits attached to this index are submitted in support of Defendant's motions in limine Nos. 1 to 6.

| <u>**Exhibit**</u> | <u>**Document**</u> |
|---|---|
| A | Plaintiff's Disclosure of Expert Witnesses, dated April 7, 2021 |
| B | October 12, 2017 Autopsy Report by Mark A. Super, M.D., Forensic Medical Group, Inc. |
| C | Excerpts of Dr. Mark Super's deposition transcript, taken on February 26, 2021 |
| D | Excerpts of Julian Gonzalez's deposition transcript, taken on February 4, 2021 |

| | |
|---|---|
| E | Excerpts of Fernando Ramirez's deposition transcript, taken on February 4, 2021 |
| F | Plaintiff's Supplemental Initial Disclosures with nine photographs, served on October 26, 2021 |
| | photographs |
| G | Three Photographs (bates stamped AG03390, AG03395, and AG01830) |
| H | Excerpts of Roger Clark's deposition transcript, taken June 2, 2021 |

Dated: October 2, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
NORMAN D. MORRISON
Supervising Deputy Attorney General

***/s/ Diana Esquivel***

DIANA ESQUIVEL
Deputy Attorney General
*Attorneys for Defendant Jimenez*

SA2018302522
45353719

# Exhibit A

**Panos Lagos, Esq. / SBN 61821**
**LAW OFFICES OF PANOS LAGOS**
5032 Woodminster Lane
Oakland, CA 94602-2614
510.530.4078
510.530.4725 (FAX)
E-mail: panos@panoslagoslaw.com

**Sanjay S. Schmidt (SBN 247475)**
**LAW OFFICE OF SANJAY S. SCHMIDT**
1388 Sutter Street, Suite 810
San Francisco, CA 94109
Tel. (415) 563-8583
Fax (415) 223-9717
E-mail: ss@sanjayschmidtlaw.com

Attorneys for Plaintiffs,
J. A. J., by and through his Guardian ad Litem,
SANTANA JUAREZ JIMENEZ,
and TERESA GONZALEZ-VELAZQUEZ

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| J.A.J., a minor, etc., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>State of California Highway Patrol Officer EFRAIN JIMENEZ (ID #18075), et al.,<br><br>Defendants. | Case No.:1:18-cv-01138-DAD-SKO<br><br>PLAINTIFFS' DISCLOSURE OF EXPERT WITNESSES<br>[Fed. R. Civ. P. 26(a)(2)] |

TO DEFENDANTS AND TO THEIR ATTORNEYS OF RECORD:

Pursuant to Federal Rule of Civil Procedure Rule 26(a)(2)(B), Plaintiffs hereby disclose the identity of expert witnesses Plaintiffs intend to call at the time of the trial of this action. In addition, Plaintiffs disclose non-retained experts and witnesses, reserving the right to call them a trial.

//

**I. RETAINED EXPERTS**

1. Roger A. Clark, Police Procedures Consultant, Inc., 10207 Molino Road, Santee, CA, 92071; Tel: (208) 351-2458, Fax: (619) 258-0045.

Mr. Clark's testimony may include, without limitation, law enforcement training and police procedural issues, as well as other issues related to his areas of expertise and his Rule 26(a)(2)(B) report.

(a) Attached hereto as **Exhibit 1** is the required report of Roger A. Clark regarding his opinions to be expressed at the time of the trial of this action.

(b) Attached to the required report of Roger A. Clark as **Exhibit A** is the Curriculum Vitae of Roger A. Clark.

(c) Attached to the required report of Roger A. Clark as **Exhibit B** is the current fee schedule of Roger A. Clark

(d) Attached to the required report of Roger A. Clark as **Exhibit C** is the Updated List of Sworn Testimony (Revised November 10, 2020) of Roger Clark.

**II. NON-RETAINED EXPERTS**

1. Paul Kealoha-Blake, East Bay Media Center, 1939 Addison Street, Berkeley, CA, 94704; Tel: (510) 843-3699.

Mr. Blake is a video technician whose testimony may include, without limitation, the modification/enhancement of video files in this case. Pursuant to the stipulation of counsel for the parties, as memorialized by counsel for Defendant in her February 24, 2021 email, Plaintiff's video technician experts are hereby disclosed pursuant to Rule 26(a)(2)(C).

2. Pursuant to the stipulation of the parties, Plaintiffs identify and disclose the following document(s) prepared by video technician Paul Kealoha-Blake of East Bay Media Center:

| **DOCUMENTS** | **BATES NOS.** |
|---|---|
| *DashCam SloMo.mov* | P000253 |
| *Hand held still.mov* | P000254 |
| *Hand Held2zzoom.tiff* | P000255 |
| *Panos ClipB.jpg* | P000256 |

| | |
|---|---|
| *Panos Still 1.jpg* | P000257 |
| *Panos Still 2.jpg* | P000258 |
| *Panos Still 3.jpg* | P000259 |
| *Panos Still 4.jpg* | P000260 |
| *Panos Still Clips.mov* | P000261 |

A Dropbox link to the modified/enhanced video files prepared by Mr. Blake is as follows:

https://www.dropbox.com/sh/r2afk8xk85sz8zb/AADkWr2OMV1MKhV9HRWYeNRMa?dl=0

3. Mark A. Super, M.D., Merced County Sheriff's Forensic Pathologist, 455 E. 13th Street, Merced, CA 95340; Tel: (209) 385-7369.

Dr. Super performed an autopsy on the decedent, Santana Juarez Gonzalez. His testimony may include, but may not be limited to, his observations, his autopsy, his findings, and his conclusions as to the locations of the entry wounds on the decedent's body from gun shots, and the cause of death.

4. Michela S. Lind, Deputy Coroner, Madera County Sheriff's Office, 2725 Falcon Dr., Madera, CA 93637; Tel: (559) 675-7770.

Deputy Lind observed the decedent at the scene of the shooting after he had died, and was present for the autopsy performed by Dr. Mark Super. Deputy Lind's testimony may include, but may not be limited to, her observations, the autopsy, as well as the notations she made on the decedent's death certificate reflecting the findings in the Coroner's Report.

5. Stephanie Clark, Senior Deputy Coroner, Madera County Sheriff's Office, 2725 Falcon Dr., Madera, CA 93637; Tel: (559) 675-7770.

Deputy Clark observed the decedent at the scene of the shooting after he had died, and was present for the autopsy performed by Dr. Mark Super. Deputy Clark's testimony may include, but may not be limited to, her observations, the autopsy, and any other related facts.

6. Vernon Franklin, Paramedic, Central California EMS, Pistoresi Ambulance, 113 N. R Street, Madera, CA 93637; Tel: (559) 673-8004.

Paramedic Vernon Franklin responded to the scene of the shooting with EMT Justin Arroyo, assessed the decedent, observed the decedent's condition, observed and was informed of the circumstances that led to his condition, and pronounced the decedent deceased at the scene, at 3:30 p.m., on the day of the incident that gave rise to this action. Paramedic Franklin's testimony will include, but may not be limited to, his assessment of the decedent's condition, his observations of the decedent, and his conclusions.

7. Justin Arroyo, EMT, Central California EMS, Pistoresi Ambulance, 113 N. R Street, Madera, CA 93637; Tel: (559) 673-8004.

EMT Justin Arroyo responded to the scene of the shooting with Paramedic Vernon Franklin, assessed the decedent, observed the decedent's condition, observed and was informed of the circumstances that led to his condition, and was with Paramedic Franklin when Mr. Franklin pronounced the decedent deceased at the scene, at 3:30 p.m., on the day of the incident that gave rise to this action. Mr. Arroyo's testimony will include, but may not be limited to, his assessment of the decedent's condition, his observations of the decedent, and his conclusions.

Dated: April 7, 2021

**LAW OFFICE OF SANJAY S. SCHMIDT**
**-and-**
**LAW OFFICES OF PANOS LAGOS**

*<u>/s/ Sanjay S. Schmidt</u>*
By: Sanjay S. Schmidt
Attorneys for Plaintiffs,
Attorneys for Plaintiffs, J. A. J., by and through his Guardian ad Litem, SANTANA JUAREZ JIMENEZ, and TERESA GONZALEZ VELAZQUEZ

***PROOF OF SERVICE***

**VIA EMAIL**

(Fed. R. Civ. Proc. 5(b)(2)(E) and 28 U.S.C. §1746)

Re: *J.A.J., et al. v. Jimenez, et al.*, (Case No. 1:18-cv-01138-DAD-SKO)

I declare that: I am employed in the County of San Francisco, State of California. I am over the age of eighteen years and not a party to the within entitled cause; my business address is 1388 Sutter Street, Suite 810, San Francisco, CA 94109.

Pursuant to Rule 5(b)(2)(E) of the Federal Rules of Civil Procedure, on April 7, 2021, I served the attached **PLAINTIFFS' DISCLOSURE OF EXPERT WITNESSE**S on the parties in said cause VIA EMAIL, addressed as follows:

XAVIER BECERRA, State Bar No. 118517
Attorney General of California
PETER A.MESHOT, State Bar No. 117061
Supervising Deputy Attorney General
DIANA ESQUIVEL, State Bar No. 202954
AMIE McTAVISH, State Bar No. 242372
Deputy Attorney General
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Telephone: (916) 210-7320
Facsimile: (916) 322-8288
E-mail: Diana.Esquivel@doj.ca.gov
*Attorneys for Defendant Jimenez*

**Panos Lagos, Esq. / SBN 61821**
**LAW OFFICES OF PANOS LAGOS**
5032 Woodminster Lane
Oakland, CA 94602-2614
510.530.4078
510.530.4725 (FAX)
E-mail: panos@panoslagoslaw.com
Co-Counsel for Plaintiff

**I declare under penalty of perjury that the foregoing is true and correct and that on the date stated above, this declaration was executed at San Francisco, California.**

*/s/ Sanjay S. Schmidt*_
Sanjay S. Schmidt

# EXHIBIT 1

# Roger Clark

Police Procedures Consultant, Inc.
10207 Molino Road. Santee, CA 92071
Phone: (208) 351-2458, Fax: (619) 258-0045
rclark9314@aol.com


April 7, 2021

Panos Lagos, Esq.
Law Offices of Panos Lagos
5032 Woodminster Lane
Oakland, CA 94602-2614

Sanjay S. Schmidt, Esq.
Law Office of Sanjay S. Schmidt
1388 Sutter Street, Suite 810
San Francisco, CA 94109

***Regarding: J.A.J., et al., vs. Efrain Jimenez, et al., Case No.: 1:18-cv-01138 DAD-SKO.***

Dear Counsel:

Thank you for retaining me to analyze and render opinions regarding the August 20, 2017 shooting death of Mr. Santana Juarez (Mr. Juarez) by California Highway Patrol (CHP) Officer Efrain Jimenez (Officer Jimenez). Pursuant to the requirements of Rule 26, I have studied the reports, audio and video recordings, CHP policies and procedures, deposition transcripts and other material (as listed below) provided to me thus far regarding this case. Please be advised that if/when any additional information is submitted, it is likely that a supplemental report will be necessary.

It is also necessary to state at the beginning of this report that I do not make credibility determinations in expressing my opinions. That is, where there are differences in the events proffered Officer Jimenez, and/or other witnesses, versus those proffered by witnesses, and others, I do not opine for the trier of fact regarding who are the more believable witnesses. I consider that any resolution of such conflicts is the purview of a jury to decide.

**Material Reviewed Thus Far:**

1. Pleadings
   a. July 22, 2019 Protective Order [Dkt. 38].
   b. First Amended Complaint for Damages filed October 9, 2018 [Dkt. 9].
   c. Dismissal as to Plaintiff Santana Juarez Jimenez filed February 10, 2020 [Dkt. 43].
   d. Appointment of Santana Juarez Jimenez as Guardian ad Litem for Minor Plaintiff, J.A.J. filed February 6, 2020 [Dkt. 42].

2. Depositions:
   a. Deposition of Plaintiff Teresa Gonzalez-Velazquez / January 8, 2021.
   b. Deposition of Minor Plaintiff J.A.J. / January 8, 2021.
   c. Deposition of Guardian ad Litem Santana Juarez Jimenez / January 8, 2021.
   d. Deposition of Defendant Efrain Jimenez / January 22, 2021.
   e. Deposition of Witness Galindo / February 4, 2021.
   f. Deposition of Witness Gonzales / February 4, 2021.
   g. Deposition of Witness Ramirez / February 4, 2021.
   h. Deposition of Officer Kensey / February 25, 2021.
   i. Deposition of Officer Martinez/ February 26, 2021.
   j. Deposition of Officer Jobinger [Zoom recording] / March 26, 2021.

3. Documents produced via Subpoena to:
   a. CHP.
   b. Madera County Sheriff's Office.
   c. Madera County Coroner.
   d. Chevron.

4. Discovery
   a. Defendant Jimenez's discovery responses:
      1. Interrogatories, Set One.
      2. Requests for Production of Documents, SetOne [AG000001-AG004304]
      3. Requests for Production of Documents, Set One, Supplemental [AG004305-AG004381].

5. POST Basic Learning Domains:
   a. #1: "Leadership, Professionalism, and Ethics."
   b. #2: "Criminal Justice System."
   c. #3: "Policing in the Community."
   d. #5: "Introduction to Criminal Law."
   e. #15: "Laws of Arrest."
   f. #20: "Use of Force."
   g. #21: "Patrol Techniques."
   h. #23: "Crimes in Progress."
   i. #33: "Arrest Methods/Defensive Tactics."
   j. #35: "Firearms/Chemical Agents."
   k. #37: "People with Disabilities."

6. Overview of the incident scene via the internet.

**<u>Brief Overview of Events and Commentary:</u>**

In August of 2017, Mr. Juarez resided at 317 W. Cleveland Avenue, in Madera, California.

On August 20, 2017, Mr. Juarez, Elvi Guzman (Elvi) and Nicholas Olivera (Nicholas) seized at gunpoint (car-jacked) a 2001 Acura. Mr. Juarez drove the Acura out of the Chevron parking lot, and Nicholas and Elvi ran away on foot from the scene. The carjack and BOLO ("Be On the Look Out") was broadcast to all agencies in the area. The Acura was later discovered disabled and Mr. Juarez was not at the scene. Several minutes later, CHP and Madera County Sheriff's Department Deputies located Mr. Juarez who was on foot and in flight to avoid apprehension. During the extensive foot chase that occurred, Mr. Juarez never threatened or attempted to assault the officers chasing him. Additionally, it is uncontested that during the entire incident Mr. Juarez never pointed or held in his hand any weapon - including a firearm. When his body was searched immediately after he was shot by Officer Jimenez, Mr. Juarez was not armed.

As recorded by video, as the police units closed in for the final tactical steps of apprehension, Mr. Juarez had been running an extensive distance in 100 degree heat and was obviously becoming worn out and had slowed to a walk. He had been under visual observation for some time - both on the ground and by an air unit. As he ran through

orchards and fields ground units were well informed and were sealing off any possible/anticipated route(s) of escape. Additionally, there were at least two K-9 units on scene. Per the recordings, all of the police units were in communication and well coordinated. However, just as the apprehension was in its final moments, CHP Officer Jimenez shot Mr. Juarez in the back as he was slowly walking away from Officer Jimenez. The following pages briefly recount the events leading up the shooting, the shooting itself and commentary on CHP Officer Jimenez's use of lethal force.

**Incident:**

Shortly before 1350 hours, Mr. Juarez, Elvi Guzman and Nicholas Olivera were at a Chevron gas station - mini mart located at 14974 Highway 41. According to witnesses, Mr. Juarez entered the driver's side of an Acura after brandishing and handgun and ordered the passengers out of the vehicle. The two males that were with Mr. Juarez, Guzman and Olivera, walked and then ran away. These two other suspects were pursued by the victim's boyfriend and another male, and they were detained. The third male, believed to be Mr. Juarez, drove away in the Acura, south on Highway 41.

CHP and Madera County Sheriff's Office (MCSO) personnel quickly responded to the scene. When Officer Jimenez arrived at the scene Elvi and Nicholas had already been detained. Officer Jimenez has testified, and when he was interviewed by the MCSO personnel investigating the shooting, he said he personally spoke with Elvi and Nicholas and asked about a gun alleged to have been used in the carjack. Neither Elvi nor Nicholas confirmed that Mr. Jimenez was armed with a gun.

Subsequent to questioning Elvi and Nicholas, CHP broadcast to involved units that a car, which matched the description of the stolen Acura, was reported abandoned and disabled near Highway 41 and Avenue 12. Multiple Deputies and CHP officers responded considering that Mr. Juarez was on foot in the area. As responding Officers and Deputies arrived, they determined that Mr. Juarez had fled in a westerly direction, on foot. Subsequently the CHP broadcast to all units a driver had reported seeing a Hispanic male walking west on Avenue 12.

CHP Canine Officer Shandara Kensey (Officer Kensey) received the CHP broadcast as he drove east on Avenue 12. As he neared Road 38, he observed Mr. Juarez as he walked westbound on the south side of Avenue 12. Officer Kensey stopped his vehicle, alighted and drew his 45 caliber pistol. He ordered Mr. Juarez to stop and show his hands. According to Officer Kensey, Mr. Juarez immediately ran into a large orange grove and headed south. Officer Kensey released his canine (Laika) and ordered Laika to

pursue Mr. Juarez. According to Officer Kensey, when he could no longer see Mr. Juarez or Liaka, he ordered Laika to return to him.

At this point in the sequence of events, CHP Air 43 located Mr. Juarez as he ran from the grove of trees. Mr. Juarez continued running east, past D & D Ranch Madera and headed south. Air 43 maintained a visual on Mr. Juarez and his location.

CHP Air 43 informed the responding ground units on Mr. Juarez's location. Units were dispatched to the Branch and Vine Event Center, located at 38802 Avenue 12. At this point, once the air unit has a constant visual, the tactic is to enclose all four points of the compass, so that there are officers blockading any possible avenue of escape.

A law enforcement containment with Mr. Juarez in view (CHP air unit) was well underway with a logical outcome of Mr. Juarez' safe apprehension. It cannot be overstated that during the entirety of the incident, Mr. Juarez had done nothing more than flee on foot and avoid contact. He had not displayed a weapon, uttered threats or done anything threatening to any officer chasing him during their efforts to apprehend him.

Officers Jobinger and Jimenez drove north, down a dirt passage that ran along the east border of the orchard Mr. Juarez had entered. As they drove, they received updates from Air 43 and all ground units were in radio contact with one another. They continued driving north until they were nearly upon Mr. Juarez.

Based on video evidence, Mr. Juarez turned northeast and fled on foot from the responding Officers. Subsequently, Officers Jobinger and Jimenez drove further north, then stopped. Officers Jobinger and Jimenez alighted from their patrol vehicles and Officer Jimenez pointed his rifle at Mr. Juarez. Mr. Juarez immediately ran northeast, away from the officers.

As Mr. Juarez ran northeast, Officers Jobinger and Jimenez got back in their vehicles with Officer Jimenez doing so first and drove on a dirt road they located. Officer Jimenez continued driving north. Mr. Juarez continued running and walking northeast. Mr. Juarez turned away from the dirt road that Officer Jimenez was on and eventually, Officer Jimenez stopped his patrol vehicle, alighted from his vehicle and chased Mr. Juarez on foot.

Notably, if Officer Jimenez had continued in his vehicle on the dirt road, he could have reached the red barn where the party goers were, or turned into the orchard and placed himself and his vehicle between the party and Mr. Juarez. Officer Jimenez was armed with his rifle as he ran after Mr. Juarez. Mr. Juarez continued running and walking

northeast, toward the Branch and Vine Event Center, located at 38802 Avenue 12. At the time, there was an active event, and families with children were in attendance.

Based on Air 43 video evidence, Mr. Juarez continued to run toward the event center. It is very clear from Air 43's recording and other evidence that there were officers to the west of Mr. Juarez, to the south of Mr. Juarez, and there was an officer immediately north of the event center.

It was a very hot day - at least 100 degrees - and Mr. Juarez had been running on foot for a considerable time. At no point was Mr. Juarez observed consuming any water either by any officer, including Officer Jimenez, so he inferably was quite thirsty and likely dehydrated. Additionally, as he was running toward the barn he could easily see and hear a CHP SUV driven by Officer Martinez (and which contained Officer Kensey and his K-9) approaching and blockading his path to the barn. Both cell phone video and Air unit video document that Mr. Juarez stopped running/jogging at that point. Mr. Juarez was walking and his gate was labored - he was basically staggering. At that time, Officer Jimenez also stopped, trained his rifle on Mr. Juarez and fired two rounds. Mr. Juarez fell the ground and lay in a prone position, dying.

It is uncontested that, at the time he was shot, Mr. Juarez, was shirtless, unarmed, and moving non-threateningly in a direction away from Officer Jimenez in an open farm field, when Officer Jimenez drew his firearm and, according to witnesses without warning, aimed his firearm at Mr. Juarez and fired, shooting Mr. Juarez in the back, and killing him. At the time Officer Jimenez fired his shots at Mr. Juarez, Mr. Juarez did not pose an immediatethreat to the safety of Officer Jimenez or to anyone else.

Officer Jimenez has testified that he did not see any weapon in Mr. Juarez's hands, did not hear any threats from Mr. Juarez and did not observe Mr. Juarez point a gun at any Officer or person.

> Q. Okay. So did you discharge your rifle at some point during your pursuit. What did you shoot at?
> A. I shot at Mr. Santana.
> Q. Okay. And when you fired those shots, you intended to fire those shots at Santana Juarez Gonzalez, correct?
> A. Yes.
> Q. How many shots did you fire at Santana Juarez Gonzalez on that day?
> A. Two.

Q. Okay. At any point prior to firing the first shot from your rifle at Santana Juarez Gonzalez, did you see a gun in his hand?
A. No.
Q. Okay. At any point prior to firing the second shot from your rifle at Santana Juarez Gonzalez, did you see a gun in his hand?
A. No.
Q. After firing the first shot at Santana Juarez Gonzalez, did the decedent turn around and point a gun at you?
A. No.
Q. Okay. After you fired the first shot at the decedent, did he react and attempt to threaten you in any way?
A. No.
Q. Okay. After you fired the first shot at the decedent, did he react and attempt to threaten anyone else in any way?
A. Yes. He continued towards the party at the barn.
Q. Okay. So other than just continuing -- which he was on foot, right?
A. Yes.
Q. Other than just continuing on foot towards the barn, did he do anything else to threaten anyone else besides yourself in any way?
A. No.
Q. At any point prior to firing the first shot from your rifle at Santana Juarez Gonzalez, did you see a gun on his person?
A. No.
Q. At any point prior to firing the second shot from your rifle at the decedent, so between the first and second shot, at any point did you see a gun on his person?
A. No. (Jimenez, Pages 43-45)

Officer Kensey's testimony confirmed that there was a feasible, non-lethal alternative available to apprehend Mr. Juarez - Officer Kensey's K-9 unit, Laika. K-9 Laika could have been deployed, if Officer Jimenez had simply waited and allowed the other units to arrive and respond to the party at the barn, or to pull over and provide both lethal and nonlethal cover for him in the field, so that Mr. Juarez could be apprehended before he reached the barn.

Q. So directing your attention to the time in which you were first in Officer Martinez's vehicle to the point in which the decedent was shot, if an opportunity had presented itself where you felt that you had a visual on the suspect and you could safely deploy the canine, you, in fact, planned to deploy your canine Laika on the suspect, correct?
… [Objection]
THE WITNESS:
A. Yes, sir.

MR. SCHMIDT:
Q. And that's exactly why you took your canine with you when you joined Officer Martinez in his CHP SUV, correct?
A. Well, I didn't have any option but to take her with me, but that would be my intent.
Q. Okay. And if -- if a request from Officer Jimenez or any other officer had been made of you to respond with canine assistance, would you have responded and honored their request?
… [Objection]
THE WITNESS:
A. Yes. I would respond. (Kensey, page 141)

**Professional Standards Regarding the Use of Force:**

Early on in the POST Basic Academy, the seriousness of the unique powers imbued on Law Enforcement Officers is stressed with the required responsibility they have to use them with "great care" because an officer cannot constitutionally kill a person who does not pose an immediate threat. It is clear that there is no room for unprofessional, immature and/or hot-headed individuals in the law enforcement profession. This is best expressed in Learning Domain # 2: "Criminal Justice System:"

"The criminal justice system gives law enforcement two extraordinary powers:

1. The power of arrest and
2. The power to use deadly force.

> "The authority to do so does not come from the rule of an authoritarian dictator. Rather it comes from the will and consent of the people who *put their trust in law enforcement to use that power with the utmost of care and restraint*. This is why it is important to emphasize that peace officers do not confer "police powers" on themselves. These powers come to the criminal justice system from the people they serve." (Learning Domain #2: "Criminal Justice System," page 1-4. Emphasis added.)

Additionally, POST specifies that there are a number of key factors that can affect which force option is approved and appropriate under the concept of the "totality of circumstances."

Officers are trained that they are not allowed to inflict excessive force on persons that they arrest and that they must calculate their use of force based on the credible threat(s) evident in the totality of the circumstances.

**Considerations Regarding the Use of Deadly Force:**

The use of deadly force is the most serious decision a peace officer may ever have to make. Such a decision should be guided by the reverence for all human life (including the officer's life and others that may be in imminent danger) and, used only when other means of control are unreasonable or have been exhausted

*Deadly force* applied by a peace officer is force that creates a substantial risk of causing death or serious bodily injury.

Reverence for all life is the foundation on which the use of deadly force rests. The authority to use deadly force is an awesome responsibility given to peace officers by the people who expect them to exercise that authority judiciously. In the law enforcement/community partnership, peace officers are expected to be self-disciplined, accountable, and in turn, the community is expected to support its peace officers.

An officer may use deadly force to protect oneself or others when the officer has the objective and reasonable belief that his/her life, or the life of another, is in imminent danger of death or serious physical injury *based upon the totality of the facts known to the officer at the time*. (LD 20: Chapter 3 –Use of Deadly Force, page 3-3. Emphasis added.)

Officers are trained that in order to understand the aspects of the use of deadly force, peace officers need to become familiar with the following terms;

> *Serious bodily harm or injury* means a serious impairment of physical condition, including, but not limited to, the following: loss of consciousness, concussion, bone fracture, protracted loss or impairment of function of any bodily member or organ, a wound requiring extensive suturing, and serious disfigurement. (Penal Code Section 243(f)(4).)
>
> *Reasonable necessity* means that delay in apprehension would create substantial and unreasonable risk to officers or others possibly resulting in serious physical injury or death.

> *Imminent danger* means a significant threat that peace officers reasonably believe will result in death or serious bodily injury to themselves or to other persons. Imminent danger is not limited to "immediate" or "instantaneous." A person may pose an imminent danger even if they are not at the *very moment* pointing a weapon at another person.

*Sufficiency of fear* - According to the law, fear alone does not justify the use of deadly force. There must be a *sufficiency of fear* for the use of deadly force to be justified. (Penal Code Section 198). There are three elements needed to establish sufficiency of fear.

- The circumstances must be sufficient to excite the fears of *a reasonable person* in like circumstances.
- The person must not act *under the influence of fear alone*. There has to be some circumstance or overt act apart from the officer's fear.
- The decision to use deadly force must be made *to save one's self or another* from great bodily injury or death.

*Considerations when deciding to use deadly force* - The decision of whether or not to use deadly force may be influenced by the officer's:

- training and experience
- judgment
- mental alertness
- emotional maturity
- existing facts and circumstances
- understanding of the law as it relates to

    - agency policies concerning the use
    - amount of force that is objectively reasonable to achieve the law enforcement mission (LD 20: Chapter 3 –Use of Deadly Force, page 3-6 & 3-7.)

**<u>Opinions Thus Far</u>**:

1. As stated above, the infliction of lethal force on a citizen is the most serious decision a Law Enforcement Officer will make in his/her career, and therefore that the reasonableness of an officer's use of

deadly force includes consideration of the officer's tactical conduct and decisions leading up to the use of deadly force. Yet, in this incident Officer Jimenez did so without any reasonable precaution to be sure he was correct or justified to shoot and kill Mr. Juarez, whom Officer Jimenez testified never brandished or pointed a gun at anyone.

While I am not critical of Officer Jimenez's response and presence at the scene, I am very critical of his abrupt fatal shooting of Mr. Juarez without allowing the opportunity for responding officers to intercede, and without allowing the opportunity for other officers - who were in close proximity - to employ non-lethal means of apprehending Mr. Juarez, such as officer Kensey's K-9.

2. Throughout the country, police departments (including the CHP) for decades have trained their officers in safe and accepted ways to contain, assess and arrest subjects in order to avoid injuries - including lethal and/or potential lethal injuries. These tactics are so fundamental that failure to use them is not excused. Additionally, as noted above, law enforcement officers are trained that they are responsible for their tactical decisions when they resort to lethal force instead of using the obvious reasonable alternatives available to them. In my opinion, a significant causal factor resulting in this shooting incident was the collective failure by Officer Jimenez to use, or create, tactical cover when they encountered and confronted Mr. Juarez.

Officers are taught that tactical **cover** (c) plus **distance** (d) provides the **time** (t) to determine the true circumstances of situation and react reasonably *[c+d=t]*. **Time** is taught as a necessary tool as much as other tools (such as the baton, taser, o/c spray, bean bag shotgun, canine etc. and, as a last resort, the firearm) as they become involved in incidents. Accordingly, the use of cover and distance to create more time is a tactic known and trained among all police agencies as an effective tactic of safety for law enforcement officers, the subjects they seek to apprehend, as well as the general public. In my opinion, Officer Jimenez utterly failed to follow these fundamental trained and required methods - which, in this case was to keep Mr. Juarez in sight and to communicate to the surrounding Officers his

observations. Instead, Officer Jimenez suddenly, unnecessarily and excessively unleashed lethal force on Mr. Juarez.

3. Officers are trained that they are responsible for their tactical decisions that result in their use of lethal force. In this case, there were obvious reasonable alternatives to any use of lethal force. They included remaining at a safe distance, allowing the Officers on their way to the event center to contain Mr. Juarez and get him to submit to detention and arrest. This could have included deploying Officer Kensey's K-9 to apprehend Mr. Juarez before he reached the party. The obvious tactical act was for the officers to respond to the barn, for officers to use the available cover opportunities and utilize the K-9 to apprehend Mr. Juarez. Accordingly, in my opinion, no officer was justified in using lethal force when it was used.

4. The CHP, through its chain of command, appears to have endorsed the dangerous and out-of-policy tactics that are connected to this incident. As such, their collective approval of these tactics puts the general public at unnecessary future risk of death and/or injury from Officer Jimenez and others on the department who have been, or are now, similarly trained and/or supervised.

5. Officer Jimenez's tactical decisions, including the actions taken and those that were not taken, were contrary to appropriate and reasonable police practices. First, all of the officers, including Officer Jimenez, conceded that there was no discussion or plan formulated when they had all converged on the dirt road. The officers, including Officer Jimenez, should have formulated a plan and designated officers to immediately respond to the party at the barn. Supposedly, the officers all got back into their vehicles with no coordination of efforts and no plan. Second, Officer Jimenez failed to proceed further north on the dirt road in order to either respond to the party at the barn, or intercept Mr. Juarez short of the party. Instead, he got out of his vehicle, proceeded on foot, and went solo, taking himself out of communication with the other units. Third, as confirmed by the testimony of the other officers, Officer Jimenez did not at any point request the assistance of a K-9 unit, despite knowing that Officer Kensey had a K-9, and that there was a Madera Sheriff's Office K-9 unit among the various law enforcement assets pursuing Mr. Juarez.

**My Qualifications To Review This Case:**

My opinions are based in part on my training, professional experience and education. I am a twenty seven year veteran of the Los Angeles County Sheriff's Department (LASD). I was hired on December 1, 1965, and I retired from active service on March 31, 1993. My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and fifteen years as a Lieutenant. I retired holding a California Peace Officer Standards and Training (POST) Advanced Certificate, and I am a graduate of the POST Command College (class #5, 1988). The POST Command College was a Masters level two-year course of study requiring a thesis, in Police Administration, with the diploma awarded by the California Department of Justice (and not the California University system).

During the course of my service with the department, I had a wide range of duties. Those duties included an 18 month assignment as a staff jail deputy and two years as an Administrator/Lieutenant in the same jail facility (Men's Central Jail). I also served on the department as a patrol officer, field supervisor, jail watch commander and administrator, station watch commander, and commanding officer of investigative units. I was a field training officer while assigned as a patrol deputy, and I trained new officers in POST and department approved patrol procedures, field investigations, apprehension techniques, and emergency procedures.

I was a Station Detective and, as such, reviewed and assessed cases passed on to me by the patrol officers. Those cases included possible complaints relating to both misdemeanor and felony crimes. They frequently required follow up investigations and interviews before the exact nature of the case could be determined. As a field officer and detective, I was trained in interview and interrogation methods and subsequently trained other officers.

Among other assignments as a Sergeant, I supervised field officers and station detectives as they took complaints and conducted preliminary investigations regarding criminal and administrative matters.

As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles County Sheriff's Department's Patrol School which taught the POST accepted patrol tactics, and investigation and apprehension methods.

As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported on the use of force and officer-involved shootings. I was also assigned by my Department

to sit as a member of Departmental review committees regarding the reasonable or unreasonable use of force and tactics.

As stated above, during my career I was assigned to the Los Angeles County Men's Central Jail (MCJ) for a period of 18 months as a line officer. Upon my subsequent promotion to Lieutenant, I returned to the same facility approximately 10 years later. During that time, I was assigned as a Jail Watch Commander, and as the Facility Training and Logistics Administrator. At the time of my assignment, the MCJ held a daily population in excess of 7,000 inmates, including a hospital, which was serviced by a staff of more than 900 sworn and civilian personnel.

During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, I worked closely with the State of California Peace Officer Standards and Training in revamping our Reserve Academy to bring it into state compliance. This process gave me an expertise in the POST Basic curriculum. I also supervised the training of cadets at our Reserve Training Academy. They were taught proper investigation, interview, and apprehension procedures. Among other topics, I lectured the Reserve Academy on the POST syllabus: "The Legal and Moral Use of Force and Firearms."

During the 1984 Olympics held in Los Angeles, I was assigned and served as the Department's Intelligence Officer at the Los Angeles Olympics Emergency Operations Center.

During the last five and one half years of my career, I commanded a specialized unit known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.), which was created to investigate, locate, observe and arrest major (career) criminals. I held this position until my retirement from the Department on March 31, 1993.

Criminals investigated and arrested by N.O.R.S.A.T. included suspects involved with homicide, robbery, kidnaping, extortion, burglary, major narcotics violations and police corruption. The majority of our cases were homicide cases, including the murder of police officers. Arrests frequently occurred in dynamic circumstances including crimes in progress.

My unit also conducted major narcotics investigations including undercover narcotics buys, buy busts, and reverse stings. We frequently deployed at the request of investigative units, such as Narcotics, which provided the initial investigative leads for our operations. These narcotics cases usually involved multiple kilogram quantities of

drugs and amounts of money ranging from one hundred thousand to more than one million dollars.

Approximately 80% of cases assigned to N.O.R.S.A.T. were active Homicide investigations. In that regard, the unit processed, under my command and supervision, various aspects (depending on the complexity of the cases involved) of approximately 1,000 Homicides ranging from deaths of police officers to serial homicide suspects.

Additionally, the majority of the over 1900 cases for which I have been retained as a consultant (since 1993) have involved injuries or deaths connected with some aspect of force during either apprehension or while in police custody.

During the first three months of my command of N.O.R.S.A.T., the unit had three justifiable shooting incidents. From that time, and over the next five years of my command, N.O.R.S.A.T. established a remarkable record of more than two thousand arrests of career criminals without a single shot fired – either by my officers or by the suspects whom we arrested.

Many of these suspects were armed and considered to be very dangerous. Some were apprehended during the course of their crimes and were very prone to use firearms to escape apprehension. This record of excellence was accomplished through the use of proper tactics, management and supervision of personnel, training in correct apprehension methods, and adherence to the moral and ethical standards endorsed by California POST and my Department. These methods and principles are also embraced by every state training commission of which I am aware, as well as the national standards established by the U.S. Department of Justice.

As a result of my position and record as the commanding officer of N.O.R.S.A.T., I was assigned to author Field Operations Directive 89-3, "Tactical Operations Involving Detective Personnel." This order remained in force 20 years (until September 30, 2009), and included the basic standards and considerations with which investigative officers must comply in the event of a tactical deployment such as the dynamic entry into a building for the purpose of an arrest and/or seizure of evidence.

Since my retirement, I have testified as an expert on use of force, jail procedures and jail administration, investigations, police procedures, police tactics, investigative procedures, shooting scene reconstruction, and police administration in Arizona State Courts, California State Courts, Washington State Courts and Federal Courts in Arizona, California, Colorado, Florida, Illinois, Indiana, Louisiana, Missouri, Nevada, Ohio,

Oregon, Pennsylvania, Texas, Utah, Washington, New Mexico, New York and Wisconsin. I have testified before the Los Angeles Police Department Board of Rights and the Los Angeles County Civil Service Commission. I have testified before the Harris County (Texas) Grand Jury and the Cleveland Grand Jury. I have also submitted written opinions in matters before Alaska, Delaware, Idaho, Montana, North Carolina, New York, Oregon, Kentucky, and Wyoming Federal and State Courts. I was selected (January 20, 2007) to present on the topic of: "Police Experts" at the National Police Accountability Project held at Loyola Law School, Los Angeles, California. I was selected (September 23, 2010) to present on the topic of: "Using POST Modules to Establish Police Officer' Standard of Care" at the National Police Accountability Project, National Lawyers Guild Convention, in New Orleans, Louisiana. I was selected (March 30, 2012) to present to the Kern County Public Defenders in Bakersfield, California, on the topics of "Ethics, Police Investigations, the California POST Curriculum, and the M26 and X26 Taser weapons." On August 7, 2013 I was invited and presented to the Texas Civil Rights Project (TCRP) 2013 Annual Legal Summit in Austin, Texas on the topic: "Ethically Working with Experts from the Prospective of a Police Expert." On October 15, 2015 I was the invited presenter at a Community Forum in Victorville, California on the topics of Police Procedures, Community Policing, Use of Force, and features of the M26, X26 and X2 Taser weapons. I was selected (January 24, 2020) to present on the topic of: "Use of force litigation under California's negligence standard and the impact of AB 392" at the National Police Accountability Project held at Loyola Law, Los Angeles, California. On February 18, 2020, and on March 10, 2021, I lectured (at request) at the University of California - Irvine, School of Law, Civil Rights Litigation Clinic.

I have worked on several projects with the Paso Del Norte (El Paso, Texas) Civil Rights Project and the Texas Civil Rights Project (Austin, Texas). As a result of my expert testimony in *Border Network, et al. v. Otero County, et al.*, Case No. 07-cv-01045 (D.N.M. 2008), a federal court issued a temporary injunction to stop the illegal and widespread immigration raids in Chaparral, New Mexico, implemented pursuant to Operation Stonegarden. The case resulted in the adoption of a model policy for inquiring into a person's immigration status, which has been adopted nationwide and has also been presented to the United States Senate, the Secretary of Homeland Security, and other government officials seeking to reform immigration enforcement.

I have been recognized, and my expert report was quoted by the USDC in *Burns v. City of Redwood City*, 737 F.Supp.2d.1047. I have been recognized, and my expert report was quoted by, the United States Court of Appeals for the Ninth Circuit as an expert in Police Administration and Use of Force in *Blankenhorn v. City of Orange, et al.*, 485 F.3d 463, 485 (9th Cir. 2007). The Ninth Circuit also drew from my expert report in a second

published case involving Police Detective Investigations. *Torres, et al. v. City of Los Angeles, et al.*, 540 F.3d 1031, 1042-43 (9th Cir. 2008). The *Torres* case was appealed to the U.S. Supreme Court and returned for trial. I provided the expert opinion in *Chavies Hoskin v. City of Milwaukee, et al.* (E.D. Wis Case No. 13-cv-0920), regarding field strip and cavity searches, hiring, training, discipline and supervision, and which resulted in significant policy changes within the MPD. My opinions supported argument in the Ninth Circuit case: *A. D., a Minor; J. E., a Minor; Sue Casey, Plaintiffs-Appellees, v. State of California Highway Patrol, Defendant, and Stephen Markgraf.*, No. 09-16460, D.C. No. 3:07-cv-05483-SI (9th Circuit, Published Opinion). My opinions supported argument in the Ninth Circuit case: *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1102 (9th Cir. 2014). The Ninth Circuit also drew from my expert reports regarding credible threats justifying the use of force, *Hayes v. County of San Diego*, 658 F.3d 867 (9th Cir. 2011), and *Young v. County of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011). The Ninth Circuit also drew from my expert reports regarding Jail Administration and Administrative Responsibilities, *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011). The Ninth Circuit also drew from my expert reports regarding an officer's violation of the 14th Amendment if an officer kills a suspect when acting with the purpose to harm, unrelated to a legitimate law enforcement objective, in *AD v. California Highway Patrol*, 712 F. 3d 446 (9th Cir. 2013). The Fifth Circuit drew from my expert report regarding search and seizure, investigations and no-knock requirements in *Bishop et al. v. Arcuri et al.*, 674 F.3d 456 (5th Cir. 2012). The Ninth Circuit also drew from my expert report regarding the use of impact weapons (PepperBall) on civilians in *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012). I was the expert in the Ninth Circuit opinion regarding the allegations proffered by police officers and their use/display of firearms against civilians in *Green v. City and County of San Francisco*, 751 F. 3d 1039 (9th Cir. 2014). Most recently, I was the expert in an important Ninth Circuit opinion regarding the allegations proffered by police officers and their use of lethal force against unarmed persons in *Jennifer Cruz, et al., v. City of Anaheim, et al.*, 765 F.3d 1076 (9th Cir. 2014). I was the expert at trial in the Ninth Circuit opinion regarding the order of evidence at trial in *Estate of Manuel Diaz, v. City of Anaheim*, et al., No. 14-55644. My opinion is quoted in the Ninth Circuit opinion regarding the use of lethal force in *A.K.H. a minor, et al, v. City of Tustin, et al.*, No. 14-55184. My opinions supported argument in the Ninth Circuit case: *Estate of Angel Lopez, et al., v. Kristopher Michael Walb*, No. 14-57007 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court. My opinions supported argument in the Ninth Circuit case: *Estate of Shakina Ortega, et al., v. City of San Diego, et al.* No. 14-56824 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court. My opinions supported argument in the Ninth Circuit case: *Jerry Newmaker, et al., v. City of Fortuna, et al.* No. 14-15098 (for publication). My opinions supported argument in the Ninth Circuit Case: *Tonya E. Shirar, v. Miguel Guerrero, et al.* regarding

use of lethal force and "suicide by cop," No. 15-55029 (not for publication). My opinions supported argument in the Ninth Circuit Case *Angel Mendez; Jennifer Lynn Garcia, v County of Los Angeles, et al.,* Nos. 13-56686, and 13-57072 (for publication) and which was settled before the Supreme Court, No. 16-369, regarding the use of lethal force and searches. My opinions supported argument in the Ninth Circuit case: *Chien Van Bui, et al, v City and County of San Francisco, et al*, No. 14-16585 (not for publication), regarding the use of lethal force. My opinions supported argument in the Sixth Circuit opinion, Case No. 16-5322*, Carey Woodcock v. City of Bowling Green, et al,* Originating Case No. 1:13-cv-00124 regarding the use of lethal force. My opinions supported argument in the Ninth Circuit opinion, Case No. No. 14-17388 (for publication), *Johnathan Jones, et al v. Las Vegas Metropolitan Police Department, et al,* Originating Case No. 2:12-cv-01636- regarding the use of lethal force and Taser weapons. My opinions supported argument in the Ninth Circuit opinion, Case No. 16-15606 (for publication), *Christian Longoria, et al v. Pinal County, et al,* Originating Case No. 2:15-cv-00043, PHX SRB, regarding the use of lethal force after a vehicle pursuit. My opinions supported argument in the Ninth Circuit case: *S. B. v. County of San Diego,* 864 F.3rd 1010 (9th Cir. 2017), (for publication) regarding issues of qualified immunity. My opinions supported argument in the Tenth Circuit case: *Russell Tenorio v. Brian Pitzer,* Case No. 2012-CV-01295 (U.S. Supreme Court No. 15-795) regarding issues of qualified immunity and use of deadly force. I participated as a retained expert in the USDC Fifth District case, *Stephen McCollum et al., v. Texas Department of Criminal Justice, et al.,* Case No.3:12-CV-02037 regarding in-custody hyperthermia deaths. My opinions supported argument (and I was cited by name) in the Ninth Circuit opinion, Case No. 17-55116 (for publication), *Susan Mellen, et al v. Marcella Winn, et al,* D.C. Case No. 2:15-cv-03006, GW AJW, regarding Detective Investigations and Qualified Immunity. My opinions supported argument in the Ninth Circuit Case *Richard Vos; Jenelle Bernacchi, v City of Newport Beach, et al.,* Nos. 16-56791 (for publication) and which was settled by the Supreme Court, No. 16-56791, regarding the use of lethal force and mental illness. My opinions (and quoted by name) supported argument in the Ninth Circuit Case *S.R. Nehad, et al. v. Browder, et al.*, No. 18-55035 (for publication) regarding the use of lethal force and custom and practice. My opinions supported argument in the Ninth Circuit opinion, Case No. 17-55930 (not for publication), *Estate of Kevin Brown, et al. v. Michael Lambert, et al.*, D.C. No. 3:15-cv-01583-DMS-WVG, regarding Detective Investigations and Qualified Immunity. My opinions supported argument in the Ninth Circuit opinion, Case No. 15-56339 (for publication), *Shane Horton, by his Guardian Ad, Litem Yvonne Horton, v. City of Santa Maria; Santa Maria Police Department; Andrew Brice*, D.C. Case No. 2:14-cv-06135- SJO-PJW, and *Jonathan Michael Castro v. County of Los Angeles, et al,* D.C. Case No. CV 10-5425 DSF (JEMx), 833 F.3d 1060 (9th Cir. 2016) (en banc), regarding in-custody suicidal prisoners and qualified immunity. My opinions supported argument in the Ninth Circuit

opinion, Case No. 17-56270 (not for publication), *James Soler v. County of San Diego, et al.,* D.C. No. 3:14-cv-02470-MMA-RBB, regarding required verification of persons taken into custody pursuant to a warrant of arrest. My opinions supported argument in the Ninth Circuit opinion, Case No. 18-17404 (for publication) Tan Lam, v. City of Los Banos, et al. D.C. No. 2:15-cv-00531-MCE-KJN, regarding the use of lethal force. My opinions supported argument (and I was cited by name) in the Ninth Circuit opinion, Case No. 19-56035 (for publication), Tiffany Tabares, et al v. City of Huntington Beach, et al, D.C. Case No. 8:18-cv-00821, JLS-JDE, regarding use of force and subjects suffering mental illness.

The California Court of Appeal (Second Appellate District) drew in part from my expert report regarding search warrant service, *Macias v. County of Los Angeles*, 144 Cal. App.4th 313, 50 Cal. Rptr.3d 364 (2006). The California Supreme Court drew in part from my expert opinion regarding police tactics and the use of deadly force, *Hayes et al. v. County of San Diego et al.*, 57 Cal.4th 622 (2013). I was quoted by the California Appellate Court (Second Appellate District, Division Three) in *B.B., a Minor, etc., et al., v. County of Los Angeles, et al., Case No. B264946 Super. Ct. Nos. TC027341, TC027438, BC505918* regarding positional asphyxia issues.

On February 10, 1989, I was personally commended at the Los Angeles County Hall of Administration by United States Attorney General, the Honorable Edwin Meese III, for my work to establish California Penal Code Section 311.11 (forbidding the Possession of Child Pornography). On February 22, 1993 (at the time of my retirement), Mr. Meese presented a second personal commendation for the success of this critical five-year effort to bring this law into effect. California Penal Code Section 311.11 is required training for all Law Enforcement Officers in California and taught extensively in the POST Basic Learning Domain #9: "Crimes Against Children," pages 1-18 to pages 1-21.

On December 7, 2015 I was requested by the Cleveland District Attorney to present my opinions to the Cleveland Grand Jury regarding the November 22, 2014 shooting death of Tamir Rice by City of Cleveland police officers. In March, 2016 I was requested by the Delaware Attorney General to review and provide my opinions regarding the shooting death of Jeremy McDole. The AG report was published May 12, 2016. I provided a written Opinion for New Mexico AG regarding the shooting Death of Teresa Anaya that included requested training opinions. I have also consulted with, and provided written opinions at the request of the U.S. Attorney (New York), the Santa Clara County District Attorney, and the San Francisco District Attorney.

I have been found competent by both Federal and State Courts to render opinions as to responsibilities as occurred in this case. A number of my cases have involved law enforcement officers as civil plaintiffs and as criminal defendants.

Since my retirement, I have become an expert in the features and the use of TASER International's products, including the Model M26, Model X26 and Model X2 ECDs. I own each, along with the download software. I have reviewed all the TASER training materials and am familiar with the risks and tactics associated with these potentially lethal devices. I have qualified as an expert on TASER products and testified both in deposition and before juries on their usage. Two published examples are *Lee v. Nashville*, 596 F. Supp. 2d 1101, 1121-22 (M.D. Tenn. 2009), and *Heston v. City of Salinas*, 2007 U.S. Dist. LEXIS 98433, *25-*26 (E.D. Cal. 2007). My most recent Federal acceptance/certifications as an expert in the general use and deployment of the TASER weapon (including Taser International product warnings/bulletins sent to every agency using the Taser weapon) occurred in Los Angles, California on November 7, 2017 in *William Mears, et al., v. City of Los Angeles, et al,* USDC Case No.: CV 15-08441 JAK (AJWx) and on February 22, 2018 in *Maria Hernandez; A.J., Jr., et al, v. City of Los Angeles, et al,* USDC Case No. 2:16-c-02689 AB (JEMx), and on May 3, 2018 in Heleine Tchayou, et al. v. City of Los Angeles, et al., Case No. 16-cv-06073-TJH-MRW, and on November 1, 2018 in Alma Rosa Godinez, v. San Diego County, et al. Case No. 3:16-cv-00236 BAS-NLS. There are many others.

I declare under penalty of perjury that the foregoing is true and correct. Executed April 7, 2021 at Santee, CA.

Roger A. Clark

# EXHIBIT A

**ROGER A. CLARK**

*10207 Molino Road • Santee CA 92071 • Telephone: (208) 351-2458. Fax: (619) 258-0045.*

## EXPERIENCE

**Police Procedures Consultant (self employed)**
April 1, 1993 to Present.................................................................. **27 years**

I have been certified by Federal and State courts as expert in jail and police procedures in Federal and State Courts. I select my cases carefully and have consulted in approximately 2100 cases thus far since my retirement from the Los Angeles County Sheriff's Department.

**Substitute Teacher, Madison School District**
August 1994 to 2003.......................................................................... **9 years**

I substitute teach at all levels in the school district (elementary to high school). As a volunteer, I wrote and managed a $85,000.00 federal grant for our Central High School. This grant is in its sixth year and has generated $510,000.00 for the school.

**District Liaison, State of Idaho Department of Juvenile Corrections**
August 1, 1995 to March 1, 1997.........................................**1 year, 7 months**

I represented the new Department of Juvenile Corrections to the ten counties in the Seventh Judicial District. As such, I worked closely with Probation Officers, County Commissioners, Judges, other state agencies, private care providers, etc. in the implementation of the new Idaho Juvenile Corrections Act of 1995. I wrote or participated in the writing of several federal grants for the District. I conducted training - both formal and informal - and developed a series of new therapy programs for juveniles with private care providers. I also served as the Director of the Detention Center and the State Placement Coordinator during this time.

**Los Angeles County Sheriff's Department**
December 1, 1965 to March 31, 1993................................**27 years 4 months**

**Note:** In 1993 the Los Angeles County Sheriff's Department had 7,000 sworn and 3,000 civilian personnel and a daily County Jail inmate population of 23,000.

**Service as a Lieutenant (15 Years, 0 Months):**

**1. Field Operations Region I**
**NORSAT** 11/15/87 to 3/31/93 **64 months**

I commanded a specialized unit created to investigate, locate, observe and arrest major (career) criminal offenders. This unit was designed as a multijurisdictional effort for the cities in the northern region of Los Angeles County. The command consisted of four (4) Sergeants, seventeen (17) Deputies, four (4) Police Officers, twenty five (25) Reserves, and three (3) civilian employees. The 1992 budget set at $1.5 million. The arrest rate averaged 500 career criminal arrests per year with a 97% conviction rate and no shots fired (on either side) for 61 consecutive months.

Significant contributions while assigned at this Bureau were:

- Increase in participating police agencies.
- Direct participation with corporate (private) agencies.
- Formation of a reserve and volunteer unit.
- Establishment of NORSAT Foundation private funding.
- Computerization of the unit.
- Promotion of fourteen personnel.
- Fleet expansion from 13 to 28 vehicles (donated).
- Formation of the DEA Valley Task Force.
- Field Operations Directive 89-3.

**2. Executive Offices**
**Reserve Forces Bureau** 05/01/84 to 11/15/87 **42 months**

I was the administrative officer to a specialized bureau responsible for coordinating the activities of 1,000 sworn reserve personnel, 900 civilian

volunteers, and 450 law enforcement explorer scouts. The Bureau identifies programs for their effective utilization throughout the Department; develops and tracks training programs; sponsors activities designed to promote growth and keep morale at high levels.

Significant contributions while assigned at this bureau are:

- Total restructure of the Academy training process for reserve Deputies.
- Implementation of upgrade programs to move lower level reserves to level I status.
- Departmental Reserve Certification procedures.
- Annual leadership seminar.
- The Reserve News, a nationally recognized police magazine.
- Computerization of the Bureau.

**3. Field Operations Region I**
**Crescenta Valley Station** 04/01/80 to 05/01/84 **49 months**

Crescenta Valley Station is a full service police facility of 100 personnel serving a population of 50,000 (including the Contract City of La Canada-Flintridge) and a total area of 250 square miles. During my four years service at this facility I served in every management role:

- **Nine months** as the Station Commander during an extended absence by the Captain (08/01/83 TO 05/01/84).
- **Sixteen months** as the Operations Lieutenant (03/01/82 TO 08/01/83).
- **Twelve months** as the station Detective Bureau Commander (03/01/81 to 01/01/82).
- **Twelve months** as a Watch Commander (04/01/80 to 03/01/81).

Significant contributions while assigned at this command are:

- Negotiation of an enhanced city contract (at a savings to the City).
- Formation of a volunteer community support group.
- Development and implementation of an integrated community emergency response plan.
- High School undercover narcotics operation.
- Restructure of the Station Detective Bureau.
- The annual station picnic, which was effective in boosting station morale.

**4. Custody Division**
**Central Jail** 04/01/78 to 04/01/80 **24 months**

The Los Angeles County Central Jail is the largest jail facility in the State of California, with a daily inmate population of seven thousand (7,000), an assigned staff of six hundred (600), and two hundred (200) civilian personnel. My service at this command was equally divided into two major assignments:

- Training and Logistics Lieutenant (04/01/79 to 04/01/8).
- Watch Commander (04/01/78 to 04/01/79).

Significant contributions while assigned at this command are:

- "Hot Fire" Training program, which is now a State (POST) mandated training module for all custody personnel throughout California.
- The "Defend in Place" fire safety operational plan for jail facilities.
- New fire safety specifications for jail bedding and mattresses.
- The development of fire safe jail mattress material.
- The development of a facility emergency response plan.
- The computerization of training, timekeeping, and scheduling for the facility (800 sworn and 200 civilian personnel).
- "Spouse day at CJ"--A program for spouses of employees.

**Service as a Sergeant (6 Years, 4 Months):**

**5. Administrative Division**
**Federal Surplus Property** 01/12/76 to 04/01/78 **27 months**

This program was entirely my idea and developed while I was assigned at my previous assignment (Emergency Operations Bureau). The unit provides millions of dollars in free federal excess and surplus food and property from clothing to heavy equipment and aircraft to the department each year. I am very proud of this contribution to the Department.

**6. Patrol Division**
**Emergency Operations** 02/01/74 to 01/12/76 **23 months**

I was among the original personnel that formed this unit which blended the activities of the Department's planning unit with emergency operations planning and preparation. I was assigned as the Personnel and Logistics Sergeant.

Significant contributions while assigned at this command are:

- Formation of a new County Emergency Operations Center.
- Participation in the 1974 Federal earthquake studies of Los Angeles County.
- Development of the Department's specialized Field Command Post equipment.
- Development of the Department's Field Booking Team.

**7. Patrol Division**
**Civil Defense Bureau** 12/01/73 to 02/01/74 **02 months**

I was assigned to this unit to facilitate the orderly transition into the new Emergency Operations Bureau.

**8. Patrol Division**
**San Dimas Station** 12/12/72 to 12/01/73 **12 months**

I performed all the duties of a Watch and Patrol Sergeant. I also frequently served as the Watch Commander.

**9. Technical Serviced Division**
**Communications Bureau** 12/01/71 to 12/12/72 **12 months**

I served as the Watch Commander in The Sheriff's Department's old radio room located at the Hall of Justice, and assisted in the transition to the existing communications facility.

**Service as a Deputy (6 Years, 0 Months):**

**10. Patrol Division**
**San Dimas Station**
**Detective Bureau** 01/01/70 to 12/01/71 **23 months**

I served as a Station Detective assigned to the evening watch. I handled the first response to all crimes requiring investigations. I processed all evening juvenile matters, prepared criminal complaints and juvenile petitions.

11. **Patrol Division**
**San Dimas Station Patrol** 01/29/68 to 01/01/70 **24 months**

I performed all duties assigned to Station Patrol: Jailer, Desk, Watch Deputy, Patrol, and Traffic.

**12. Technical Services Division**
**Transportation Bureau** 11/01/67 to 01/29/68 **02 months**

I was temporarily assigned to the Beverly Hills Municipal Court pending my assignment to a Patrol Station.

**13. Custody Division**
**Central Jail** 05/06/66 to 11/01/67 **18 months**

I returned to my previous assignment at the Central Jail after graduation from the Academy. I performed all aspects of a Custody Deputy i.e. Module Officer, Prowler, Control Booth, High Power, etc.

**14. Administrative Division**
**Academy** 01/17/66 to 05/06/66 **04 months**

I was a Sheriff's trainee assigned to Class #110.

**15. Custody Division**
**Central Jail** 12/01/65 to 01/17/66 **01 month**

I was a pre-academy Custody Deputy assigned to the Central Jail as an "off the street" Deputy Sheriff.

## DEGREES AND CERTIFICATION

| | | |
|---|---|---|
| P.O.S.T. Command College (Class #5) | POST | 1988 |
| Management Certification | POST | 1980 |
| Advanced Certification | POST | 1975 |
| Associate of Science Degree | Chaffey College | 1971 |

# EXHIBIT B

Roger A. Clark
Police Procedures Consultant, Inc.
10207 Molino Road. Santee, CA 92071
Phone: (208) 351-2458, Fax: (619) 258-0045
rclark9314@aol.com

April 7, 2021

Panos Lagos, Esq.
Law Offices of Panos Lagos
5032 Woodminster Lane
Oakland, CA 94602-2614

Sanjay S. Schmidt, Esq.
Law Office of Sanjay S. Schmidt
1388 Sutter Street, Suite 810
San Francisco, CA 94109

***Regarding: J.A.J., et al., vs. Efrain Jimenez, et al., Case No.: 1:18-cv-01138 DAD-SKO.***

Dear Counsel:

My fee schedule is as follows:

- Travel time at the rate of $50.00 per hour.
- (Travel via automobile to and from San Diego to Los Angeles 8 hours $400.00)
- All case review, consulting, and writing of expert opinions (such as Rule 26 reports) at $250.00 per hour.
- All testimony (either at trial or deposition) at $350.00 per hour, with a two hour minimum required.
- A retainer fee of $3,500.00 when initially retained will be used against the above listed fees. Subsequent billings at the rates specified.
- A "rush fee" of $500.00 for work required less than three weeks from notice/retention.
- An invoice will be submitted periodically upon request reflecting the activities and charges associated with the account. Payment is due upon receipt of the invoice.

There is no formal contract required. My Federal Tax ID Number is **72-1576857.**
Sincerely,

Roger A. Clark

# EXHIBIT C

Roger Clark
Police Procedures Consultant, Inc.
10207 Molino Road. Santee, CA 92071
Phone: (208) 351-2458, Fax: (619) 258-0045
rclark9314@aol.com

**UPDATED LIST OF SWORN TESTIMONY FOR RULE 26**

**April 3, 2017 to April 1, 2021**
(Revised April 1, 2021

**Deposition:** April 3, 2017. Walter Deleon, et al., vs. City of Los Angeles, et al., Case No.: 2:16-cv-03721-FMO-RAO. 1595

**Trial:** April 5, 2017. Joshua Osorio, et al. v. State of California (CHP) et al. Superior Court State of California (San Diego County) Case No. 37-2013-0072536 CU-CR-CTL

**Deposition** April 7, 2017. Channel Centeno, et al., v. City of Fresno, et al., Case No.: 1:16-CV-00653-DAD-SAB.

**Deposition:** April 10, 2017. Allen B. Shay v. County of Los Angeles – Case No. 15-CV-4607 CAS (RAO).

**Deposition:** April 14, 2017. Eliel Paulino, v. Marco Cruz, et al., Case No. CV16-02642-NC.

**Trial:** April 20, 2017. Marius Mitchell v. Neal A. Robertson, Case No.: 2:16.

**Deposition:** April 24, 2017. Mercedes Hernandez, v. Department of Motor Vehicles, et al. Superior Court Case No. BC588742.

**Deposition:** April 26, 2017. Daniel Smith v. City of Anaheim, et al. Case No. SACV15-1776 CJC (DFMx).

**Trial:** April 27 &28, 2017. Ray Webb, v. Officer J. Ackerman, (Long Beach) et al., Case No.: CV013-09112.

**Deposition:** May 8, 2017. Ethan Morse vs. County of Merced, et al., Case No.: 1:16-CV-00142-DAD-SKO.

**Deposition:** May 10, 2017. Dyrone Leake, Sr. v. City of Los Angeles, et al. Superior Court Case No. BC 606819.

**Deposition:** May 22, 2017. Isabel Bel Montez, et al., v. City of Stockton, et al., Case No.: 2:10-

cv-03149 MCE FEB.

**Deposition:** May 26, 2017. Antonio Ortiz, Luiz Ortiz, vs. City of Fullerton, et al., Case No.: CV-16-01499 DOC (DFMx).

**Deposition:** May 30, 2017. Estate of Derek Williams Jr., et al., vs. City of Milwaukee, et al., Case No.: 2:16-cv-00869.

**Deposition:** June 5, 2017. Lee Darnell Watson, vs. City of San Jose, et al., Case No.: 3:15-cv-04054.

**Deposition:** June 12, 2017. Estate of Gustavo Najera, et al. v. City of Anaheim, et al., Case No. 8:16-CV-01243 JLS (JCG).

**Deposition:** June 15, 2017. Estate of Danny Cecil Jones, et al., vs. City of Spokane, et al., Case No.: 2:16-cv-00325.

**Trial:** June 16 & 19, 2017. People v. Robert Branch, Superior Court, State of California, (San Diego County) Case No. CD264516.

**Deposition:** June 20 &26, 2017. Kierra Williamson, Princeton Williamson, and Michael Williamson, vs. Chicago Police Officer Wilfredo Ortiz, et al., Case No.: 14 CV 6397.

**Deposition:** June 27, 2017. Doyma Vanessa Michel, v. United States of America. Case No. Case No.16-CV-0277 GBC-RBB.

**Trial:** July 12, 2017. The Estate of Ashley DiPiazza, et al., v. City of Madison, and Justin Bailey, Gary Pihlaja, and Carey Leerek, Case No.: 16cv060.

**Deposition:** July 21, 2017. Graciela Lopez Franco, et al, v. United States, et al. Case No. 15-cv-2626 - JM (RBB).

**Trial:** July 24, 2017. Maria Del Carmen Rivas, et al., v. City of Los Angeles, et al., Case No.:2:15-CV-000456-JFW-JEM.

**Trial:** July 31, 2017. People v Amanda Christine Jaramillo. Superior Court, Orange County, Case CHPW 14-1404

**Deposition:** August 1, 2017. Randy Conan v. City of Fontana, et. al. Case No. 15:16-cv-01261.

**Trial:** August 4, 2017. Shirar et al, v. CHP Officer Miguel Guerrero, et al, USDC Case No. EDCV 13 - 0906 JGB (OPx).

**Deposition:** August 14, 2017. Breanna Cooke, et al., vs. City of Stockton et al, Case No. 2:14-cv-00908-KJM-KJN.

**Deposition:** August 15, 2017. Marcus Vaughn, et al. v. City of Los Angeles, et al. Case No. 2:16-cv-03086 AB-AJW.

**Deposition:** August 17, 2017. Shawna Brown, et al., vs. City of Stockton, et al., Case No. 2:13-CV-01007-KJM-KJN.

**Deposition:** August 21, 2017. Sandra Salazar, et al., vs. Deputy Shandon Deasey, et al., Case No. 5:16-cv-01103-JFW-KK.

**Deposition:** August 21, 2017. Sufle v. City of Gardena, et al., Case No. CV 16-00384-GW-MRWx

**Deposition:** August 22, 2017. Andrew Jeremy Garcia v. City of Garden Grove, et al. Case No. 8:16-cv-00154 DOC (KESx).

**Trial:** August 28, 2017. The Estate of Angel Lopez, et al., v. City of San Diego, et al. Case No.: 13CV2240 GPC BGS.

**Deposition:** September 7, 2017. Arthur Moore, et al, v. City of Berkeley et al, Case No.: 14-cv-000669 CRB.

**Deposition:** September 8, 2017. Estate of Ruben Nunez, et al v. County of San Diego, et al., Case 3:16-cv-01412-BEN-MDD.

**Trial.** September 11, & 12, 2017. Kierra Williamson, Princeton Williamson, and Michael Williamson, vs. Chicago Police Officer Wilfredo Ortiz, et al., Case No.: 14 CV 6397.

**Trial.** September 15, & 18, 2017. Lee Darnell Watson, vs. City of San Jose, et al., Case No.: 3:15-cv-04054.

**Deposition:** September 20, 2017. Aubrey Williams vs. City of Birmingham, et al., Case No.: 2:16-cv-00650-JEO.

**Deposition:** September 25, 2017, Douglas Cruse and Iveta Cruse, v. Jacob Emory Swigger, and Signal Hill Police Department, et al. Superior Court (Los Angeles County) Case No. BC602211.

**Deposition:** September 27, 2017. Lastenia Marizol Rodriguez, vs. City of Fontana, et al., Case No. 5:16-cv-01903 JGB-KK.

**Deposition:** September 28, 2017. Herbert O. Allen v. City of Santa Monica, et al, USDC Case No. 2:11-cv-10139 R-GJS

**Trial:** October 5, 2017. Graciela Herrera, et. al., v. City of Los Angeles, et al., USDC Case No.:2:16-cv-02719-DSF-SK.

**Deposition:** October 9, 2017. Dionne Smith-Downs, et al v. City of Stockton, et al. Case No. 2:10-cv-02495 MCE-GGH.

**Deposition:** October 12, 2017. Evangelina Gonzalez and Victor Gonzalez vs. County of Los Angeles, Deputies Adrian Dominguez, Steven Velasquez, et al., Case No.: 2:16-cv-07018

**Deposition:** October 13, 2017, & December 15, 2017. Felipe Navarro, et al., vs. State of New Mexico, et al., Case No.: 2:16-cv-01180 MCA/CG.

**Trial:** October 17, 2017. Mayumi Donaldson, et al. v. Deputy U.S. Marshal Michael Hall, et al. Case No. 3:15-cv-00908 BAS-KSC.

**Deposition:** October 19, 2017. Giselle Genesis Lopez, et al v. City of Inglewood, et al. Superior Court (Los Angles County) Case No. Case No. BC563203.

**Trial.** October 25, 2017.Randy Conan v. City of Fontana, et. al. Case No. 15:16-cv-01261.

**Trial.** October 27, 2017. Estate of Manuel Diaz, Genevieve Huizar, v. City of Anaheim, et al. USDC Case No. 12-01897 JVS (RNBx).

**Trial.** November 7, 2017. William Mears, et al., v. City of Los Angeles, Case No.: CV 15-08441 JAK (AJWx).

**Trial:** November 15, 2017. Shellabarger et al, v. Dicharry et al, Case No. 13-cv-00188-TLN-CMK.

**Deposition:** November 21, 2017. Heleine Tchayou, et al. v. City of Los Angeles, et al., Case No., 16-cv-06073-TJH-MRW

**Deposition:** November 27, 2017. Monica Ortiz, et al. v. City of Rialto, et al., Case No. 5:16-cv-01384-JGB. (KSx).

**Deposition:** December 1, 2017. C.R. Co-Successor-in-Interest to Decedent Rakeem Rucks, et al., vs. City of Antioch, et al., Case No.: C16-03742 JST.

**Trial:** December 8, 2017, Sammy Sanchez, et al v. City of Tucson, et al. USDC Case No. 72-1576857.

**Deposition:** December 11, 2017. Estate of Roshad McIntosh, v. City of Chicago, et al. USDC Case No. 1:15-cv-01920

**Deposition:** December 14, 2017. Taylor Swift vs. David Woo, Vera Hicks, et al. USDC Case No.: 3:17-cv-00866-VC.

**Deposition:** December 18, 2017. Domingo Davis, Jr., vs. City of Santa Clara and Cuong Phan, Case No. 5:15-CV-05603-EJD.

**Deposition:** December 27, 2017. Estate of Pierre Loury v. City of Chicago, et al. USDC Case No. 1:16-C-04452.

**Trial:** January 11, 2018. Giselle Genesis Lopez, et al v. City of Inglewood, et al. Superior Court (Los Angles County) Case No. Case No. BC563203.

**Deposition:** January 12, 2018. Filiberto Valencia, Sr., et al., vs. City of Stockton, et al., Case No.: 2:16-cv-02081-JAM-AC.

**Deposition:** January 16, 2018. Edmon Washington v. City of Los Angeles, et al., Case No. 2:17-02829-PA (FFMx)

**Deposition:** January 22, 2018. Shainie Lindsey, et al., vs. City of Pasadena, et al., Case No.: CV 16-8602 SJO (RAOx).

**Trial:** January 24, 2018. Penelope Armstrong, v. County of Los Angeles, et al., Superior Court Case No.:BC528453

**Deposition:** January 30, 2018. Joe Robles and Elvira Robles vs. Aransas County, Texas: Matthew Campbell Individually, Civil Action No.: 2:15.

**Trial:** February 1, 2018. S.B. a minor, et al (Brown), v. County of San Diego, et al., Case No. 14CV0072, JAH KSC.

**Deposition:** February 1, 2018.. Jenny Tucker, et al., v. The County of Riverside, et al., Case No.: 5:16-CV-02275-JGB (DTBx).

**Trial:** February 7, 2018. People v. Gilberto Fajardo. Superior Court, State of California, (Kern County). Case No. BF160536A

**Deposition:** February 8, 2018. Archibald et al. v. County of San Bernardino et al. USDC Case No. CV 16-01128 AB (SPx). Mr. Dale K. Galipo

**Deposition:** February 12, 2018. Estate of Johnny Martinez, et al. v. County of Los Angeles, et al., Superior Court, State of California, (Los Angeles County), Case No. BC579140 MPL (Dept

34).

**Deposition:** February 14, 2018. Maria Hernandez; A.J., Jr., et al, . City of Los Angeles, et al Case No. 2:16-c-02689 AB (JEMx).

**Deposition:** February 15, 2018. Marc Alan Corbin, v. County of Los Angeles, et al., Superior Court, State of California (Los Angeles County), Case No. BC 512036

**Trial:** February 22, 2018. Maria Hernandez; A.J., Jr., et al, v. City of Los Angeles, et al. Case No. 2:16-c-02689 AB (JEMx).

**Deposition:** February 23, 2018. Robert Ayala, vs. Aransas County, Texas and Anthony Ciarletta, In The United States District Court For The Southern District of Texas Corpus Christi Division, Case No. 1:15

**Hearing:** March 7, 2018. People v. Michael David Suyssman, Superior Court, State of California (Los Angeles County), Case No. M232634DV.

**Trial:** March 13, 2018: April 10, 2014. Chien Van Bui, et al, vs. City and County of San Francisco, et al. USDC Case No. CV 11-04189 LB.

**Deposition:** March 19, 2018. Kevin Foy vs. Pulaski County, Arkansas, Austin Callahan, et al., Case No.: 4:17-cv-358-BSM.

**Deposition:** March 23, 2018. Anthony Wilson, et al., vs. City of Douglasville, GA, et al.., Case No.: 1:17-cv-00634-ELR.

**Trial:** March 26, 2018. Adolfo Garcia, et al v. William Davidson, et al. Superior Court (San Diego County) Case N0. 37-2014-00021070 CU-CR-CTL.

**Deposition:** March 27, 2018. Jane Doe vs. County of Fresno, et al. Superior Court State of California, (Fresno County) Case No. 16CECG03273

**Deposition:** March 28, 2018. Phillip Murry v. North Las Vegas Police Department, etal. Case No.: 2:17-cv-00157-APG-CWH.

**Deposition:** April 5, 2018. Alma Ramirez, et al, v. City of Gilroy, et al. Case No. 5:17-cv-00625 HRL

**Deposition:** April 12, 2018. Melane Jackson v. City of Los Angeles, et al., Superior Court, State of California (Los Angeles County) Case No. BC609513.

**Deposition:** April 17, 2018.1701. Leticia Solis, et al, v. City of City of Los Angeles, et al. Case

No. 2:17-cv-02352, AB-PJW

**Deposition:** April 19, 2018. Jesse Sanchez, v. City of Stockton, et al. Superior Court State of California (San Joaquin County), Case No. CV-2015-0006499.

**Trial:** April 20, 2018. Ethan Morse vs. County of Merced, et al., Case No.: 1:16-CV-00142-DAD-SKO

**Deposition:** April 26, 2018. Marco A. Figueroa vs. City of Casa Grande, et al., Case No: 2: 16-CV-03275-ROS

**Deposition:** April 27, 2018. Tanya A., et al., v. City of San Diego, et al., Case No.: 3:14-cv-01942-L-RBB, and Jane Doe, v. City of San Diego, et al. Case No. 14cv1941-L-AGS.

**Trial:** April 30, 2018. Melane Jackson v. City of Los Angeles, et al., Superior Court, State of California (Los Angeles County) Case No. BC609513.

**Trial:** May 1, 2018. Estate of Gustavo Najera, et al. v. City of Anaheim, et al., Case No. 8:16-CV-01243 JLS (JCG).

**Trial:** May 3, 2018. Heleine Tchayou, et al. v. City of Los Angeles, et al., Case No., 16-cv-06073-TJH-MRW.

**Deposition:** May 8, 2018. Amber Wallisa, v. City of Hesperia, et al., Case No.: 5:16-cv-2638.

**Trial:** May 10, 2018. The People of the State of California v. Michael David Sussman. Case No. M232634DV.

**Deposition:** May 11, 2018. Rosamanda Flores vs. The City of Concord, et al., Case No.: 4:15-cv-05244-PJH, and Rosamanda Flores vs. The City of Concord, et al., Case No.: 4:17-cv-05810-PJH (Combined by the Court).

**Deposition:** May 18, 2018. Estrella Lysandra Zayas vs. State of California, et al., Case No.: 3:17-CV-02739-EMC.

**Deposition:** May 22, 2018. Denise Garcia vs. Harris County, Texas, et al., Case No.: 4:16-cv-2134.

**Trial:** May 24, 2018. Graciela Lopez Franco, et al, v. United States, et al. Case No. 15-cv-2626 - JM (RBB).

**Deposition:** May 29, 2018. Royce Belcher vs. Williamson County, Texas Deputy Jeremy Ellison, individually, and Deputy Gauna, Individually, Case No.: 1:17-cv-00153-SS.

**Deposition:** June 4, 2018. Cynthia Briones, et al., v. City of Ontario et al., Case No.: 5:17-cv-00590-DMG-JPR.

**Deposition:** June 5, 2018. E.H., (Martin Hurtado deceased) et al. v. City of Long Beach, et al. Case No. 2:16-v-09641-SJO (KSx).

**Deposition:** June 6, 2018. R.J. v. City of Los Angeles, et al., Case No. 2:16-CV-07232 CBM (Skx).

**Deposition**: June 11, 2018. Chandra Jacquez individually, and as successor-in-interest to Richard Jacquez (deceased), v. City of San Jose, et al. Case No. 5:16-CV-5343. NC.

**Deposition:** June 12, 2018. Kelly Carter vs. County of Alameda, et al., Case No.: 3:16-cv-05132-WHO.

**Trial:** June 14, 2018. Leticia Solis, et al, v. City of City of Los Angeles, et al. Case No. 2:17-cv-02352, AB-PJW

**Trial:** June 14, 2018, Alma Rosa Godinez, v. San Diego County, et al. Case No. 3:16-cv-00236 BAS-NLS.

**Trial**: June 19, 2018. Floyde Armbrester, v. City of Berkeley et al. Case No. 3:16-cv-04615.

**Deposition:** June 20, 2018. Ashley Lauren Watts vs. City of Newport Beach, Christine Maroney, Monica Aguilar, et al., Case No.: 8:17-cv-01099-AG (Skx).

**Deposition:** June 25, 2018. Matthew Francois, v. The City of San Diego, et al. Superior Court, State of California (San Diego County), Case No. 37-2016-00003251.

**Deposition:** July 12, 2018. Maurice Lallemand v. County of Los Angeles, et al., Case No. CV17-00781 JAK (SS)

**Trial:** July 19, 2018. Matthew Francois, v. The City of San Diego, et al. Superior Court, State of California (San Diego County), Case No. 37-2016-00003251, CU-OB-CTL.

**Deposition:** July 24, 2018. Cesar Cuellar, Sr. et al. v. City of Laredo (Texas), et al. USDC Case No. 5:17-cv-00076.

**Trial**: July 26, 2018. Jesse Sanchez, v. City of Stockton, et al. Superior Court State of California (San Joaquin County), Case No. CV-2015-0006499.

**Trial:** August 7, 2018. Tan Lam v. City of Los Banos, et al. Case No. 2:15-cv-00531 MCE, KJN.

**Deposition:** August 8, 2018. Dane Zeen, v. County of Sonoma, et al, Case No. Case No: 3:17-cv-02056-LB

**Deposition:** August 9, 2018. Aram Tagmazyan, Angela Tagmazyan, v. City of Los Angeles, et al. Superior Court (Los Angeles County) Case No. BC561908.

**Deposition** August 13, 2018. Marina Borawick, v. City of Los Angeles, et al. Case No. 2:17-cv-02036 BRO-JC

**Trial:** August 20, 2018. Dane Zeen, v. County of Sonoma, et al, Case No. Case No: 3:17-cv-02056-LB.

**Trial:** August 24, 2018. Gina Best and Shaun Lowrance, et al., vs. Virginia Beach Police Officers Ferreira, Roys, Thorson, and Ziemer, Case No.: CL17-1137.

**Trial:** August 29, 2018. People v, Jon Luthuli Larson, Superior Court State of California (Napa County), Case No. CR

**Deposition:** August 30, 2018. Wilson Ramos, As Administrator of the Estate of Jose A. Maldonado, v. Town of East Hartford, et al. Case No. 3:16-cv-00166 VLB

**Deposition:** September 5, 2018. Teresa Dominguez, et al, vs. City of Los Angeles, et al. Case No.: CV 17-04557 DMG (PLAx).

**Trial:** September 6, 2018. Chandra Jacquez individually, and as successor-in-interest to Richard Jacquez (deceased), v. City of San Jose, et al. Case No. 5:16-CV-5343. NC.

**Deposition:** September 7, 2018. Teresa Todero, as Special Administrator of the Estate of Charles Todero vs. City of Greenwood, Brian Blackwell, Renee Elliott, and Elizabeth Laut, Case No. 1:17-cv-01698-TWP-MJD.

**Deposition:** September 14, 2018. David P. Demarest vs. The City of Vallejo, et al. Case No.: 2:16-cv-0227-GEB-KJN.

**Deposition:** September 21, 2018. Taina Rozier, et al (Okwera Olango, deceased), v. City of El Cajon, et al. USDC Case No. 17-cv-347-BAS-NLS, and Case No. 3:17-cv-00089 BAS-NLS, and Lucy Olango, v. City of El Cajon, et al., Superior Court Case No. 37-2017-00005331 CU-PO-CTL

**Deposition:** October 9, 2018. Joseph Earl Wheeler vs. Graves County Kentucky and Graves County Sheriff's Department and Dewayne Redmon, et al., Case No.: 5:17-cv-38-TBR.

**Deposition:** October 11, 2018. Jimmy Brooks vs. City of Vallejo, et al., Case No.: 2:16-cv-02376-WBS - EFB.

**Trial:** October 19, 2018 and October 23, 2018. People v. Steve Rodriguez, San Bernardino Case No: MWV1507990.

**Trial:** October 31, 2018 and November 1, 2018, Alma Rosa Godinez, v. San Diego County, et al. Case No. 3:16-cv-00236 BAS-NLS.

**Trial:** November 2, 2018. Jenny Tucker, et al., v. The County of Riverside, et al., Case No.: 5:16-CV-02275-JGB (DTBx).

**Deposition:** November 6, 2018. Ramon Cortesluna, v. City of Union City Police Officer Manuel Leon, et al, Case No.: 3:17-cv-05133-JSC.

**Deposition:** November 7, 2018. Estate of Kevin Matthews, et al., vs. City of Dearborn (Michigan), et al. Case No. 2:16-cv-13763 GCS-SDD

**Deposition:** November 8, 2018. D.F., M.F., A.F., N.F., (Minors), Panfilo Flores, and Yolanda Flores, v. City of Anaheim, et al. Case No. 8:17-cv-01194 AG-JCG.

**Trial:** November 14, 2018: Estrella Lysandra Zayas vs. State of California, et al., Case No.: 3:17-CV-02739-EMC.

**Trial:** November 15, 2018. Teresa Dominguez, et al, vs. City of Los Angeles, et al. Case No.: CV 17-04557 DMG (PLAx).

**Deposition:** November 16, 2018. Roy Nelson III, Successor-in-Interest to Decedent Roy Nelson; Orenell Stevens, Individually, v. City of Hayward, et al. USDC Case No. 3:16-cv-7222

**Deposition:** November 20, 2018. Neftali Monzon, et al. v. City of Murrieta, et al. Case No. 2:17-cv-01371 ODW (Skx)

**Deposition:** November 21, 2018. Leticia Barron vs. State of California, Case No.: 8:17-cv-01275-JVS-KES.

**Deposition:** November 27, 2018. Estate of Juan Manuel Avila, JR., et al. v. City of Long Beach, et al. Case No. 2:17-CV-05067 AB JPR.

**Deposition:** November 29, 2018. Chris Mathis, v. Nicholas Stevens and Edward Black. USDC (Texas) Case No. 3:17-cv-1835-S.

**Deposition:** November 30, 2018. Trinidad Brown vs. Eddie Diaz, Eric Howard, Laertis Moraitis, and Daniel Villalobos, Case No.: 2:17-cv-01157-KJM-AC.

**Trial:** December 3, 2018 and December 4, 2018. Donna Lancaster, v. Kansas City Board of Police Commissioners, et al., Case No.:4:14-cv-00171-SOW.

**Deposition:** December 5, 2018. Ryan M. Larson vs. John L. Sander, et al., Case No.: 0:17-cv-00063.

**Deposition:** December 11, 2018. Leslie A. Merritt, Jr. vs. State of Arizona, et al., United States District Court, District of Arizona, Case No. CV17-4540-PHX-DGC

**Trial:** December 13, 2018. Leticia Barron vs. State of California, Case No.: 8:17-cv-01275-JVS-KES.

**Deposition:** December 14, 2018. Estate of Joseph Valverde (Isabelle Padilla), et al, v. Justin Dodge, and the City and County of Denver, Colorado, Case No. 1:16-cv-01703 MSK-KMT.

**Trial:** December 19, 2018. People v. Anthony J. McGaff. Superior Court, San Diago County, California, Case No. SCE379648, DA NO. MBQ014.

**Trial:** January 17, 2019. L. Alicia Rascon, individually, et al., vs. Clinton H. Brookins, et al. Case No.: 2:14-cv-00749-PHX-JJT.

**Deposition:** January 30, 2019.. Xaime Casillas v. City of Los Angeles, et al. USDC Case No. 2:16-cv-09606-TJH-GJS

**Deposition:** January 31, 2019. Tony Nunez, et al. v. City of San Jose, et al. Case No. 17-cv-03860 LHK.

**Deposition:** February 4, 2019, Kathryn Green (individually and as a representative of the Estate of Patrick Green, Deceased), David Green, vs. Harris County, Texas, Former Harris County Sheriff, et al., Case No.: 4:16-cv-00893.

**Deposition:** February 6, 2019. Sofia Valenzuela (Jose Romero), et al, v. City of Long Beach, et al. Superior Court Case No. BC672993.

**Deposition:** February 7, 2019. Rubia Rosaura Serna, et al. v. City of Bakersfield and Reagan Selman U.S. Dist. Court, Eastern District of CA - Case No. 1:17-CV-01290-LJO-JLT.

**Deposition:** February 11, 2019. Annice Evans (aka Ramos), et al. v. City of Vallejo, et al. Case No: 2:17-cv-01619-TLN-AC.

**Depositoin:** February 15, 2019 L.M., et al., vs. City of Redding, et al., Case No.: 2:14-CV-00767 MCE-AC.

**Trial:** February 20, 2019. Akrem Azzam vs. City of Houston, Texas, et al., Case No.: 4:17-cv-

1242.

**Trial:** February 22, 2019. Moises Palacios, Victoria et al., v. City of Los Angeles, et al., Case No.: 14-cv-09639-MJF (AJWx).

**Trial:** February 27, 2019. Russell Tenorio v. Brian Pitzer, et al., Case No.: 2012-CV-01295 LH/KBM.

**Trial:** March 4, 2019. Sofia Valenzuela (Jose Romero), et al, v. City of Long Beach, et al. Superior Court Case No. BC672993.

**Deposition:** March 5, 2019. Puente, an Arizona Nonprofit Corporation, et al, v. City of Phoenix, et al., Case No. 2:18-cv-02778-JJT.

**Deposition:** March 8, 2019. Lawrence, et al. v. Las Vegas Metropolitan Police Department, et al. (USDC Case No. 2:16-cv-03039-JCM-NJK)

**Deposition:** March 12, 2019. Estate of Omar Gonzalez, et al. vs . City of Los Angeles, Officer Eden Medina, et al., Case No.: BC660356.

**Deposition:** March 14, 2019. Jasmin Salcido, et al., vs. City of Whittier, et al., Case No.: 2:17-cv-8819-CBM (Asx).

**Deposition:** March 19, 2019. L.F., a minor, by and through Danisha Brown, and K.F., a minor, by and through Danisha Brown, vs. City of Stockton, et al. Case No.: 2:17-cv-01648-KJM-DB.

**Deposition:** March 25, 2019. Kevin DeCarlo, et al. v. City of Vallejo, et al. Case No. 4:18-cv-00109 JSW.

**Deposition:** April 5, 2019. Jacob Gorsky, and Olesya Gorsky, v. Harris County, Texas, et al. Case No; 4:16-cv-2877

**Trial:** April 11, 2019, &April 12, 2019. Estate of Omar Gonzalez, et al. vs . City of Los Angeles, Officer Eden Medina, et al., Case No.: BC660356.

**Trial:** April 15, 2019. The State of Arizona vs. John David Rothrock, Case No.: CR2016-137374-001.

**Deposition:** April 19, 2019. Estate of Mark Roshawn Adkins, et al. v. County of San Diego, et al. Case No 18-cv-0371-H-MDD.

**Deposition:** May 8, 2019. M.J.L.H. (Hurtado), et al, v. City of Pasadena, et al. Case No.: 2:18-cv-03249 JFW (SSx)

**Deposition:** May 20, 2019. Jayd Schroeder, v. Rialto Police Department. Case No. 5:18-cv-00427 SP.

**Deposition:** May 30, 2019 Mary H. Garcia, individually and successor-in-interest to Estate of Phillip Soto Garcia Jr., et al., vs. Sergeant Ayala; et al., Case No.: 5:15-cv-839- SJO (Asx).

**Trial:** June 5, 2019. Schroeder, Jayd v. Wright, Steven and Parcher, Nicholas, Case No. 5:18-cv-00427-SP.

**Deposition:** June 10, 2019. Jason Anderson, v. City of Vallejo, et al. Case No. 2:17-cv-00137-JAMDB.

**Trial:** June 24, 2019. Tony Nunez, et al. v. City of San Jose, et al. Case No. 17-cv-03860 LHK.

**Deposition:** July 8, 2019. Sierra Rivera, et al, v. County of Sacramento, et al. Case No.: 2:18-cv-00056 WBS EFB.

**Deposition:** July 19, 2019. John Gocke vs. United States of America, et al., Case No.: 5:16-cv-01560 MWF (DTBx).

**Deposition:** July 22, 2019. Dennis Todd Rogers, Jr., et al vs. County of Los Angeles, et al., Case No.: 2:17-cv-05236-AB-E and Janet Williams vs County of Los Angeles, et al., Case No.: 2:17-cv-05640-AB-E.

**Trial:** July 25, 2019. E.V., A Minor, (Sanchez) et al, v. City of Anaheim, et al. Superior Court (Orange County) Case No: 30-2015 00770859 CU-MC-CJC.

**Trial:** July 29, 2019. Lucy Olango, v. City of El Cajon, et al. Superior Court. San Diego County (California) Case No. 37-2017-00005331 CU-PO-CTL.

**Deposition:** July 30, 2019. Yolanda Banks-Reed, et al, v. Bay Area Rapid Transit, et al., Case No.: 4:18-cv-05755-YGR.

**Deposition:** August 13, 2019. L.D. (DeLeon), et al. v. City of Los Angeles, et al. USDC Case No.: 2-16-cv-04626 PSG.

**Deposition:** August 22, 2019. Hwa Sung Sim vs. Monica Duran, et al, Case No.: 1:16-cv-01051-DAD-SAB.

**Deposition:** August 29, 2019. Betty Casey, et al. v. Richard W. Sanders, et al. USDC Case No: 7:17-cv-00145 KKC-EBA.

**Hearing:** August 30, 2019. People v. Joshua Justiniano. Superior Court, Ventura County, (California) Case No 2018008290.

**Deposition:** September 3, 2019. A.B. (Birtcher), et al. vs. County of San Diego, et al., Case No.: 3:18-cv-01541-MMS-LL.

**Trial:** September 5, 2019. People v. Joshua Justiniano. Superior Court, Ventura County, (California) Case No 2018008290.

**Deposition:** September 16, 2019. Joseph Lee Green, et al, v. City of Stockton, et al. Superior Court, San Joaquin County, Case No. 39-2011-00271041 CU-PO-STK

**Deposition:** September 18, 2019. Erwin Duero-Young vs. City of Oceanside, et al. Case No.: 3:18-cv-01569-H-MDD.

**Deposition:** September 23, 2019. Estate of Tyler S. Rushing, Scott K. Rushing, and Paula L. Rushing, vs. AG Private Protection, Inc.; Edgar Sanchez, City of Chico Police Department, et al., Case No. 2:18-cv-01692-MCE-AC.

**Deposition:** September 25, 2019. Tyrone Johnson, vs. County of San Bernardino, et al. Case No. 5:18-cv-01054-DMG-GJS

**Deposition:** October 1, 2019. Susan M. Huntzinger, et al., vs. Toby Coyle, Individually and in his Capacity as a Kentucky State Police Officer, Case No.: 5:17-cv-00184-KKC.

**Trial:** October 2, 2019. Hwa Sung Sim vs. Monica Duran, et al, Case No.: 1:16-cv-01051-DAD-SAB.

**Trial:** October 3, 2019, and October 7, 2019. Marcus Vaughn, et al. v. City of Los Angeles, et al. Case No. 2:16-cv-03086 AB-AJW.

**Deposition:** October 8, 2019. The Estate of Clemente Najera-Aguirre, et al, vs. County of Riverside, et al. Case No.: 5:18-cv-00762-DMG-SP.

**Deposition:** October 10, 2019. Daniel Andrews v. City of Henderson, et al. Case No.: 2:18-cv-01625-RFB-PAL.

**Deposition:** October 18, 2019. Darcy Harper vs. City of Merced, et al., Case No.: 1:18-cv-00562 LJO SKO.

**Deposition:** October 21, 2019. 1934. Estate of Athony Soderberg, et al, v. City of Los

Angeles, et al, Case No. 2:18-cv-03861 FMO-JPR.

**Deposition:** November 5, 2019. Nicholas K. Vieira, vs. Joseph Zalec, City of Antioch, County of Sacramento, Case No.: 3:18-cv-05431 VC.

**Trial:** November 6, 2019. Dionne Smith-Downs, et al v. City of Stockton, et al. Case No. 2:10-cv-02495 MCE-GGH.

**Deposition:** November 14, 2019. Ann Janette Cortez vs. City of Los Angeles, et al., Case No.: 2:18-cv-03248-CAS-JPR.

**Deposition:** November 18, 2019. Alexander Herd, et al. v. County of San Bernardino, et al. USDC Case No.: 5:18-cv-01244-AB-SP.

**Deposition:** November 19, 2019. Christopher D. Hall, Administratrix of the Estate of William Allen Young, vs. Russell Braun, et al. Case No.: 3:17-CV-00481-DJH-RSE.

**Deposition:** November 25, 2019. Adrian Miranda, vs. City of Casa Grande, et al., Case No. S1100CV201801191.

**Deposition:** November 26, 2019. Matthew Kass v. Alameda, et al.; Case No.: 3:18-cv-01302-CRB.

**Deposition:** December 6, 2019. Jennifer Landeros, Individually and as Successor in Interest to Daniel Landeros, et al., v. City of Elk Grove, et al. Case No.: 2:17-cv-02598-KJM-CKD.

**Deposition:** December 11, 2019. Richard William Kollin v. City of Tehachapi, et al. Case No, l:18-cv-00617-LJO-JLT.

**Deposition:** December 13, 2019. Richard Donastorg, vs. City of Ontario, et al. Case No.: 5:18-cv-00992-JGB-SP.

**Deposition:** January 6, 2020. James M. Lacy, et al. v. County of San Diego, et al. Superior Court (San Diego County), Case No. 37-2018-00017428, CU-PO-CTL

**Deposition:** January 13, 2020. J.M. et al., vs. County of Stanislaus, et al., Case No.: 1:18-cv-01034-LJO-SAB.

**Deposition:** Marco Contreras v. City of Compton, et al. Case No. 2:17-cv-08834 FFM.

**Trial:** January 15, 2020. Joseph Lee Green, et al, v. City of Stockton, et al. Superior Court, San Joaquin County, Case No. 39-2011-00271041 CU-PO-STK

**Deposition:** January 16, 2020. Puente, an Arizona Nonprofit Corporation, et al, v. City of Phoenix, et al., Case No. 2:18-cv-02778-JJT.

**Deposition:** January 22, 2020. Robert Strong v. City of Vallejo, Jarrett Tonn, Andrew Bidou, et al., Case No.: 2:18-CV-01246-WBS-AC.

**Trial**: January 24, 2020 and January 28, 2020. L.D. (DeLeon), et al. v. City of Los Angeles, et al. USDC Case No.: 2-16-cv-04626 PSG.

**Trial:** February 4, 2020 & February 5, 2020. Rebecca Brown, et al v. City of San Diego, et al. Case No. 15-CV-1583-DMS-WVG

**Deposition:** February 14, 2020. Zared Rodriguez Suarez, v. City of Salinas, et al., Case No.: 3:18-cv-056515-VC.

**Trial:** February 20, 2020. James M. Lacy, et al. v. County of San Diego, et al. Superior Court, San Diego County, Case No. 37-2018-00017428 CU-PO-CTL

**Trial:** December 26, 2019 & February 25, 2020. 1972. People v. Rafael Garcia and Raquel Garcia,. Superior Court (Riverside County) Case No. RIF 1702728.

**Trial:** February 26, 2020. Phillip Murry v. North Las Vegas Police Department, et al. Case No.: 2:17-cv-00157-APG-CWH.

**Trial:** February 11, 2020, February 12, 2020, February 21, 2020 and February 28, 2020. Yolanda Banks-Reed, et al, v. Bay Area Rapid Transit, et al., Case No.: 4:18-cv-05755-YGR.

**Deposition:** March 2, 2020: Monique Morgan v. City of Los Angeles and Leovardo Guillen USDC Case No.: 2:17-cv-06693.

**Deposition**. March 26, 2020. Gilberto Fajardo, v, City of San Bernardino, et al. Case No. 1:16-at-00364.

**Deposition:** March 31, 2020. Shane Horton, by his guardian ad litem, Yvonne Horton, v. City of Santa Maria, et al. Case No. 2:14-cv-06135 SJO-PJW.

**Deposition:** April 9, 2020, Bob Anderson, Administrator of the Estate of Charles Christopher McClure, et al., vs. City of Fulton, Kentucky, et al., Case No.: 5:18-cv-00032-TBR.

**Deposition:** April 16, 2020. Mora et. al. v. City Of Garden Grove et al. Case No: 8:19-cv-00418-JLS-JDE.

**Deposition:** April 20, 2020. Travis Mihalovic, v. City of Turlock, et al. Case No.

1:17-cv-01742 LJO-SAB.

**Deposition:** April 22, 2020. Charmane Henderson, individually and as successor-in-interest to Decedent Deautry Charles Ross, vs. City of Torrance, a municipal corporation, et al., Case No.: 2:18-cv-03918-MWF-E.

**Deposition:** April 28, 2020. Estate of Clifford Tucker, by Donald Scott Tucker, Personal Representative, vs. Marquette County, Keith Romback And Mark Ulvila, Case No. 2:19-cv-00078.

**Deposition:** May 4, 2020. Adorthus Cherry v. Modesto Police Sgt. James "Derrick" Tyler and Lt. Terry Seese, No. 1:18-cv-01268-LJO-EPG (EDCA).

**Deposition:** May 5, 2020. Charmane Henderson, individually and as successor-in-interest to Decedent Deautry Charles Ross, vs. City of Torrance, a municipal corporation, et al., Case No.: 2:18-cv-03918-MWF-E.

**Deposition:** May 12, 2020. Quanice Hayes, vs. City of Portland, and Officer Andrew Hearst, Case No. Case No. 3;18-cv-00988-AC.

**Deposition:** May 14, 2020. Jason B. Perkins, Plaintiff, v. City of Modesto, et al., Case No.: 1:19-cv-00126-LJO-EPG.

**Deposition:** June 2, 2020. Antony Jackson, et al. v. City of Los Angeles, et al. Case No. 2:19-CV-02254-GW-RAO.

**Deposition:** June 4, 2020. Araceli Flores (Juan Barillas), v. City of Los Angeles, et al. Case No. 2:18-cv-09936.

**Deposition:** June 9, 2020. AGG a minor, et al. v. City of Hayward, et al. Case No.: 4:19-cv-00697 DMR.

**Deposition:** June 12, 2020. Remi Hamilton, et al. v. City of Covina, et al. Case No.: 2:18-CV-09822 JAK (MAAK).

**Deposition:** June 15, 2020. Wilbert Winchester, v. Oakland Housing Authority, et al. Case No. 3:19-cv-02653-JCS.

**Deposition:** June 24, 2020: Samuel Kolb, et al, v. Placer. County, et al. Case No. 2:19-cv-00079 DB.

**Deposition:** June 30, 2020. Thomas Irwin plaintiff, v. Officer J. Santiago, in his individual capacity, Officer R. Roberts, in his individual capacity, Officer B. J. Ivy, in his individual

capacity, and City of Garland, Case No.: 3:19-cv-2926-B.

**Deposition:** July 6, 2020. Michael Scott Taylor, et al., v. Calaveras County, et al. Case No. 1:18-at-00403, BAM.

**Deposition:** July 9, 2020. Anyka Harris, et al. v. City of Tulare, et al. Case No. 1:18-cv-01135, LJO-SKO .

**Deposition:** July 13, 2020. Tammy Shidler and Gary Shidler v. County of San Bernardino USDC Case No. 5:19-cv-00503-CAS-SHKx.

**Deposition:** July 17, 2020. The Estate of VU ANH NGO, et al. v. County of Riverside, et al. Superior Court Case, RIC 1902381.

**Deposition:** July 20, 2020. Sheldon Lockett et al. v. County of Los Angeles, et al. Case No. 2:18-cv-05838 PJW.

**Trial:** August 12, 2020. James Adams, v. State of California, et al. Case No. 3:16-cv-02161 W-NLS.

**Deposition:** August 18, 2020. Carlos M. Gomez, Sr. vs. City of Vacaville, a public entity, Vacaville Police Officer, William Boehm, et al., Case No.: 2:18-cv-02968.

**Deposition:** September 24, 2020. Black & Brown Liberation, et al (ACLU of Indiana), v. City of Fort Wayne, et al. Case No. 1:20-cv-00240 (Indiana) DRL-SLC

**Trial:** October 7 & 8, 2020; 1318. Christian Longoria, et al., v. Pinal County (Arizona), et al. Case No. 2:15 CV 00043 PHX SRB

**Deposition:** October 24, 2020. Susan Peck (Paul Mono deceased), et al. v. County of Orange, et al., Case No. 2:19-cv-04654.

**Deposition:** October 27, 2020. Jennifer Buenrostro-Briano, et al v. Farmersville Police Department, et al. Case No. 1:19-cv-01382 LJO-SAB.

**Trial:** October 30, 2020. Leslie A. Merritt, Jr. vs. State of Arizona, et al., United States District Court, District of Arizona, Case No.: CV17-4540-PHX-DGC.

**Deposition:** November 9, 2020. Florentina Pelayo, (Petrica Muntean), v. City of Anaheim, et al. Case No.:8:19-cv-02318, DOC (ADSx).

**Deposition:** December 4, 2020. Melanie Dunne, et al, v. City of Las Cruces (New Mexico), et al. Case No. D-307-CV-2018-02315.

**Deposition:** December 14, 2020. Cristobal Solano; M.H., et al. v. County of Orange, et al.; USCD Case No. 8:19-cv-00549-JVS-ADS.

**Deposition:** December 22, 2020. John F. Dunham v. County of Monterey, et al. Case No.: 3:18-cv-04467-EDL.

**Deposition:** December 28, 2020. Cameron Vincent, v. City and County of San Francisco, et al. Case No: 19-cv-0329..

**Deposition:** January 6, 2021. Rashid Adan vs. City of San Diego and Officer Jason Langley, Case No.: 3:19-cv-1523-LAB-AHG.

**Deposition:** January 11, 2021. Sabrina Paloni, et al. v.City of Albuquerque, et al. Judicial District Case No. D-202-CV-201800015.

**Deposition:** January 14, 2021. William Bernal, and Celia Bernal, Plaintiffs, vs. Sacramento County Sheriff Department, et al., Case No.: 2:19-cv-00482-MCE-AC.

**Deposition:** January 22, 2021. Tracy Jenkins, as Personal Representative of the Estate of Theoddeus R. Gray, et. al. v Tom Price, Jessie Smith, James Ziemiecki, Trevor Head, Travis Kaufman and City of St. Clair Shores, Michigan (19-cv-10383)

**Deposition:** January 27, 2021. Jose Magana, (Omar Magana), v. City of Los Angeles, et al. Case No. 2:19-cv-03631 CAS-AGR.

**Deposition:** February 1, 2021. Estate of Logan Johnsrud, et al. v. Deputy Nathan Dean and Wood County, Wisconsin., Case No. 20-CV-108.

**Deposition:** February 3, 2021. Harry Donald Lemly, Jr., v. California Department of Parks and Recreation, et al. Case No. 8:19-CV-01603 DOC DFM.

**Deposition:** February 9, 2021. Christopher Ramos. v. County of Alameda et al. Case No. 4:19-cv-05715 DMR

**Deposition:** February 10, 2021. Casmir Anumudu vs. David Salvador, Andrew Essig, et al., Case No.: 2:19-cv-04045-ODW.

**Deposition:** February 18, 2021. Abraam Sweiha. v. Alameda County, et al; Case No.: 3:19-cv-03098-LB.

**Deposition:** February 19, 2021. Albert Anthony Arteaga, v. City of Oakley, et al.. Case No.

3:19-cv-05725

**Deposition.** February 22, 2021. Jeannie Atienza, v Andrew Hall Case No.: 3:19-cv-03440.

**Preliminary Hearing**. February 23, 2021 and February 24, 2021. People v. Terrance Stangle Case No 20013301.

**Deposition:** February 26, 2021. D.T., a minor by and through his guardian Tanika Tyler vs. San Diego Metropolitan Transit Services, et al., Case No.: 3:19-cv-1523-LAB-AHG.

**Deposition:** March 3, 2021 James Stewart, et al. v. County of Yuba, et al., Case No.: 2:19-cv-01744-TLN-DB.

**Deposition:** March 4, 2021. Judy O'Neil, v. City and County of San Francesco, et al.; Case No.: 3:17-cv-07190-JCS.

**Deposition:** March 11, 2021. Vincent Henderson vs. Harris County Sheriff's Department, Rick Hickman, Michael Richard, Dan Richards, A/K/A Dan Richardson, and Deputy Brisco, Case No.: 4:18-CV-413

**Deposition:** March 18, 2021 Cynthia Ames, individually and as a successor in interest of Henry Simmons, deceased, v. County of San Bernardino, et al., Case No.: 5:18-cv-01362-SJO-FFM.

**Deposition:** March 19, 202 Zakhary Gabriel Mallett, v. County of Los Angeles, et al Case No.: 2:19-cv-8506.

**Deposition:** March 24, 2021. 2115. Lourdes Toman, et al. v. City of Fullerton, et al. Case No.: 8:20-cv-00046 DOC-KES.

**Deposition:** April 1, 2021. Matthew Burghardt, as guardian of Matthew B. Burghardt, and Christian Beard v. Officer Ezekiel Ryan, and Officer Kristopher London. Consolidated Case Nos.:5:18CV00325, and 5:18CV02788.

# Exhibit B

FORENSIC MEDICAL GROUP, INC.

Kelly A. Arthur-Kenny, M.D.
Arnold R. Josselson, M.D.
Mark A. Super, M.D.
Ikechi O. Ogan, M.D.

☒ AUTOPSY ☐ EXTERNAL EXAMINATION

**NAME: JUAREZ GONZALEZ, SANTANA** **CASE NO. 2017-3660 (MAD17-093)**

**POSTMORTEM DATE:** 08-22-2017 **TIME:** 08:45

**DATE OF DEATH:** 08-20-2017 **TIME:** 15:30

**AGE:** 29 **SEX:** Male **RACE:** Hispanic

## AUTOPSY FINDINGS:

1. Perforating gunshot wound of left upper back:
   - A. Indeterminate range-type entrance wound, left upper back.
   - B. Perforating fracture of left 8th rib.
   - C. Perforation of left lung.
   - D. Perforating fracture of left 2nd rib.
   - E. Transections of left subclavian artery and vein.
   - F. Exit wound, left supraclavicular area.
   - G. No projectile is recovered.
   - H. Wound path: straight back to front, and upward.

2. Gunshot wound of left lower back:
   - A. Indeterminate range-type entrance wound, lower lateral left back.
   - B. Tangential perforation of left thoracic wall with fractures of 10th through 8th ribs.
   - C. Laceration of left hemidiaphragm and contusion of left lung.
   - D. Small-caliber jacketed bullet recovered from anterior left chest wall.
   - E. Wound path: straight back to front, and upward.

3. Minor blunt impact injuries:
   - A. Abrasion of left chest.
   - B. Abrasion-contusion of medial left upper arm.
   - C. Small abrasion of right upper back and posterior left thigh.

**CAUSE OF DEATH: Gunshot wounds of back into chest.**

MASuper MD
Mark A. Super, M.D.
Forensic Pathologist

10-12-17
Date

This copy was prepared by the Madera County Sheriff's Office on: 1-9-18 for the official use of: CHP - Sgt Haller. Other ... and may not be revealed to any unauthorized persons. CONFIDENTIAL: UNLAWFUL RELEASE OR POSSESSION OF THIS INFORMATION

MAS/wcp
D: 08-22-17
T: 08-31-17
F: 10-10-17

The autopsy is conducted at the Madera County Sheriff-Coroner Morgue Facility in Madera, CA.
**Investigator:** Deputy Coroner M. Lind.
**Witnesses:** Detective Sergeant M. Mollet, Madera Sheriff's Office.
Investigator J. Banta, California Highway Patrol.
Lieutenant W. Spears, DA Investigator, Madera County District Attorney's Office.
Assistant District Attorney A. Hill, Madera County District Attorney's Office.
Detectives J. Noland and L. Padgett, Madera County Sheriff's Office.
Supervising Deputy Coroner S. Clark, Madera County Sheriff's Office.
Deputy Coroners M. Lind and M. Davis, Madera County Sheriff's Office.
**Autopsy assistants:** Deputy Coroners S. Clark, M. Lind and M. Davis.

**IDENTIFICATION:**

The body is unidentified at the time of the autopsy. The body is received encased in a black vinyl body bag locked with red flex-tie containing a placard labeled JOHN DOE #17-3660. There is also a plastic red seal locking the body bag - #069937. An orange coroner's type identification bracelet encircles the right ankle, labeled JOHN DOE #17-3660.

**EVIDENCE OF MEDICAL INTERVENTION:**

EKG pads are on both pectoral areas and both sides of the abdomen. A plastic Ambu bag mask is around the neck on a strap. Bloodstained gauze lies near a gunshot wound on the left subclavicular area. Apparent bloodstained tissue is adhered to the left side of the head.

**CLOTHING:**

The following clothing items are on or about the body:

1. White sneakers - brand Air Jordan, size 9 ½. These have drop-like bloodstains on the tops of both shoes. No gunshot defects.

2. Faded blue jeans that are pushed down to the hips, brand Levi Strauss, size 36 x 32. A black belt is in place in the belt loops, but the buckle is undone. The waist button is undone and the zipper is half-down. This garment is generally soiled from dirt. Bloodstains are on the left upper front. Both pant legs are partially cutaway. Bloodstains are on the posterior waistband area and left seat. In the left front pocket is 37¢ in change.

3. Black half-socks. These are dirty, but without significant defects.

4. Gray boxer-briefs are in place, brand Russell. The size is not labeled. The left front pant leg is bloodstained. A large tear is on the inner surface of the left pant leg.

## EXTERNAL EXAMINATION

The partially clothed, unembalmed body is that of a normally developed, adequately nourished, Hispanic male who appears to be approximately 25-40 years of age. The body measures 66 inches long and weighs 144 pounds (after removal of clothing, medical appliances and removal

of the body from the body bag). Rigor mortis is fully developed in the cold body. The face is covered by bloodstains admixed with apparent soil. Rivulets of dried blood emanate from gunshot wounds of the upper back and left subclavicular region. Smudged dried bloodstains admixed with soil are on the anterior torso. The right hand is literally covered by dried caked blood. Bloodstains are also on the left arm. Two horizontal rivulets of dried blood course from a gunshot wound of the right back onto the right flank and lower abdomen. Patchy areas of skin slip involve the right lateral arm, right lateral torso, and dorsal left arm. Some of these exhibit secondary drying discoloration of exposed dermis. There are also clusters of brown spotted lesions on the left subclavian area and left forearm attributed to postmortem insect activity. Red discoloration involves the legs and distal arms consistent with postmortem thermal injuries. Lividity is non-blanching.

The scalp hair is black, straight and cropped short, averaging approximately 2 cm long. Facial hair consists of a sparse black moustache and chin beard. The irides are brown and the corneas are cloudy. The sclerae and conjunctivae are unremarkable. No scleral hemorrhages or conjunctival petechiae. No peri-orbital cutaneous petechiae. Blood and or soil are in the nares and mouth. The nasal skeleton and facial bones are palpably intact. The lips are uninjured. The frenulum appears to have been remotely ruptured and secondarily healed. The gingivae are pale. The teeth are natural and in fair condition. The left ear lobe is remotely pierced once. A small mole is on the left cheek.

The neck is mobile but symmetric.

The chest is stable and symmetric. There is palpable subcutaneous emphysema on the left lateral chest wall attributed to gunshot wound described below. The abdomen is mildly scaphoid and soft. No abdominal surgical scars. The external genitalia are those of an uncircumcised adult male with bilaterally descended testes.

The extremities are symmetric without angularity or deformity. The fingernails are soiled but uninjured and clipped short. No clubbing of the digits. No hesitation-type scars on the wrists. On the ventral right forearm is a monochromatic tattoo of the name ARACELY. On the skin over the distal left ulna is a faint ovoid 1.5 cm remote scar. No needle tracks. The legs show no evidence of peripheral edema. The toenails are not dystrophic. On the anterior left thigh is a 3cm faint pigmented mole.

The posterior torso and anus are unremarkable for gunshot wounds described below, and numerous small postmortem ovoid brown marks consistent with insect activity.

**EVIDENCE OF INJURY:**

**1. Perforating gunshot wound of left upper back:** On the left upper back is a gunshot wound of entrance situated 10 cm to the left of mid-spine, 41 cm from the top of the head. The wound consists of a 0.5 cm ovoid hole with an eccentric marginal abrasion and beveling along the inferior edge. No soot deposition, gunpowder stippling or muzzle imprint is seen. The wound path perforates the skin and subcutis of the left upper back and enters the left chest cavity through a gaping ovoid perforation of the left chest cavity with fracture of the left 8th rib, associated with fresh hemorrhage. The wound path perforates the left lower lung lobe and then the left upper lobe, with associated fresh hemorrhage, and then exits the left chest cavity through a gaping ovoid fracture defect involving the lateral aspect of the left 2nd rib, associated with fresh hemorrhage. The wound path then perforates the left subclavicular region transecting the left subclavian artery and vein, with surrounding fresh hemorrhage. The wound path exits the left supraclavicular area through a 2 x 1.5 cm ovoid hole centered 11 cm to the left of mid-sternum and 28 cm from the top of the head. The edges of the hole are dried. Extending laterally from the hole is an irregular 1.5 cm abrasion. No projectile is recovered. The path of the wound is oriented straight back to front and upward at approximately 60 degrees.

**2. Gunshot wound of left lower back:** On the lower lateral left back is a gunshot wound of entrance situated 14 cm to the left of mid-spine, 57 cm from the top of the head. Surrounding the hole and extending onto the left lateral chest wall is a large area of red-purple ecchymosis with secondary postmortem green discoloration. There is a large amount of postmortem ant activity on the skin of the back, as well. The wound consists of a 0.7 cm ovoid hole with a wide 0.7 cm eccentric marginal abrasion along the medial edge. No soot deposition, gunpowder stippling or muzzle imprint is seen. The wound path perforates the skin and subcutis of the left lateral back and tangentially perforates the left thoracic wall resulting in a stitch-like group of perforating lateral fractures involving left ribs #10, #9 and #8, all associated with marked surrounding soft tissue hemorrhage and all within a large elongated laceration of the thoracic wall. In doing so, the lateral aspect of the left hemidiaphragm is lacerated with secondary herniation of intestinal viscera into the left chest cavity and contusion of the basilar left lower lobe. The wound path then penetrates into the subcutaneous soft tissues of the anterolateral left chest where a small-caliber bullet with copper-colored jacketing and a mushroomed nose is recovered. The bullet is recovered beneath the skin at a point 5 cm inferior to and 6 cm lateral to the left nipple, 45 cm from the top of the head. The path of the wound is oriented straight back to front, and upward at approximately 45 degrees.

**Blunt impact injuries:** On the lateral left chest is a semi-ovoid abrasion, 8x5 cm. On the right scapular area is a wavy linear abrasion, 6 cm long. Below that on the right scapular area is a 1 cm superficial abrasion. On the medial left upper arm is a superficial abrasion-contusion, 6 x 4.5 cm. On the upper posteromedial left thigh is a 4.5 cm abrasion-superficial laceration. Lateral to that on the posterior left thigh is a 1 cm abrasion, and below that on the posteromedial thigh is a punctate abrasion.

## INTERNAL EXAMINATION

### HEAD:

The scalp is reflected after making the usual intermastoid incision and is free of subcutaneous or subgaleal hemorrhages. The calvarium is intact. No epidural or subdural hemorrhages. The brain weighs 1280 grams and is of the usual configuration covered by glistening transparent leptomeninges with clear cerebrospinal fluid. The vessels at the base of the brain pursue their usual anatomic courses and are patent throughout without significant atherosclerosis, thrombosis, or aneurysms. No evidence of coning or herniation. Recent or remote traumatic lesions or other abnormalities are not noted on serial coronal sectioning in the fresh state. The ventricular system is symmetric and free of blood. No lesions are seen in the mid-brain, brain stem or cerebellum. The bones at the base of the skull are without evidence of fracture. The atlanto-occipital membrane is intact.

### NECK:

The hyoid bone and laryngeal cartilages are intact with flexible hyoid bone and laryngeal cartilages. The larynx and trachea are unobstructed and lined by grey-tan mucosa. No laryngeal mucosal edema. No anterior cervical soft tissue hemorrhage. The cervical spine is intact. No anterior prevertebral fascia hemorrhage.

### BODY CAVITIES:

See above under "Evidence of Injury". The body cavities are entered in the usual manner. Testing for free air in the pleural cavities is positive on the left, negative on the right. All cavities are free of excess or abnormal fluid accumulations or adhesions. There is a gaping 5 cm laceration of the lateral left hemidiaphragm with secondary herniation of much of the stomach, the splenic flexure of the colon, and the spleen into the left chest cavity. The right lung is partially expanded but the left lung is collapsed. Serosal surfaces are generally smooth and glistening.

### CARDIOVASCULAR SYSTEM:

The heart weighs 250 grams and is of the usual configuration covered by smooth glistening epicardium. Serial sections show firm red-brown fibrillar myocardium without recent or remote

infarcts. The heart walls are not thickened. The endocardium is unremarkable. The heart valves are normally formed, pliable and intact. No vegetations. The coronary ostia are in their usual locations and are patent. The coronary circulation is right dominant. The coronary arteries exhibit minimal atherosclerosis and are patent throughout, without thrombosis. The aorta is intact and exhibits mild atherosclerosis. No complicated plaques or aneurysms. The vena cava and pulmonary arteries are free of antemortem thrombus. The left subclavian artery and vein are transected by gunshot. The heart and great vessels contain scant residual fluid blood.

**RESPIRATORY SYSTEM:**

See above under "Evidence of Injury". The lung weights are: right – 410 grams, left – 220 grams. The pleural surfaces are smooth and glistening and the lungs exhibit the usual lobation with mild anthracotic pigmentation. There is a 7 cm, gaping perforating hole in the LLL and a 4cm gaping hole in the LUL, associated with fresh hemorrhage. The basilar edge of the LLL is contused. Otherwise, sections show soft and crepitant, pink-gray cut surfaces that are dry. Fresh hemorrhage is associated with injuries. No focal nontraumatic intrapulmonary lesions. The tracheo-bronchial tree is unobstructed and without mass lesions.

**LIVER AND PANCREAS:**

The liver weighs 1700 grams and is covered by a smooth intact capsular surface with blunt anterior margins. Sections show pale tan-yellow cut surfaces that display the usual lobular architecture and have a slightly greasy consistency. No focal intraparenchymal lesions. I can easily pass my thumb through 2 cm thick sections. The gallbladder contains approximately 5 ml of thin green-brown bile and the gallbladder mucosa is unremarkable. No stones. The bile passages appear patent. No portal lymphadenopathy. The pancreas is free of fat necrosis, fibrosis or hemorrhages.

**GASTROINTESTINAL SYSTEM:**

The tongue is without evident injury. The pharynx is unobstructed. The esophagus is intact and lined by gray-tan mucosa. The stomach contains 60 ml of pink-tan mucoid fluid with admixed fragmented food material, some of which is identifiable as bologna, sliced beef and vegetable material. No pill fragments or peculiar scent is noted. The gastric mucosa is mildly autolyzed, but intact without ulcers or masses. The duodenum and remainder of the small and large bowels are without evident mucosal abnormality. The colon contains soft green-brown feces without blood. The appendix is present.

**SPLEEN AND LYMPH NODES:**

The spleen weighs 60 grams and is covered by an intact blue-gray capsule. Sections show softened and pale red-brown parenchyma without focal lesions. No enlargement of mediastinal, lung hilar, mesenteric or para-aortic lymph nodes.

**ENDOCRINE SYSTEM:**

The adrenal glands are free of cortical masses or medullary hemorrhages. The thyroid is of the usual size, shape and consistency. No thyroid cysts or masses. The pituitary gland is unremarkable.

**UROGENITAL SYSTEM:**

The kidneys are of similar size and shape, each weighing 110 grams. The capsules strip with ease to reveal smooth cortical surfaces with persistent fetal lobation and mild pallor. Sections show uniform cortical thickness with distinct cortico-medullary junctions. The calices, pelves and ureters are unremarkable. The bladder contains 75 ml of clear straw-colored urine. The bladder mucosa is unremarkable. The prostate gland is not enlarged.

**MUSCULOSKELETAL SYSTEM:**

See above under "Evidence of Injury". The red-brown muscle is firm and without focal nontraumatic abnormalities. No visible or palpable fractures of the sternum, vertebral column, pelvis or long bones of the extremities. Multiple ribs are injured by gunshot as described above. The abdominal fat averages 2 cm in thickness.

**TOXICOLOGY:**

Samples of peripheral blood, vitreous humor, urine and gastric contents are retained.

**HISTOLOGY:**

None. Sections of all major viscera are retained in stock.

**PHOTOGRAPHS:**

Digital photographs are obtained of external findings and some internal findings.

**X-RAYS:**

Total anterior-posterior x-rays of the body are obtained. A lateral x-rays is also obtained of the head and neck. These reveal a snowstorm pattern of fine metallic densities in the left upper chest and shoulder area, and in the left lateral chest area, with prominent herniation of the gastric bubble and colon gas into the left chest cavity. A large metallic density is noted in the

left lower chest area/abdomen. This was the projectile that was recovered from the left chest wall. None of the other tiny metallic fragments are recovered. Multiple rib fractures are noted.

**EVIDENCE:**

DNA cards are obtained. The bullet recovered from the left chest wall is retained. The clothing is retained.

**FINISH TIME:**

11:15.

MAS/wcp
D: 08-22-17
T: 08-31-17



ra County Coroner's Office
Name: DOE, JOHN
): 08/20/2017 @ 1530 HRS
CASE # 17-3660 MAD17-093

# Exhibit C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
---o0o---

J.A.J., a minor, etc., et al.,)
) Case No.
Plaintiffs, ) 1:18-cv-01138-DAD-SKO
)
vs. )
)
State of California Highway )
Patrol Officer EFRAIN JIMENEZ )
(ID #18075), et al., )
)
Defendants. )
______________________________)

ZOOM DEPOSITION OF:
MARK SUPER, M.D.

February 26, 2021 at 2:05 a.m.

Before: CINDY M. HOOKS, CSR #10813

Taken via remote

MARK SUPER, M.D.,

the Witness herein, after having been administered the oath remotely by the court reporter to tell the truth, the whole truth, and nothing but the truth, testified as follows:

EXAMINATION

BY MR. SCHMIDT: Hi, good afternoon, Dr. Super. My name is Sanjay Schmidt and I'm co-counsel with Mr. Lagos, who I believe you spoke to in terms of setting of this deposition today. We represent the surviving son and mother of a man that is now deceased who was named Santana Juarez Gonzalez. How are you doing this afternoon?

A. I'm sorry. What?

Q. Oh, no. I just introduced myself and I asked how you're doing this afternoon.

A. I'm fine. Thank you.

Q. Thanks for joining us through Zoom. And so for the record, I'm appearing through this platform from San Francisco, and the parties have stipulated that we can conduct these depositions in this format. Sometimes the court reporter says that. So I'm just putting it on the record now.

Have you ever -- I'm assuming you've been

A. Yes, absolutely.

Q. Have you ever had to treat a patient that was suffering the effects of methamphetamine?

A. No, not that I recall. It's been many, many years.

Q. And I think that's all the questions I have for you. I'm sorry. One final question. In your -- you're not making any kind of determination in terms of -- based on your autopsy of Mr. Juarez how either quickly or slowly he died as a result of the gunshot wounds; is that correct?

A. Correct.

MS. ESQUIVEL: Okay. Thank you. I have no further questions.

FURTHER EXAMINATION

MR. SCHMIDT: Thank you.

Q. Doctor, just one quick question to verify one matter that was addressed. So as you testified initially when I was asking you questions before, nothing in this toxicology report that we see on the screen right now that you reviewed changed any of your opinions as to what the cause of death was in this case; is that correct?

A. That's correct.

STATE OF CALIFORNIA )
: ss
COUNTY OF STANISLAUS )

I, CINDY M. HOOKS, do hereby certify that I am a licensed Certified Shorthand Reporter, duly qualified and certified as such by the State of California;

That prior to being examined, the witness named in the foregoing deposition remotely appeared and was duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That the said deposition was by me recorded stenographically at the time and place herein mentioned; and the foregoing pages constitute a full, true, complete and correct record of the testimony given by the said witness;

That I am a disinterested person, not being in any way interested in the outcome of said action, or connected with, nor related to any of the parties in said action, or to their respective counsel, in any manner whatsoever.

DATED: June 22, 2021

________________________________

CINDY M. HOOKS, CSR #10813

# Exhibit D

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| J.A.J., ET AL., ) | |
| PLAINTIFFS, ) | |
| VS. ) | CASE NO.: 1:18-cv-01138 DAD-SKO |
| EFRAIN JIMENEZ, ET AL., ) | |
| DEFENDANTS. ) | |

VIDEOCONFERENCE DEPOSITION OF

JULIAN GONZALES

SANGER, CALIFORNIA

THURSDAY, FEBRUARY 4, 2021

REPORTED BY:

LAURA MATEO, C.S.R. 13410

JOB NO. 10077697

SANGER, CALIFORNIA

THURSDAY, FEBRUARY 4, 2021; 3:07 P.M.

THE REPORTER: Absent any objections from counsels, I will now remotely swear in the witness per Emergency Rule 11.

JULIAN GONZALES,

having been first duly placed under oath, was examined and testified as follows:

EXAMINATION

BY MS. ESQUIVEL:

**Q. Good afternoon, Mr. Gonzales. My name is Diana Esquivel, as I introduced myself before we got started. I'm also the individual with whom you have been in contact with in the past -- or who has been contacting you in the past week or two about your deposition. We are here in connection with a lawsuit that arises from a shooting incident at the Branch & Vine which is known as "The Red Barn" in Madera on August 20, 2017. And it's my understanding that you were at The Red Barn on that date and witnessed the incident. This is the reason**

**is in front of The Red Barn, can we have an understanding that this would be the front of The Red Barn?**

A. Yes.

**Q. And when I say "the back," it will be the part that faces the field -- the open field that's behind The Red Barn.**

A. Yes.

**Q. Can we have that understanding?**

A. Yes.

**Q. So at the time that you became aware, were you outside in the back of The Red Barn?**

A. Yes. I was outside in the back, yes.

**Q. And what happened that drew your attention to the fact that there were law enforcement officers in the area -- in the immediate area of The Red Barn?**

A. There was a man walking towards the barn. He seemed, like, really drunk. He seemed drunk. He was incoherent. He seemed incoherent. We saw him and then that's when we saw the cops show up behind him. There was a little hill and we saw the cops behind him.

**Q. Can you estimate about how far this man -- who appeared to be drunk to you -- was from your**

**location when you became aware of him?**

A. I would say maybe around 200 yards.

**Q. So two football field lanes?**

A. Yeah. Seems about right.

**Q. Was he still at about that distance when you became aware of the officer who was coming up around -- that you identified --**

A. Yeah.

**Q. -- just a minute ago?**

A. Yes.

**Q. And what was it about the man's appearance that gave you the impression that he was drunk or incoherent?**

A. He was just walking like really awkwardly. He wasn't like -- he wasn't walking straight. He was kind of like stumbling. He just gave that impression that he wasn't in his mind. He wasn't coherent -- was incoherent. Sorry.

**Q. Was he saying something that you could hear from your location?**

A. Not that I could hear, no.

**Q. So when you say "incoherent," I guess I'm trying to understand -- I usually use that term when someone is speaking or saying something. So if you can just explain to me how you're using the term**

**"incoherent" to describe what this man was doing.**

A. Yes. So "incoherent," I would think that he's not mentally, like, in tune with reality. He's kind of like not -- he's not kind of like -- like in a regular state of mind.

**Q. I guess that's what I'm trying to see, if you can explain this to me to, you know, the best you can.**

A. Yeah.

**Q. Other than him not walking straight -- would "staggering" be a term that you would use --**

A. Yeah.

**Q. -- to describe it?**

A. Yes.

**Q. So other than not walking straight and what appeared to be staggering to you, what else about his demeanor indicated to you that he was incoherent and out of it?**

A. It was mainly just his walking because that's all I could really see. I mean, he wasn't at a distance where I could visibly see the details of him. I just kind of saw his body figure and the way he was walking.

**Q. And when you first became aware of this man, in what direction was he walking?**

A. He was behind him -- like a few feet behind.

**Q. Okay. And was he directly behind him or was he offset, either -- you know, if you're facing the man -- who got shot -- and you're facing the officer, was the officer to the left of the man who got shot or to the right or directly in the back?**

A. I can't remember that.

**Q. And about how many feet away, would you estimate, from the man was the officer?**

A. About, like, five to eight feet.

**Q. And just going back to some background information. I'm going to skip around a little bit. Actually, strike that. I'll ask you that later.**

**So you're 29 years old. You've had the opportunity to observe people before who may be intoxicated; right?**

A. Yeah.

**Q. And so from your perception, the man looked like he may potentially be drunk; right?**

A. Yeah.

**Q. And you said that you made that conclusion because the man did not have a steady gait; right? His walking pattern was not steady from what you perceived?**

A. Yeah. I was just using that in reference to the way that he was walking.

**Q. Did you have a chance to see what kind of shoes the man had on?**

A. Sorry. Could you repeat that?

**Q. Did you observe what kind of shoes the man was wearing or was he -- strike that. I'll withdraw that question.**

**Was the man wearing shoes as far as you could tell?**

A. I don't remember that.

**Q. Did you have an opportunity to see what kind of shoes he was wearing, if he was wearing shoes?**

A. No.

**Q. Did you have an opportunity to see what kind of -- a specific description of the pants that the man was wearing?**

A. No. Just -- I mean, they were just regular pants. I believe some blue jeans.

**Q. From what you could tell, did the man have clothes that were pretty clean or did the man, who was being followed by the officer, look like his clothes were dirty?**

A. I wasn't able to see the very detailed

stuffs.
**Q. From what you could tell -- and I don't want you to guess or speculate. But I'm just -- I want to know what you could tell from your observations. Did it look like the man had been walking or running for some period of -- for a substantial time prior to you seeing the man who was being followed by the officer?**
A. Just by speculation, possibly.
**Q. Did the man look sweaty to you?**
A. He looked like -- he looked dirty. You know, his clothes looked dirty.
**Q. So the man's clothes looked dirty. Did you have an opportunity to see if the man had any sweat coming down or anything like that?**
A. No. I couldn't see that, no.
**Q. What was the weather like that day out there?**
A. It was -- it wasn't a hot day. It was maybe in the 80's. Sunny.
**Q. So to your recollection, it was in the 80's?**
A. Yeah.
**Q. Were you under that canopy or were you on one side of it or the other?**

A. I was on one side.

**Q. Okay. So which side of the canopy were you on? If you were facing where the man was walking up and where the police officer was following the man -- so if you're facing that direction, were you on the left or the right side of that canopy?**

A. I was on the right side.

**Q. And was there anything else besides the man's unsteady gait that suggested to you that he might be drunk?**

A. No. That's all I kind of based it on, just his walk.

**Q. Did you see the man's facial expressions? Were you close enough to see that?**

A. No.

**Q. No? Okay. And then you made an observation that the man didn't look like he was mentally -- is that right?**

A. Yeah.

**Q. And given that you're studying social work -- and I'm sure you've had an opportunity in your lifetime to observe people who may have some kind of a mental health problem. Do you feel that you've had enough life experience in what you observed to observe somebody who may have a mental health**

**problem or may not be "mentally in tune" as you said?**
MS. ESQUIVEL: Objection as to form.
THE WITNESS: I can't really say that. I'm not, like, a professional or anything. But all I can go by is how he was walking, you know.
BY MR. SCHMIDT:
**Q. But you've seen -- have you ever seen anyone in your lifetime that had a mental health problem?**
A. Yeah. I would say possibly. They could possibly be something -- but I mean -- I don't know.
**Q. But whatever it was, something about what you saw in this man walking up towards the barn -- and who was being followed by a police officer -- on that day suggested to you that he was not in a regular state of mind; is that right?**
A. Yes.
MS. ESQUIVEL: Objection as to form.
BY MR. SCHMIDT:
**Q. And do you recall telling the Sheriff's detective -- who interviewed you at the scene of the accident -- that the guy who was shot by the police officer looked delusional?**
A. Yeah.

Q. And you told the detective that because that's -- that was the conclusion you drew at that time; right?
A. Yeah.
Q. And do you recall telling the Sheriff's detective that the man looked incoherent?
A. Yes.
Q. And when you told the Sheriff's detective that the man looked incoherent, what did you mean by that? How were you defining that?
A. Like -- if you were to ask him something, he wouldn't be able to give you a straight answer. You know, he wasn't in tune with reality. He was just kind of in his own mind.
Q. So, basically -- in other words, the man looked like he was out of it; right?
A. Yeah. Yeah. Definitely. Yeah.
Q. And if you recall, that's the phrase that you used in your interview. You used the word "out of it"?
A. Yeah.
Q. Do you recall that? Okay.
As far as you could tell, from what you observed of the man who was being followed by the police officer on that day, did that man look tired

**to you?**

A. Yeah, kind of. Yes. He looked like he could be tired.

**Q. Did the man, who was being followed by the police officer, look thirsty to you as far as you could tell?**

A. I couldn't really tell anything of the police officer.

**Q. No, no. I'm not talking about the police officer. But the man who was being followed by the police officer --**

A. Oh.

**Q. -- you could tell -- did that man look like he was thirsty?**

A. I don't think I could really have a conclusive answer about that.

**Q. Okay. Let me ask it in a different way. Did the man, who was being followed by the police officer, look like he had been running or walking in the heat for a long time?**

A. Possibly, yeah.

**Q. When you say "possibly," do you mean -- do you mean "yes" or -- I just want to get a sense of it.**

A. I would say that -- just by the way he was

walking -- I mean, the reason he could have been walking like that, it could have been -- he could have been running for miles. So, I mean, that's definitely an answer that could be --

**Q. And then just to be clear, when you estimated that it was maybe in the 80's on that day -- just to be clear, are you making the estimation that it was in the 80's outside, under or near the canopy area?**

A. Outside.

**Q. Okay. So like in the hot -- in the complete -- outside without any shade or anything cool?**

A. Yeah.

MR. SCHMIDT: Okay. I've got to figure out how to use this screenshare. It might be the browser that I'm using, because I switched.

MS. ESQUIVEL: I don't think the browser matters, because it's an app.

MR. SCHMIDT: It shouldn't but sometimes it does. But, anyway, we'll get it working.

BY MR. SCHMIDT:

**Q. So let me ask you this -- I know that the video was taken on Snapchat. Did you ever end up posting that video to Snapchat?**

I, Laura Mateo, C.S.R. No. 13410, Certified Shorthand Reporter, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness declared under penalty of perjury; that the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed under my direction and supervision; that the foregoing is a full, true and correct transcript of my shorthand notes so taken and of the testimony so given;

That before completion of the deposition, review of the transcript [ X ] was [ ] was not requested; [ ] that the witness has failed or refused to approve the transcript.

I further certify that I am not financially interested in the action, and I am not a relative or employee of any attorney of the parties, nor of any of the parties

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Dated this 19th day of February, 2021.

LAURA MATEO

# Exhibit E

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

J.A.J., ET AL., )
)
PLAINTIFFS, )
)
VS. ) CASE NO.: 1:18-cv-01138
) DAD-SKO
EFRAIN JIMENEZ, ET AL., )
)
DEFENDANTS. )
_______________________)

VIDEOCONFERENCE DEPOSITION OF

FERNANDO RAMIREZ

DOS PALOS, CALIFORNIA

THURSDAY, FEBRUARY 4, 2021

REPORTED BY:

LAURA MATEO, C.S.R. 13410

JOB NO. 10077698

DOS PALOS, CALIFORNIA

THURSDAY, FEBRUARY 4, 2021; 4:57 P.M.

THE REPORTER: Absent any objections from counsels, I will now remotely swear in the witness per Emergency Rule 11.

FERNANDO RAMIREZ,

having been first duly placed under oath, was examined and testified as follows:

EXAMINATION

BY MS. ESQUIVEL:

**Q. Good afternoon, Mr. Ramirez. I apologize. I got ahead of the court reporter there. My name is Diana Esquivel. We have not previously met, although we have communicated via telephone and e-mail in setting your deposition here today. And as I mentioned during those prior communications, I subpoenaed you because it's my understanding that you were a witness to a shooting incident that occurred at the Branch & Vine, also known as "The Red Barn" in Madera on August 20th, 2017. Is that your understanding as to why you're here**

**Q. But you just couldn't make out the words; is that correct?**
A. That -- I couldn't make out exactly what he was saying and then I could hear him.
**Q. So once you could make out the words that the officer was saying, what was he saying?**
A. He was yelling at the guy.
**Q. And what -- what was he yelling at the guy without a shirt?**
A. Just to stop and get on the ground.
**Q. And you heard him say that, "Get on the ground"?**
A. He said, "Stop. Get on the ground" -- over and over.
**Q. Okay. Did you eventually hear any shots being fired?**
A. Yes. I heard two shots.
**Q. How far away was the man without a shirt when you heard the first shot? How far away from the barn?**
A. It was probably a good 50 -- I would say in between 50 to 75 yards when I heard the first shot. And then he kept running. And then I heard the second shot. That's why I said everything happened between 75 -- before everything went down.

**Q. When you -- when you heard the first shot, could you estimate -- to the best that you can -- how far the officer was behind the man without a shirt?**

A. About 20, 25 yards.

**Q. Okay. Before you heard the first shot, other than the officer who was pursuing the man without a shirt, did you see any other officers in the orchard?**

A. Yeah. There was -- I want to say there was one or two more cops -- further back, though.

**Q. Okay. Before you heard the first shot, were there any law enforcement officers -- whether in vehicles or on their feet -- at The Red Barn?**

A. No.

**Q. After -- you mentioned that after you heard the first shot, the man without a shirt kept running; is that correct?**

A. Yes.

**Q. How much time passed -- or if distance is better for you to estimate -- had passed before you heard the second shot?**

A. I want to say five to ten seconds, maybe, if that.

**Q. When you heard the first shot and you saw**

**the man without a shirt continue to run -- just based on what you were seeing, did you think that the officer had missed?**

MR. LAGOS: Objection. Misstates the evidence.

THE WITNESS: I actually thought that he was shooting rubber bullets at him.

BY MS. ESQUIVEL:

**Q. Okay. And after you heard the second shot, what did the man without a shirt do?**

A. I just -- after the second shot, he took maybe two or three more steps and then he fell.

**Q. When you first became aware of the man without a shirt and the officer out on the open field, was there anything about the way the man without a shirt was running that appeared unusual to you or just not common?**

A. No. I mean, he was running from the cops.

**Q. Did it look like he was staggering?**

A. No.

**Q. Did he look like he was slowing down?**

A. Yeah. It looked like he was tired.

**Q. So based on what you were able to see, he was slowing down as far as his pace of running?**

A. Yeah. Once he started to -- once he turned

**there -- after the shooting -- said the words, "He shot him." Okay?**

A. Uh-huh.

**Q. Did you say that?**

A. Could have been me. I don't recall.

**Q. Did you ever see a gun in the individual's hands?**

A. No.

**Q. Did you ever see him reach for his right pocket area?**

A. I don't recall that.

**Q. Is it your testimony that after he was shot -- let me rephrase that.**

**After the first sound of a gunshot, is it your testimony that the person -- who ended up dying in this situation -- kept running?**

A. Yes.

**Q. Can you describe the -- strike that.**

**Can you tell us why you thought the decedent was tired?**

A. He had ran a long way. It was a pretty big orchard.

**Q. Any other reasons why you thought he was tired?**

A. He had probably been running from the cops

for a while.

**Q. What was the temperature like at the time, if you know?**

A. It was warm. It was -- I want to say 90's.

**Q. Did you hear the --**

A. I --

**Q. Yeah. Sorry?**

A. I would say mid to low 90's, yeah.

**Q. Okay. It's not unusual for that time of the year, is it?**

A. No.

**Q. Did you hear the officer -- the chasing officer -- issue a warning that if he didn't stop, he would be shot?**

A. Not that I recall. I just -- like I said, all I remember hearing him say is just "Stop. Stop. Get on the ground." I don't remember him ever issuing a warning, no, before he was shot.

**Q. And when you say -- we're talking now about the hands -- remember the questions that you were asked about the hands -- where were they as he was running? You said that they were down by his side in a running motion?**

A. Yes.

**Q. Could you specify what you mean by that a**

I, Laura Mateo, C.S.R. No. 13410, Certified Shorthand Reporter, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness declared under penalty of perjury; that the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed under my direction and supervision; that the foregoing is a full, true and correct transcript of my shorthand notes so taken and of the testimony so given;

That before completion of the deposition, review of the transcript [x] was [ ] was not requested; [ ] that the witness has failed or refused to approve the transcript.

I further certify that I am not financially interested in the action, and I am not a relative or employee of any attorney of the parties, nor of any of the parties

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Dated this 22nd day of February, 2021.

LAURA MATEO

# Exhibit F

**Panos Lagos, Esq. / SBN 61821**
**LAW OFFICES OF PANOS LAGOS**
5032 Woodminster Lane
Oakland, CA 94602-2614
510.530.4078
510.530.4725 (FAX)
E-mail: panos@panoslagoslaw.com

**Sanjay S. Schmidt (SBN 247475)**
**LAW OFFICE OF SANJAY S. SCHMIDT**
1388 Sutter Street, Suite 810
San Francisco, CA 94109
Tel. (415) 563-8583
Fax (415) 223-9717
E-mail: ss@sanjayschmidtlaw.com

Attorneys for Plaintiffs,
J. A. J., SANTANA JUAREZ JIMENEZ,
and TERESA GONZALEZ-VELAZQUEZ

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| J.A.J., a minor, etc., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>State of California Highway Patrol Officer EFRAIN JIMENEZ (ID #18075), et al.,<br><br>Defendants. | Case No.:1:18-cv-01138-DAD-SKO<br><br>PLAINTIFFS' SUPPLEMENTAL DISCLOSURES [F.R.C.P. 26(a)(1)] |

In compliance with Rule 26(a)(1) of the Federal Rules of Civil Procedure, Plaintiffs, J.A.J., a minor, through his Guardian ad Litem, SANTANA JUAREZ JIMENEZ, and TERESA GONZALEZ-VELAZQUEZ, disclose the following supplemental information relative to potential witnesses, while reserving their right to amend, supplement, and/or reasonably update their Disclosures during the course of this litigation through further formal and/or informal disclosure, formal and/or informal discovery, and/or through information obtained by Plaintiffs and/or Defendants pursuant to subpoena, or other discovery:

**A. Name, address, and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claim or defenses:**

2. All other percipient witnesses, including, but not limited to:

   a. Personnel and/or investigating officers of the California Highway Patrol, the Madera County Sheriff's Department, and/or the Coroner's Division of the Madera County Sheriff's Department, whose full names and contact information is known to opposing counsel, including, but not limited to:

   (3) On-Scene fire and emergency personnel including, but not limited to:

      a. Mark A. Super, M.D., Merced County Sheriff's Forensic Pathologist, 455 E. 13th Street, Merced, CA 95340; Tel: (209) 385-7369.

Dr. Super performed an autopsy on the decedent, Santana Juarez Gonzalez. His testimony may include, but may not be limited to, his observations, his autopsy, his findings, and his conclusions as to the locations of the entry wounds on the decedent's body from gun shots, and the cause of death.

      b. Michela S. Lind, Deputy Coroner, Madera County Sheriff's Office, 2725 Falcon Dr., Madera, CA 93637; Tel: (559) 675-7770.

Deputy Lind observed the decedent at the scene of the shooting after he had died, and was present for the autopsy performed by Dr. Mark Super. Deputy Lind's testimony may include, but may not be limited to, her observations, the autopsy, as well as the notations she made on the decedent's death certificate reflecting the findings in the Coroner's Report.

      c. Stephanie Clark, Senior Deputy Coroner, Madera County Sheriff's Office, 2725 Falcon Dr., Madera, CA 93637; Tel: (559) 675-7770.

Deputy Clark observed the decedent at the scene of the shooting after he had died, and was present for the autopsy performed by Dr. Mark Super. Deputy Clark's testimony may include, but may not be limited to, her observations, the autopsy, and any other related facts.

///

d. Vernon Franklin, Paramedic, Central California EMS, Pistoresi Ambulance, 113 N. R Street, Madera, CA 93637; Tel: (559) 673-8004.

(10) Central California EMS personnel including, but not limited to:

a. Vernon Franklin, Paramedic, Central California EMS, Pistoresi Ambulance, 113 N. R Street, Madera, CA 93637; Tel: (559) 673-8004.

Paramedic Vernon Franklin responded to the scene of the shooting with EMT Justin Arroyo, assessed the decedent, observed the decedent's condition, observed and was informed of the circumstances that led to his condition, and pronounced the decedent deceased at the scene, at 3:30 p.m., on the day of the incident that gave rise to this action. Paramedic Franklin's testimony will include, but may not be limited to, his assessment of the decedent's condition, his observations of the decedent, and his conclusions.

b. Justin Arroyo, EMT, Central California EMS, Pistoresi Ambulance, 113 N. R Street, Madera, CA 93637; Tel: (559) 673-8004.

EMT Justin Arroyo responded to the scene of the shooting with Paramedic Vernon Franklin, assessed the decedent, observed the decedent's condition, observed and was informed of the circumstances that led to his condition, and was with Paramedic Franklin when Mr. Franklin pronounced the decedent deceased at the scene, at 3:30 p.m., on the day of the incident that gave rise to this action. Mr. Arroyo's testimony will include, but may not be limited to, his assessment of the decedent's condition, his observations of the decedent, and his conclusions.

**B. A copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment:**

///

///

23. Nine (9) photos taken by attorney Panos Lagos on or about February 12, 2021, to show Ofc. Jimenez's potential view of the elevated roadway and Ofc. Martinez's vehicle. (Bates numbered P000253-P000261)

Dated: October 26, 2021

**LAW OFFICES OF PANOS LAGOS**
**-and-**
**LAW OFFICE OF SANJAY S. SCHMIDT**

Panos Lagos, Esq.
Attorneys for Plaintiffs,
J. A. J., SANTANA JUAREZ JIMENEZ,
and TERESA GONZALEZ-VELAZQUEZ

***PROOF OF SERVICE***

**VIA EMAIL**

(Fed. R. Civ. Proc. 5(b)(2)(E) and 28 U.S.C. §1746)

Re: *J.A.J., et al. v. Jimenez, et al.*, (Case No. 1:18-cv-01138-DAD-SKO)

I declare that: I am employed in the County of Alameda, State of California. I am over the age of eighteen years and not a party to the within entitled cause; my business address is 5032 Woodminster Lane, Oakland, CA, 94602.

Pursuant to the stipulation of the parties, under Rule 5(b)(2)(E) of the Federal Rules of Civil Procedure, on October 26, 2021, I served the attached:

***PLAINTIFFS' SUPPLEMENTAL DISCLOSURES [F.R.C.P. 26(a)(1)]***

on the parties in said cause VIA EMAIL, addressed as follows:

| | |
|---|---|
| XAVIER BECERRA, State Bar No. 118517<br>Attorney General of California<br>PETER A.MESHOT, State Bar No. 117061<br>Supervising Deputy Attorney General<br>DIANA ESQUIVEL, State Bar No. 202954<br>Deputy Attorney General<br>1300 I Street, Suite 125<br>P.O. Box 944255<br>Sacramento, CA 94244-2550<br><br>*Attorneys for Defendant Jimenez* | *E-mail: Diana.Esquivel@doj.ca.gov*<br>*E-mail: Cathy.Thao@doj.ca.gov*<br>*E-mail: crissy.rojas@doj.ca.gov* |

I declare under penalty of perjury that the foregoing is true and correct and that on the date stated above, this declaration was executed at Concord, California.

Alicia Hubbs
ALICIA HUBBS



















# Exhibit G




SHERIFF'S LINE DO NOT CROSS



# Exhibit H

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

J.A.J., et al.,

Plaintiffs,

vs. No. 1:18-cv-01138DAD-SKO

EFRAIN JIMENEZ, et al.,

Defendants.
_______________________________/

REMOTE DEPOSITION VIA BLUE JEANS

VIDEOCONFERENCE OF

ROGER CLARK

VOLUME I

Santee, California

Wednesday, June 2, 2021

Reported by:
KATHLEEN BACA
CSR No. 10267

JOB No. 10083115

Santee, California, Wednesday, June 2, 2021

10:03 a.m.

MS. REPORTER: Will all counsel please state your appearance and stipulate to the swearing in of the witness remotely.

MR. SCHMIDT: So stipulated. And this is Sanjay Schmidt, co-counsel for the plaintiff.

MR. LAGOS: Totally agree. Panos Lagos for plaintiff.

MS. ESQUIVEL: Diana Esquivel for defendant and noticing party. So stipulated.

ROGER CLARK,

having been first duly sworn, was examined and

testified as follows:

EXAMINATION BY MS. ESQUIVEL

MS. ESQUIVEL: Q. Good morning, Mr. Clark. I introduced myself before we got started. As I mentioned, my name is Diana Esquivel and I represent Officer Jimenez in this lawsuit brought by the family of Santana Juarez, who was fatally shot on August 20th, 2017.

And, I'm sorry, I'm just grabbing my notes

**pocket or what appeared to be reaching into his pocket as he was chasing him towards the Branch and Vine?**

A. Well, that's quite a lengthy question and the answer is, as I heard it from you, yes,

MR. SCHMIDT: I just want to reiterate my objections that it was an incomplete hypothetical and it calls for speculation as to what was in the mind of Jimenez and doesn't set forth all the relevant facts.

But go ahead and continue your answer.

THE WITNESS: I -- nothing has changed my five opinions as expressed, and I hope they clearly state that even at all that accepting it as true, he still would withhold fire until he has certainly -- certainty that Juarez has a gun and is going to use it.

MS. ESQUIVEL: Okay. I'm sorry. I want to make sure I heard you correctly because you -- the audio on my end glitched a little bit.

**Q. Did you say that Jimenez is to hold fire until he had certainty that Mr. Juarez had a weapon?**

A. That's exactly what I said.

MR. SCHMIDT: Objection. Misstates -- misstates the evidence. Misstates the testimony.

Can you read back the answer, Madam Reporter.

MS. ESQUIVEL: I'll ask the question again.

**Q. So, Mr. Clark, is it your testimony that**

Officer Jimenez should not have shot until he had certainty that Mr. Juarez had a gun.
Is that correct?
A. Yes.
Q. Okay. Where -- again, I had asked you earlier about those points about the POST domains and you said that there was nothing in there that said that an officer had to have visual confirmation of a weapon before employing deadly force.
So what are you relying on to opine that Officer Jimenez had to be certain that Mr. Juarez had a gun before he could employ deadly force?
A. This set of facts.
Q. What is it about this set of facts -- well, I guess under what set of facts -- strike that too.
So if the POST does not require certainty that a suspect has a weapon, but yet you're saying that here Officer Jimenez should have been certain that Mr. Juarez had a gun, what is it about the facts in this case that your -- it's your opinion that certainty was a requirement before the employment of deadly force?
A. Because I -- if I take your question as I understand it, if no such requirement existed, incidentally by POST and training, then all an officer would have to say is "Well, I thought he had a gun so I

shot him."  And that's nonsense.  That's clearly not what the POST training is.  Especially reading of Chapter 3 of Learning Domain 20, or the other sections about reverence for life.

So you can't give an excuse for shooting someone by alleging "Well, POST doesn't precisely say" -- "POST does not precisely say you have to see a gun before you shoot."  And all you need to do is say "I thought he had a gun" to justify the shooting.

So that's why I said the facts of this case don't lend itself to a justifiable shooting of Mr. Juarez.

**Q.    In Opinion No. 2, what is the purpose of that opinion concerning -- well, I'm sorry.  Hold on a second.**

**In Opinion No. 2, the last sentence you talk about -- the paragraph talks about tactics and tactical decisions made before legal force is used.  And then you conclude that paragraph -- the first paragraph of Opinion No. 2 by saying "In my opinion, a significant causal factor resulting in this shooting was the collective failure by Officer Jimenez to use or create tactical cover when they encountered and confronted Mr. Juarez."**

**Before I ask you more about that question.**

CERTIFICATE

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken remotely before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [X] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: June 15, 2021

Kathleen Baca

KATHLEEN BACA, CSR #10267